UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 19-CR-60153-COHN-SELTZER

UNITED STATES OF AMERICA

vs.

ADRIAN FIERROS

_____/

## DEFENDANT'S SENTENCING MEMORANDUM

Defendant, ADRIAN FIERROS ("Defendant" or "Mr. Fierros"), through his undersigned counsel, hereby submits his Sentencing Memorandum for this Honorable Court's consideration in support of a fifteen year prison sentence, as required by the minimum mandatories that apply under the Federal Sentencing Guidelines.

## INTRODUCTION

Mr. Fierros will appear before this Honorable Court on April 23, 2020 to be sentenced on two counts of production of material involving the sexual exploitation of minors, a Class B Felony, in violation of 18 U.S.C.A. § 2251(a); two counts of distribution of material involving the sexual exploitation of minors, a Class C Felony, in violation of 18 U.S.C.A. § 2259(a)(2); and four counts of sending extortionate interstate communications, a Class E Felony, in violation of 18 U.S.C.A. § 875(d). The minimum term of imprisonment is fifteen (15) years; and the maximum term of imprisonment is one-hundred and eight (108) years and fine of $2,190,800.00 dollars.

On January 8, 2020, pursuant to a Plea Agreement with the United States Attorney's Office, Mr. Fierros plead guilty to all counts with the understanding that he would receive a prison sentence of fifteen (15) years, up to the guideline sentence, and

that the Government has agreed not ask for more than forty (40) years. *See Plea Agreement,* between the United States of America and Adrian Fierros (January 8, 2020), attached hereto as "**Exhibit A.**" Thus, Defendant respectfully requests this Court order a sentence that departs downward from the advisory guideline range sentence recommended by the United States Probation Office, downward from the Government's recommendation, and sentence the Defendant to fifteen years in federal prison, followed by a period of supervised release.

## BACKGROUND

**Childhood and Family Information.** Mr. Fierros (who is currently twenty-one (21) years old) was born in Sylmar, California on June 3, 1998 to his mother, Maria Mancillas (who is currently fifty-one (51) years old), and his father, Miguel Fierros (who is currently fifty (50) years old). Though his parents only recently wed, they collectively raised Mr. Fierros and his two older brothers, Omar Fierros (who is currently twenty-three (23) years old), and Miguel Fierros, Jr. (who is currently thirty (30) years old).

As the youngest child in the family, Mr. Fierros looked up to his older brothers and maintained a close relationship with his mother, though she often treated him like a baby and coddled him to excess. To counter such coddling, his father was especially harsh in disciplining Mr. Fierros and often beat him while sparing his older brothers. Such discipline only worsened when his father drank to excess. This was the case for one particularly traumatizing incident that occurred when Mr. Fierros was eleven or twelve years old, in which his father became so enraged that he punched Mr. Fierros in the chest, threw him to the floor, and beat him with his fists. Though his brother Omar was present

and pleaded for their father to stop, he continued punching Mr. Fierros, which traumatized him, "as his father had never punched him" before. *See* Shannon Culberson, *Pre-Sentence Investigation Report*, U.S. Probation Office, Feb. 20, 2020 at 16, which has been attached hereto as "**Exhibit B**."

While Mr. Fierros maintained a rocky relationship with his parents throughout his childhood, he maintained a loving and supportive relationship with his brother Omar, which made the pair inseparable. However, like many siblings, there was a sense of sibling rivalry between Mr. Fierros and Omar, which was compounded by their closeness in age. This perceived need to compete made Omar aggressive and even caused him to act violently towards Mr. Fierros. For instance, Mr. Fierros recalls one particularly traumatizing incident where Omar lost a hockey game and got so angry that he smashed Mr. Fierros' head against a window, which caused it to break; and another incident where Omar lost a game and threw the hockey puck at him. *See* Exhibit B at 16. While his relationship with Omar was far from perfect, Mr. Fierros' relationship with his oldest brother, Miguel, was much, much worse.

For as long as Mr. Fierros can remember, his brother Miguel has mentally and physically abused the entire Fierros family, though he often targeted Mr. Fierros himself. For instance, Miguel often punched Mr. Fierros in the face, beat his body, and on one occasion he even hung Mr. Fierros from a staircase. *See* Exhibit B at 15-16. Those who knew about the abuse that Miguel inflected upon Mr. Fierros claim that "he is amazingly resilient to have survived it;" but believe such "traumatic experiences" may have "affected him emotionally" *See* Armando Campos, *Character Letter* (February 28, 2020),

attached hereto as "**Exhibit C**;" and Diana Deleon, *Character Letter* (February 27, 2020), attached hereto as "**Exhibit D**."

Worse than the physical abuse that Miguel inflected upon Mr. Fierros, was the substantial mental and emotional abuse that Miguel inflicted upon the entire family. For instance, Miguel frequently exhibited violent outbursts, which caused substantial damage to their family home, as he destroyed countless doors, windows, and walls. *See* Exhibit B at 15-16. Such behavior was only worsened by Miguel's subsequent addiction to crystal methamphetamines, which ultimately caused their mother to seek a restraining order against Miguel in 2016. *See id.*[1]

While Miguel's terrorization of their family was traumatizing in and of itself, Mr. Fierros was particularly traumatized by the graphic pornography videos that Miguel forced him to watch when he was just three years old. *Id.* Moreover, by the time Mr. Fierros had reached the third grade, Miguel had progressed to showing him pornographic videos that depicted Miguel and his then-girlfriend. *Id.* Miguel continued to show Mr. Fierros his personal pornographic videos throughout Mr. Fierros' teenage years. *Id.*

Given the problems Mr. Fierros faced at home and at school, one could understand why he periodically battled with depression. *See* Exhibit B at 18. However, such depression drastically worsened when his father was diagnosed with Amyotrophic Lateral Sclerosis ("ALS") in October of 2017. *Id.* at 15. Such news was especially hard for Mr. Fierros to handle as his brother Omar was his biggest support system and he was

---

[1] In addition to the restraining order entered against Miguel in 2016, the Pre-Sentence Investigation Report indicates Miguel has the following criminal history: burglary, petty theft, domestic violence, assault with a deadly weapon, and criminally insane. *See* Exhibit B at 15.

no longer living at home. *Id.* Though Mr. Fierros tried to work and provide financial support for the family, hie became overwhelmed by anxiety and depression, which prompted him to quit his job and care for his father full-time. *See id.* at 21-22.

Despite their prior differences, Mr. Fierros and his father grew closer following his ALS diagnosis. While Mr. Fierros' family members have always described him as a "person of good moral character, [who is] family oriented" and who is always "willing to go out of his way to help with anything and everything," he continues to demonstrate his love and dedication to his family, as he embraced a caretaking roll for his father and took on additional responsibilities. *See* Elena Gonzalez Mancillas, *Character Letter* (February 27, 2020), attached hereto as "**Exhibit E.**" *See also*, Exhibit C. Specifically, Mr. Fierros took responsibility for cooking and feeding his father meals, cleaning the home, while offering assistance with various household chores and caretaking duties. *See* Exhibit D; *see also*, Estela Cottle, Character Letter, attached hereto as "**Exhibit F.**"

Since his arrest in this case, Mr. Fierros has continued living with his mother and father in their Sylmar, California home. *See* Exhibit B at 16. His mother, Maria Mancillas, currently works as an aesthetician to provide financial support for their family. *Id.* at 15. However, since moving out of the family home, Mr. Fierros' brother, Omar, now lives in San Diego, California, works in the U.S. Marine Corps, and is married with no children; while his oldest brother, Miguel, now lives in Sylmar, California, works as a tattoo and canvas artist, and lives with his girlfriend and their child (though he also has two children from a prior relationship). *Id.* at 16.

While both of Mr. Fierros' family was shocked by the news of his current charges and convictions, they continue to standby and support him. *See* Exhibit B at 15. Thus, in March 2018, Mr. Fierros' parents submitted their residence to a home inspection by U.S. Probation Officer Gregory Kwan, who found their home to be suitable for supervision, as it is clean, free of weapons, and did not pose any safety concerns. *Id.* at 16.

**Mental and Emotional Health.**  Given the above, it's no surprise Mr. Fierros has a history of mental and emotional health problems and that many of these problems concerned his relationship with his brother, Miguel. For instance, when Mr. Fierros was in sixth or seventh grade, he began seeing a therapist due to recurring nightmares involving Miguel. *See* Exhibit B at 17. In these nightmares, Mr. Fierros often appeared to be very small in relation to his brother, Miguel, who would tower over Mr. Fierros and crush him with his feet. *Id.* While Miguel's violent and aggressive behavior continued to escalate, Mr. Fierros stopped attending counseling and became increasingly withdrawn from his family.

Throughout high school, Mr. Fierros continued to struggle mentally and emotionally, as he frequently fell in and out of depression. *See id.* at 17-18. This was partially due to the physical absence of his brother, Omar, who had moved out of the house and rarely visited. *Id.* at 17. This sense of loss was compounded by a bad breakup with Mr. Fierros' then-girlfriend, which only worsened his anxiety and depression. *Id.* at 18. During this time, Mr. Fierros felt lonely, lost, and even contemplated committing suicide, though he never attempted it. *Id.*

6

Though Mr. Fierros tried to pull himself out of his depression, by 2018 it had returned with full force. Despite the rocky relationship that Mr. Fierros maintained with his father throughout his childhood, Mr. Fierros was deeply saddened by the ALS diagnosis that his father received in October of 2017. *See* Exhibit B at 17-18. To make matters worse, as his father's condition deteriorated and his symptoms worsened, Mr. Fierros' brother, Miguel, brought drugs into their home and began stealing from their parents. *Id.* at 18. As Miguel's drug addiction worsened, so did his behavior, as he stole (and crashed) their parents' car, and then stole a family heirloom from their father to pawn it for drugs. *Id.* When police officers arrived at their home to investigate the reported thefts, Miguel became so enraged that he pushed their ailing father to the ground and chased their mother around the house. *Id.*

Eventually, Miguel's actions pushed their entire family into various levels of depression, and even caused their mother to suffer from Post-Traumatic Stress Disorder ("PTSD"), for which she received treatment from a licensed therapist. *See* Exhibit B at 18. While their mother was the only family member who obtained mental health treatment, she admits that Mr. Fierros "always talked about being depressed," and that she "never got him the help he needed." *See id.*; *see also*, Exhibit F. Thus, it is of no surprise that Mr. Fierros became increasingly isolated from his family and friends, as he felt he had nowhere to turn for support and guidance.

However, since his arrest in this case, Mr. Fierros has viewed the court-ordered psychological treatment as a silver lining, as it has finally allowed him to receive the treatment that he was longing for. Thus, on or about September 4, 2019, Mr. Fierros

enrolled with Anew Therapeutic Services (which is a "California Sex Offender Management Board approved provider") for general sex offender treatment, and began attending weekly individual sessions, which he finds extremely beneficial. *See* Manuel Mercado, *Treatment Summary* (January 1, 2020), which has been attached hereto as "**Exhibit G.**" As Mr. Mercado explained in his letter,

> This program's general sex offender treatment is based on the 'Good Lives Model' of sex offender treatment;" which uses "a strength-based approach designed to assist individuals with identifying the needs that have historically acted to inform their offense cycle (ultimately resulting in the offense itself) and finding adaptive alternatives around how such needs can be expressed and met in a healthy manner.

*Id.*

However, since Mr. Fierros is classified as a "pre-trial client," Mr. Mercado has focused his treatment on "addressing themes of grief and loss associated with his charges in addition to assessing for risk to self and others." *Id.* Despite months of weekly individual counseling sessions, Mr. Mercado maintains that Mr. Fierros continues to struggle "with fully comprehending and accepting the magnitude of the consequences associated with the charges he is facing *given his developmental mindset*, which seems *firmly embedded within an adolescent framework.*" (emphasis added) *Id.* Moreover, Mr. Mercado noted that this struggle "has given way to the onset of *moderate depression* and *significant anxiety* that impacts his day to day functioning." (emphasis added) *Id.*

In addition to the psychological counseling sessions that Mr. Fierros is required to maintain by this Court, in November 2019, he voluntarily underwent a psychosexual evaluation, which was conducted by Dr. Stephen I. Bloomfield, a licensed psychologist in

Jacksonville, Florida. *See* Dr. Stephen I. Bloomfield, Psychological/Psychosexual Evaluation Report, Bloomfield Psychological Services (November 16, 2019), attached hereto as "**Exhibit H**."

While Mr. Fierros told Dr. Bloomfield that he was "very happy" as a child, and "somewhat happy" as a teenager, Mr. Fierros also reported a number of incidents that he considered traumatic moments in his life. *Id.* at 2. For instance, during this evaluation Mr. Fierros confided in Dr. Bloomfield by confessing that he had been molested by a relative several times as a child and teenager. *Id.* at 2; 6-7. Additionally, Mr. Fierros described substantial psychological and physical abuse that he suffered at the hands of his parents. *Id.* at 2-3. Specifically, Mr. Fierros reported that his mother would "ignore him, yell at him, take away privileges, tell him that she was ashamed of him, make him feel that he had hurt her, embarrass him, or put him in 'time out;'" and that his father would "yell at him, make him feel like he hurt him," or resort to "spanking or slapping, pinching, ear or hair pulling, and shoving or pushing." *Id.* The fear of such punishment had a profound impact on Mr. Fierros, as it made him apprehensive and hesitant to approach his parents to discuss any problems that he was facing. *See id.*

Furthermore, as part of his evaluation, Dr. Bloomfield administered various tests, including (but not limited to) the Minnesota Multiphasic Personality Inventory test (which is a "psychometric instrument designed to provide scores on all the more clinically important phases of personality") and the Personality Assessment Inventory test (which is a "self-administered inventory of adult personality designed to provide information on critical clinical variables"). *Id.* at 4-5. Upon reviewing the results, Dr.

Bloomfield observed "elevations in a number of areas including significant issues with mental dullness and physical functioning, as well as brooding and *anxiety, a great deal of depression,* as well as the possibility of some *bipolar tendencies.*" (emphasis added) *Id.* at 5. Based on his observations, Dr. Bloomfield reported the following diagnostic considerations for Mr. Fierros: "Adjustment Disorder with Anxiety; Dysthymic Disorder, and Generalized Anxiety Disorder." *Id.*

Moreover, during this evaluation, Dr. Bloomfield interpreted and scored the Sexual Adjustment Inventory test, which "identifies sexually deviant and pedophilia behavior in people accused or convicted of sexual offenses." *Id.* at 6. Upon reviewing the results, Dr. Bloomfield noted that the "Impulsive Scale is in the *severe problem range*" and recommends "treatment that includes medication, individual, and group therapy." (emphasis added) *Id.* Consistent with the observations made by Mr. Mercado, Dr. Bloomfield noted that Mr. Fierros scored "*extremely high* in the Distress Scale both in terms of *anxiety* and *depression.*" (emphasis added) *Id.*

Thus, upon completing his evaluation, Dr. Bloomfield identified a number of psychological problems exhibited by Mr. Fierros that are in need of treatment. *Id.* Specifically, Dr. Bloomfield identified issues such as extreme impulsivity, anxiety and depression, which he believes need to be treated psychopharmacologically and therapeutically. *Id.* Dr. Bloomfield also recommends that Mr. Fierros complete a course of treatment, which involves psychosexual treatment on an individual and group basis. *Id.* at 8. However, it is important to note Dr. Bloomfield's ultimate conclusion that "the issues of young adult and adolescent brain development *certainly play a factor*" in the

10

decisions that lead to Mr. Fierros' arrest in this case, and that he is "*amenable to change* given the appropriate treatment." (emphasis added) *Id.*

**Education.** Though Mr. Fierros began elementary school on the standard academic track, it wasn't long before his teachers realized that he was struggling academically. Upon receiving numerous calls by concerned teachers, Mr. Fierros underwent a psychoeducational evaluation, in which he "scored in the below average to average range in most of the areas measured." *See* Exhibit H at 1. This evaluation also revealed that Mr. Fierros "has problems with focusing, listening, concentrating, and ignoring distractions." *Id.* This ultimately led to Mr. Fierros being diagnosed with Attention Deficit Disorder ("ADD"), for which he was afforded an individualized education program that allowed for easier courses and additional testing time. *See* Exhibit B at 21. This program greatly benefitted Mr. Fierros, as his grades improved such that he was able to attend Sylmar Charter High School, which is a science/math technology magnet school near his home in California. *Id.*

Though he initially struggled with the advanced magnet classes that he was placed into, Mr. Fierros' grades improved when he was placed into mainstream classes, which made for a timely graduation in 2016. *See id. See also,* Sylmar High School Diploma (June 2016), attached hereto as "**Exhibit I**." Despite his academic struggles, teachers considered Mr. Fierros to be "a likeable young man who was always respectful to staff and peers," and "a student who tried to better his situation and circumstances." *See* Irese T. Moxley, *Character Letter*, Sylmar Charter High School (February 3, 2020), attached hereto as "**Exhibit J**."

Upon graduating from Sylmar Charter High School in 2016, Mr. Fierros briefly attended Mission College in Santa Clara, California, though he later withdrew from classes to pursue various employment opportunities and assist his mother with the care of his father. *See* Exhibit B at 21.

**Employment History.** Upon withdrawing from college in late 2016, Mr. Fierros began working as a package handler for FedEx in Los Angeles, California. *See* Exhibit B at 22. While working in this capacity, Mr. Fierros was earning approximately $13.50 per hour. *Id.* However, over the next few months, Mr. Fierros experienced significant issues with anxiety and depression, which hindered his ability to perform the required employment tasks and prompted his resignation. *Id.*

Following a brief period of unemployment, Mr. Fierros began working as an aviation technician for HRD Aero Systems, Inc. in 2018. *Id.* at 21. While Mr. Fierros was grateful for the full-time position in which he earned approximately $1,000.00 per week, he struggled to meet the demanding expectations that were set out by his boss. *Id.* This caused Mr. Fierros a tremendous amount of stress and anxiety, which often caused him to break down and cry in the bathroom at work. *Id.* Due to the mounting stress and anxiety caused by his job and his father's ALS diagnosis, Mr. Fierros ultimately resigned from his position at HRD Aero Systems in early 2019, so that he could stay home and assist with the care of his father. *Id.*

**Financials.** Mr. Fierros has approximately $361.35 in assets ($300.00 in his personal checking account; and $61.35 in his personal savings account). *See Account Summary for Adrian Fierros*, Chase Bank, which has been attached hereto as "**Exhibit**

12

K." As noted in the Pre-Sentence Investigation Report, Mr. Fierros does not have any liabilities, which makes his net worth approximately $361.35. *See* Exhibit B at 22. Thus, the Report further indicates that Mr. Fierros does not have the ability to fully pay a fine that is rendered within the guideline range. *Id.* at 23.

**Substance Abuse History.** Though Mr. Fierros does not have a substantial history with substance abuse, there is evidence that he was introduced to drugs and alcohol at an early age. Specifically, Mr. Fierros recalls first drinking alcohol at the encouragement of his father and brother, sometime between fourth and sixth grade. *See* Exhibit B at 20. To the extent Mr. Fierros' substance abuse ever peaked, such peak would have occurred during his junior year of high school, when he reverted to drinking alcohol, and was encouraged to smoke marijuana by his brother, Miguel. *Id.* Though Mr. Fierros was initially able to limit his use of marijuana, by the time he was eighteen years old, he was smoking marijuana nearly every day after work. *Id.* This pattern continued for approximately six months, at which point Mr. Fierros quit smoking. *Id.* However, it should be noted that Mr. Fierros has not drank any alcohol or taken any illicit substances since his arrest, as evidenced by the urinalysis that was conducted on January 8, 2020, which returned negative results for the presence of any illicit substances. *Id.*

**Marriage and Children.** Mr. Fierros has never been married and does not have any children. While Mr. Fierros has engaged in heterosexual romantic relationships, it should be noted that he has never engaged in sexual intercourse, as he remains a virgin. *See* Exhibit B at 18-19. *See also*, Exhibit H at 7.

13

**Additional Mitigation.** Multiple family members and friends have written character letters on Mr. Fierros' behalf. These letters describe Mr. Fierros as a kind, generous, trustworthy, respectful young man, who has taken on the responsibility of caring for his father, and who has a great deal of potential for the future. *See* Collection of Character Letters Written on Mr. Fierros' Behalf, which have been attached hereto as "**Exhibit L.**"

## ARGUMENT IN FAVOR OF A DOWNWARD VARIANCE SENTENCE

Mr. Fierros respectfully requests this Honorable Court to depart downward from the Federal Sentencing Guidelines and consider the statutory mitigating factors in imposing the applicable fifteen-year minimum mandatory prison sentence. Given the unique set of facts and circumstances that surround this case, undersigned counsel respectfully requests this Court to give Mr. Fierros' case a unique review for sentencing purposes.

### FEDERAL SENTENCING PROCEDURE

A District Judge must first: (I) calculate the applicable sentencing Guidelines range; (II) allow both parties to present arguments in favor of what they believe to be the appropriate sentence; (III) consider all of the factors enumerated in § 3553(a), and clearly document the court's reasoning for the sentence it hands down. *Gall v. U.S.*, 552 U.S. 38, 53 (2007). If this procedure is followed, the only remaining question for appellate review is whether the sentence was "reasonable." *Id.* at 56. In reviewing whether a sentence is "reasonable," when it is outside of the Guidelines range, "appellate courts may therefore, take the degree of variance into account and consider the extent of a deviation from the

Guidelines. [The court] reject[s], however, an appellate rule that requires 'extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id.* at 47.

## I. ADVISORY GUIDELINES AND MAXIMUM SENTENCE

The advisory guideline imprisonment sentence is 1,296 months (or 108 years), based upon Mr. Fierros' total offense level of 43 and criminal history category of I. Mr. Fierros is facing a maximum sentence of one-hundred and eight (108) years imprisonment.

As indicated in the Presentence Investigation Report ("PSI"), the base offense level and enhancements assessed to Mr. Fierros under §§2G2.1 and 2G2.1(a) are as follows:

**Counts One, Three, and Five:** Production of Material Involving the Sexual Exploitation of Minors (Victim 1) [18 U.S.C.A. § 2251(a)]

Base Offense Level: Production of Material Involving the Sexual Exploitation of Minors 18 U.S.C.A. § 2251(a) – U.S.S.G §2G2.1(a)

**32**

Specific Offense Characteristics: The produced material involved a minor who had not attained the age of 12 years [U.S.S.G § 2G2.1(b)(1)]

**+4**

Specific Offense Characteristics: The Defendant knowingly engaged in distribution of such material [U.S.S.G §2G2.2(b)(3)]

**+2**

Special Offense Characteristics: The offense involved (A) the knowing misrepresentation of a participant's identity to persuade, induce, entire, coerce, or facilitate the travel of, a minor to engage sexually explicit conduct; or (B) the use of a computer or an interactive computer service to (i) persuade, induce, entire, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct [U.S.S.G §2G2.1(b)(6)(B)]

**+2**

Adjusted Offense Level (Subtotal):                              **40**

**Counts Two, Four, and Six:** Production of Material Involving the Sexual Exploitation of Minors (Victim 2) [18 U.S.C.A. § 2251(a)]

Base Offense Level: Production of Material Involving the Sexual Exploitation of Minors 18 U.S.C.A. § 2251(a) – U.S.S.G §2G2.1(a)

**32**

Specific Offense Characteristics: The produced material involved a minor who had attained the age of 12 years, but not attained the age of 16 years. [U.S.S.G § 2G2.1(b)(1)]

**+2**

Specific Offense Characteristics: The Defendant knowingly engaged in distribution of such material [U.S.S.G §2G2.2(b)(3)]

**+2**

Special Offense Characteristics: The offense involved (A) the knowing misrepresentation of a participant's identity to persuade, induce, entire, coerce, or facilitate the travel of, a minor to engage sexually explicit conduct; or (B) the use of a computer or an interactive computer service to (i) persuade, induce, entire, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct [U.S.S.G §2G2.1(b)(6)(B)]

**+2**

Adjusted Offense Level (Subtotal):                              **38**

**Count Seven:** Sending Extortionate Interstate Communications (Victims 2 and 3) [18 U.S.C.A. § 875(d)]

Base Offense Level: Sending Extortionate Interstate Communications, 18 U.S.C.A. § 875(d) – U.S.S.G §2B3.2(a)

**18**

Adjusted Offense Level (Subtotal):                              **18**

**Count Eight:** Sending Extortionate Interstate Communications (Victims 1 and 4) [18 U.S.C.A. § 875(d)]

Base Offense Level: Sending Extortionate Interstate Communications,
18 U.S.C.A. § 875(d) – U.S.S.G §2B3.2(a)

**18**

Adjusted Offense Level (Subtotal):                                                  **18**

Multiple Count Adjustment: Units are assigned pursuant to § 3D1.4(a),
(b), and (c). One unit is assigned to the group with the highest offense
level. One additional unit is assigned for each group that is equally serious
or from 1 to 4 levels less serious. One-half unit is assigned to any group
that is 5 to 8 levels less serious than the highest offense level. Any groups
that are 9 or more levels less serious than the group with the highest
offense level are disregarded.

| Count(s) | Adjusted Offense Level | Units |
|----------|------------------------|-------|
| 1, 3, 5  | 40                     | 1.0   |
| 2, 4, 6  | 38                     | 1.0   |
| 7        | 18                     | 0.0   |
| 8        | 18                     | 0.0   |

**2**

Greater of the Adjusted Offense Levels Above:                          **40**

Increase in Offense Level: The offense level is increased pursuant to the
number of units assigned.

**+2**

Combined Adjusted Offense Level: Determined by taking the offense
level applicable to the Group with the highest offense level and increasing
the offense level by the amount indicated above.

**42**

Chapter Four Enhancement: The offense of conviction is a covered sex
crime, neither § 4B1.1 (career offender) nor subsection (a) of § 4B1.5
applies and the defendant engaged in a pattern of activity involving
prohibited sexual conduct. As such, the defendant is a repeat and
dangerous sex offender against minors. The offense level shall be five plus
the offense level determined under Chapters Two and Three.

**47**

Acceptance of Responsibility Adjustment [U.S.S.G § 3E1.1(a)]
Demonstrated acceptance of responsibility for offense                  **-2**

Acceptance of Responsibility Adjustment [U.S.S.G § 3E1.1(b)]
Assisted authorities in the investigation/prosecution                  **-1**

**Total Offense Level**: Pursuant to Chapter 5, Part A (comment n.2), where the total offense level is calculated in excess of 43, the offense level shall be treated as a level 43.

**43**

## II.   LEGAL BASIS FOR A DOWNWARD DEPARTURE FROM THE SENTENCING GUIDELINE RANGE

*Background.*   Federal Sentencing Guidelines were established in an effort to "provide certainty and fairness in sentencing, to avoi[d] unwarranted sentencing disparities, to maintain sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices, and to reflect, to the extent practicable, [sentencing-relevant] advancement in [the] knowledge of human behavior." *Rita v. U.S.*, 551 U.S. 338, 348 (2007). In *U.S. v. Booker*, 125 S. Ct. 738, 756-757 (2005), the Supreme Court recognized that mandatory sentencing guidelines violate the Sixth Amendment to the United States Constitution.   To remedy this constitutional violation, the Supreme Court severed and excised the portion of the federal sentencing statute - 18 U.S.C.A. § 3553(b)(1) -- that made the sentencing guidelines mandatory.  *Id.*

*Booker* made the sentencing guidelines "effectively advisory," and "requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C.A. § 3553(a)(4), but it permits the court to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a)." *Id.*

### 18 U.S.C.A. § 3553 Imposition of a Sentence

(a) Factors to be considered in imposing a sentence. – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in

paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effect manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

>> (i) that, except as provided in section 3742(g), are in effect on the date the defendant was sentenced; or

> (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be

> incorporated by the Sentencing Commission into amendments under section 994(p) of title 29);

(5) any pertinent policy statement;

> (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28; and
> (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*Federal Sentencing Overview.* In short, a sentencing court must consider both the federal sentencing guidelines and the statutory factors under section 3553(a). *See United States v. Hunt*, 459 F. 3d 1180, 1185 (11th Cir. 2006) (holding "that a district court may determine, on a case-by-case basis, the weight to give the [sentencing] Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must also consider in calculating the defendant's sentence."). If a court imposes a sentence properly calculated under the United States Sentencing Guidelines range, this sentence is clothed in a "presumption of reasonableness" under appellate review. *Rita v. U.S.*, 551 U.S. 338, 341(2007).

This "nonbinding appellate presumption that a Guidelines sentence is reasonable does not require the sentencing judge impose that sentence." *Id.* at 353. *See Kimbrough*

*v. U.S.*, 552 U.S. 85, 91 (2007) (holding that under *Booker*, "the cocaine Guidelines, like all other Guidelines, are advisory only, and the [lower court] erred in holding the crack/powder disparity effectively mandatory.   A district judge must include the Guidelines range in the array of factors warranting consideration.   The judge may determine, however, that, in the particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing.  18 U.S.C.A. § 3553(a)."). *See also*, *United States v. Dorvee*, 616 F.3d 174, 184 (2nd Cir. 2010) (noting the "Commission did not use an empirical approach in formulating the guidelines for child pornography," similar to the crack cocaine guidelines at issue in *Kimbrough*).

## III. STATUTORY FACTORS: APPLICATION OF 18 U.S.C.A. § 3553 FACTORS

❖ **18 U.S.C.A. § 3553(1)** *Nature and circumstances of the offense and the history and characteristics of the defendant*

• *Nature and Circumstances of the offense:* On or about February 28, 2019, Mr. Fierros contacted Victim 1 by sending her a message through Instagram, which is a popular social media application that individuals can downloaded to their cell phones and use to share photos and videos.[2] Upon engaging her in further messages, Mr. Fierros befriended Victim 1 and asked her to send him a photo of herself. Victim 1 complied, which prompted Mr. Fierros to continue requesting photos. *See* Exhibit B at 6. At some point during their exchange, Victim 1 refused to provide the requested photo. *Id.* at 6-7. Without considering the consequences of his actions, Mr. Fierros impulsively responded by bullying Victim 1 and threatening the distribution of prior images. *Id.*

---

[2] Defendant contacted all Victims through two Instagram accounts ("jenniorvo" and "jxneed"), in which he portrayed himself as a fourteen-year-old female.

21

On March 5, 2019, the parents of Victim 1 contacted the Coral Springs Police Department and filed a report, in which they claimed the Defendant used Instagram to pressure their daughter into sending nude images and videos of herself. *See* Exhibit B at 6. Unaware of the report to authorities, Mr. Fierros continued to contact Victim 1 and became furious when she stopped responding. *See id.* Thus, when the Victim finally ceased contact with Mr. Fierros on or about March 11, 2019, the Defendant, acted impulsively in that he followed through with his prior threat and sent images of Victim 1 to six of her classmates via Instagram. *See id.*

On March 12, 2019, Instagram was served with a subpoena for information relating to the usernames "jenniorvo" and "jxneed." *Id.* at 7. Instagram responding in providing the IP addresses association with those accounts, which were ultimately traced back to the Defendant. *Id.* Furthermore, the documents provided by Instagram revealed Defendant's contact with additional female victims, specifically Victims 2, 3, and 4. *Id.* at 8-9. According to the investigative case agent, authorities ultimately discovered eleven images and one video of Victim 1, and four images and four videos of Victim 2. *Id.* at 9.

On June 4, 2019, a federal search warrant was executed at Mr. Fierros' home, in Sylmar, California. *Id.* at 8. When confronted about his communications with Victim 1, Mr. Fierros waived his Miranda Rights and admitted to using his Instagram account to contact minor females and obtain sexually explicit images. *Id.* Mr. Fierros also expressed deep remorse for his actions and told investigators that he "was in a dark time going through depression and [that he] did not mean the hurtful things [he] did." *Id.* Moreover, it should be noted that Mr. Fierros immediately took it upon himself to write apology

letters to the Victims, in which he acknowledged his wrongs, indicated he was not thinking about the people he was hurting, and expressed his sincerest apology for the pain that he caused the Victims and their families. *See* Adrian Fierros, *Apology Letters to Victims*, attached hereto as "**Exhibit M**."

While Mr. Fierros instantly regretted the actions that lead to his arrest, he understood the wrongfulness of his conduct and cooperated with investigators as he was taken into custody upon the execution of the June 4, 2019 search warrant.[3] After evaluating the evidence obtained during the search, Mr. Fierros was Indicted for two counts of Production of Material Involving the Sexual Exploitation of Minors, in violation of 18 U.S.C.A. § 2251(a) and (e). two counts of Distribution of Child Pornography, in violation of 18 U.S.C.A. § 2252(a)(2) and (b)(1); and four counts of Sending Extortionate Interstate Communications, in violation of 18 U.S.C.A. § 875(d).

In accepting responsibility for his decisions and the actions that lead to the charges in this case, on January 8, 2020, Mr. Fierros entered a plea of guilty to all charges pursuant to a pre-negotiated Plea Agreement. *See* Exhibit **A**. Under the provisions of this Plea Agreement, this Court may sentence Mr. Fierros to prison for a minimum term of fifteen (15) years and a maximum term of one-hundred and eight (108) years, though the

---

[3] While Defendant's case is here in the Southern District, it should be noted that he was confined on bond in Los Angeles, California. *See* Appearance Bond for Adrian Fierros (June 21, 2019), attached hereto as "**Exhibit N**." Moreover, it should be noted that the Court imposed a number of pre-trial release conditions (i.e. Defendant shall be placed on home detention, Defendant shall participate in mental health assessment and/or treatment, Defendant shall not access the internet; and Defendant shall not contact children under the age of 18), for which he has no reported violations. *See id. See also,* Exhibit B at 6. The Court also permitted the Defendant to travel since the inception of this case, as he continues to attend all court-related obligations. *See id.*

Government has agreed not to ask for a term of imprisonment that exceeds forty (40) years. *Id.* at 2-3, 5.

While the inherent nature of child pornography reflects the profound seriousness of such offenses, as reflected by the lofty guideline sentences to which they are paired, appellate courts have upheld the imposition of minimum or low prison sentences when warranted by the nature and circumstances of the offense. *See U.S. v. Polk,* 546 F.3d 74, 75 (1st Cir. 2008) (upholding defendant's sentence to fifteen years and eight months in prison for attempted production of pornography, where defendant "engaged in online conversations with a person who he presumed to be a thirteen-year-old girl," and "pressured her to take and send him sexually explicit photos of herself."). *See also, U.S. v. Sutton,* 496 F.App'x 948 (11th Cir. 2012) (holding defendant's sentence to eight years in prison for the distribution of child pornography was reasonable, where defendant "engaged in numerous online conversations with children and parents of minor children, encouraging them to engage in bizarre sexual acts and send him nude photographs.").

Though Defendant concedes that there is sufficient evidence to prove the statutory elements of the charged offenses, Mr. Fierros also contends that the facts and circumstances surrounding these offenses are unique such that the imposition of the fifteen year minimum mandatory is a reasonable sentence in his case. Like the defendants in *Polk* and *Sutton,* the Defendant in this case engaged in online conversations with minor females, who he subsequently pressured and encouraged to take and send sexually explicit images. Moreover, like the defendants in *Polk* and *Sutton,* Mr. Fierros never met any of the Victims in this case, nor did he personally produce any of the videos or

images, as all videos and images were initially produced and distributed by the Victims. Thus, following the holdings rendered in *Polk* and *Sutton*, this Court should impose the fifteen-year minimum mandatory sentence, which is reasonable given the unique facts and circumstances of Defendant's case.

■ *History and Characteristics of the Defendant:* From an outside perspective, it may seem as though Mr. Fierros lead a relatively normal life prior to his arrest in this case, as he enjoyed playing sports, he graduated high school, he gained and maintained employment, he had no criminal history, and like many young adults, he lived with his parents. However, upon closer inspection, it is clear that Mr. Fierros' life was far from normal, as the traumas he experienced throughout his childhood followed and impacted his transition into adulthood.

As previously mentioned, throughout Mr. Fierros' childhood, he was traumatized by the physical and mental abuse of his father and brother, by the pornography that his brother forced him to watch, and by the molestation that he suffered by the hands of a family member. Though he received some psychological counseling when he was in sixth or seventh grade, such counseling fell woefully short of that which he needed to overcome the trauma. Thus, Mr. Fierros continued to struggle with depression and anxiety into adulthood, despite repeated requests for his mother to find him professional help. *See* Exhibit F; *see also*, Exhibit B at 18.

While Mr. Fierros wishes that he could have received help sooner, he is grateful for the psychological counseling that he has been receiving while out on pre-trial release. As his counselor, Mr. Mercado, stated in his letter to the Court, Mr. Fierros maintained

regular attendance at his weekly sessions and fully participated in every clinical session. *See* Exhibit G. However, despite weeks of individual counseling sessions (which were focused to address the grief and loss associated with his charges), Mr. Mercado maintains that Mr. Fierros still "struggles with fully comprehending and accepting the magnitude of the consequences associated with the charges he is facing *given his developmental mindset*, which seems *firmly embedded within an adolescent framework*." (emphasis added) *Id.* Moreover, Mr. Mercado noted that "this has given way to the onset of *moderate depression* and *significant anxiety* that impacts his day to day functioning." (emphasis added) *Id.*

Consistent with the observations made by Mr. Mercado, Dr. Bloomfield noted that Mr. Fierros scored "*extremely high* in the Distress Scale both in terms of *anxiety* and *depression.*" (emphasis added) *See* Exhibit H at 6. However, this Court should give substantial consideration to the enumerated results of the psychosexual evaluation that Dr. Bloomfield conducted on Mr. Fierros, as such findings shed more light on the reasoning behind Mr. Fierros' conduct. *See* Exhibit H. Specifically, this Court should consider Defendant's results on the Sexual Adjustment Inventory test, which revealed a "severe problem" with impulsivity. *Id.* at 6. While Dr. Bloomfield identified several problem areas in need of treatment, he maintains his belief that "the issues of young adult and adolescent brain development *certainly play a factor*" in the decisions and actions that lead to Mr. Fierros' arrest, and that he is "*amenable to change* given the appropriate treatment." (emphasis added) *Id.* at 5.

As with cases involving certain facts and circumstances, appellate courts have upheld the imposition of minimum or relatively low prison sentences where the history and characteristics of the defendant provide evidence that defendant was operating at a diminished mental capacity, which factored into the commission of the offense. *See U.S. v. Sutton*, 496 F.App'x 948 (11th Cir. 2012) (affirming the district court's downward departure and imposition of eight-year prison sentence for distribution of child pornography, where the district court properly considered defendant's mental capacity and found defendant "had 'issues' and was not 'operating at full speed.'"). *See also*, *U.S. v. McDade*, 399 F.App'x 520, 524-25 (11th Cir. 2010) (affirming the district court's downward departure and imposition of twenty-year prison sentence for production of child pornography was reasonable, where the district court considered defendant's personal culpability in light of his diminished capacity).

Like the evidence presented in *Sutton* and *McDade*, the evidence in Defendant's case supports the conclusion that he was operating at a diminished mental capacity at all times relevant to the charged offenses, which inevitably factored into the crimes' commissions. Specifically, the evidence in this case shows that Defendant struggled academically throughout school, despite accommodations he received for his ADD diagnosis; that Defendant was mentally and physically abused by his father and brother; that Defendant struggled to control issues related to his severe anxiety and depression; and that Defendant has severe problems with impulse control. This is consistent with well-documented medical research on adolescent brain development, which undersigned counsel expects Dr. Bloomfield will explain at Defendant's Sentencing Hearing;

specifically, as the medical research relates to adolescent brain development, the development of the frontal lobe, and how such research relates to Mr. Fierros and the facts of his case.

While Defendant's actions were certainly reckless, impulsive, and immature, these are the very characteristics are affected by his diminished capacity. Thus, following the court's holdings in *Sutton* and *McDade*, this Court should impose the fifteen-year minimum mandatory sentence in Defendant's case, as the Defendant's diminished capacity certainly factored into the very commission of the charged offenses, and the Defendant is amenable to change with the proper treatment.

❖ **18 U.S.C.A. § 3553(2) THE NEED FOR THE SENTENCE IMPOSED**

*(A)to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

- *18 U.S.C.A.§ 3553(2)(A): to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense;*

Pursuant to the pre-negotiated Plea Agreement, Mr. Fierros will be sentenced on two counts of Production of Material Involving the Sexual Exploitation of Minors, in violation of 18 U.S.C.A. § 2251(a) and (e); two counts of Distribution of Child Pornography, in violation of 18 U.S.C.A. § 2252(a)(2) and (b)(1); and four counts of Sending Extortionate Interstate Communications, in violation of 18 U.S.C.A. § 875(d). *See* Exhibit A at 1.

While it is indisputable that production of child pornography is a serious offense that results in perpetual harm to victims, this Court must evaluate the specific facts of this

case and render a sentence that reflects the seriousness of the offense, promotes respect

for the law, and provides just punishment for the offense. *See* 18 U.S.C.A. § 3553(2)(A).

As described in the legislative history of Section 3553(a):

> This purpose—essentially the "just deserts" concept—
> should be reflected clearly in all sentences; it is another
> way of saying that the sentence should reflect the gravity of
> the defendant's conduct. From the public's standpoint, the
> sentence should be of a type and length that will adequately
> reflect, among other things, the harm done or threatened by
> the offense, and the public interest in preventing a
> recurrence of the offense. From the defendant's standpoint
> the sentence should not be unreasonably harsh under all the
> circumstances of the case and should not differ
> substantially from the sentence given to another similarly
> situated defendant convicted of a similar offense under
> similar circumstances.

S.Rep. No. 98–225, at 75–76, 1984 U.S.C.C.A.N. at 3258–59.

This is concept of individually analyzing the circumstances surrounding the

charged conduct of each case is especially true for those involving child pornography, as

there are a number of enhancements that apply in nearly every case. In a Letter from

Anne Gannon,[4] the United States Department of Justice addressed the application of

these enhancements as follows:

> We agree with the Report's conclusion that the existing
> specific offense characteristics ("SOCs") in USSG 2G2.2
> may not accurately reflect the seriousness of an offender's
> conduct, nor fairly account for differing degrees of offender
> dangerousness. The current guidelines can at times under-
> represent and at times over-represent the seriousness of an

---

[4] Letter from Anne Gannon, Nat'l Coordinator for Child Exploitation Prevention and Interdiction, Office of the Deputy Attorney General, U.S. Dep't of Justice, to Honorable Patti B. Saris, Chair, U.S.   Sentencing   Comm'n   at   1   (March   5,   2013),   available   at http://sentencing.typepad.com/files/doj-letter-to-ussc-on-cp-report.pdf (last visited March 27, 2020) ("DOJ Letter").

offender's conduct and the danger an offender poses." DOJ recommended the guidelines "should establish sentencing ranges based on how an offender obtains child pornography; the volume and type of child pornography an offender collects; how long an offender has been collecting child pornography; the attention and care an offender gives to his collection; how an offender uses his collection once obtained; how an offender protects himself and his collection from detection; and whether an offender creates, facilitates, or participates in a community centered on child exploitation." DOJ Letter at 2.

Upon reviewing child pornography cases where the defendant engaged the victim in an online conversation and encouraged the victim to produce and distribute explicit images themselves, appellate courts have found the imposition of mandatory minimum sentences to be reasonable, as they reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. *See, U.S. v. Polk*, 546 F.3d 74, 78 (1st Cir. 2008) (affirming defendant's sentence to 188 months in prison for attempting to produce child pornography, as such sentence was not grossly disproportionate to the crime of conviction); *see also, U.S. v. Sutton*, 496 F.App'x 948, 949-50 (11th Cir. 2012) (affirming defendant's sentence to 8 years in prison for distribution of child pornography). *See generally, U.S. v. Osorio*, 481 F.App'x 548, 552 (11th Cir. 2012) (where defendant defendant's sentence to 235 months in prison for production of child pornography sufficiently promoted respect for the law and provided just punishment for defendant's disregard of the law).

Like the defendants in *Polk* and *Sutton*, Mr. Fierros engaged the Victims in an online conversation in which he encouraged them to produce and send explicit images of themselves. However, in considering how the images were obtained, this Court should

give special consideration to the fact that all of the images and videos possessed by Mr. Fierros were created and distributed by the Victims themselves. While minors who use the internet are certainly a class of people in need of protection, this Court should consider the fact that Congress initially enacted mandatory minimum sentences for the production of child pornography in 1996, long before the existence of cell phones with cameras and the creation of social media applications. While the evolution of the statute reflects the legislative intent to implement harsh minimum mandatory sentences for those who violate the federal production of child pornography statute, the legislature fails to address the significant differences between those who use the internet to encourage the self-production of such images, and those who physically force and engage in the production of child pornography.

It should also be noted that the only images discovered in Mr. Fierros' possession were the fifteen images and five videos that were sent to him by the Victims in this case. Considering the fact that 67.6% of cases involving the possession of child pornography involve the possession of at least 600 images, this Court should consider the volume of images possessed by Mr. Fierros to be incredibly low. *See* United States Sentencing Commission, *Report to Congress: Federal Child Pornography Offenses*, at 209 (Dec. 2012), https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-pornography-offenses/ (last visited March 27, 2020). Furthermore, it should be noted that there is no evidence to suggest Mr. Fierros was a member of any child exploitation online community, or that he sold any of these images to other individuals. Rather, all evidence suggests Mr. Fierros acquired the images for personal use.

Moreover, the Court should consider the fact that Mr. Fierros did not protect his communications from detection when confronted by law enforcement. Rather, he admitted full responsibility for soliciting the production of material that sexually exploited the Victim and expressed great remorse. Furthermore, since his arrest, Mr. Fierros has continued to take responsibility as he immediately authored apology letters and took every opportunity to obtain the psychological treatment that he needs. Thus, given the specific facts of this case, this Court should follow the courts' holdings in *Polk* and *Sutton,* and render the applicable fifteen-year minimum mandatory sentence in Mr. Fierros' case, as it adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.

- *18 U.S.C.A. § 3553(2)(B)*: *to afford adequate deterrence to criminal conduct;*

The collateral consequences Mr. Fierros will face as a convicted felon serve as a substantial deterrent for future criminal conduct. In *United States v. Nesbeth*, 188 F.Supp.3d 179, 180 (E.D.N.Y. 2016), Senior District Court Judge Block, urged the legal community to consider the "collateral consequences" of a felony conviction, many of which . . . "serve no useful function other than to punish defendants after they have completed their court-imposed sentences." Citing related research and over two decades of judicial experience, Judge Block notes these "collateral consequences" "amount to a form of 'civil death' and send the unequivocal message that 'they' are no longer part of 'us.'" *Id.* These "collateral consequences" include, but are not limited to, denial of certain government benefits, denial of public housing, loss of eligibility for certain forms of financial aid, grants, loans, and, of course, the well-known loss of one's right to vote,

32

or to sit on a jury. *Id.* at 185. Further, even after a sentence is completed, a convicted felon may be precluded from obtaining certain professional licenses and will likely find it incredibly difficult to gain employment because many employers refuse to hire ex-convicts and convicted felons. *Id.*

The *Nesbeth* defendant had been convicted of a drug trafficking charge and was facing 33 to 41 months in prison. *Id.* Instead of imposing a prison sentence, however, Judge Block ordered Ms. Nesbeth to complete one year of probation, with six months of home confinement, and 100 hours of community service. Judge Block explained this sentence by noting the above-mentioned consequences of being a convicted felon and determined that defendant Nesbeth would be "sufficiently punished" and "is likely to suffer – principally [because of] her likely inability to pursue a teaching career and her goal of becoming a principal." *Id.* at 194. In short, "jail [was] not necessary to render a punishment that is sufficient but not greater than necessary to meet the ends of sentencing." *Id.* at 194. Mr. Fierros urges this Honorable Court to adopt the reasoning in *Nesbeth* and consider the collateral consequences the Defendant will face as a convicted felon and registered sex offender.

In this case, there is no indication Mr. Fierros attempted, or considered attempting, making inappropriate physical contact with a child. Further, he immediately accepted responsibility once confronted by law enforcement, apologized to the Victims and their families, and sought psychological treatment. Moreover, because has no prior criminal history, a fifteen-year period of incarceration, followed by any period of house arrest, supervised release, community service, continued treatment, permanent felony

conviction, and sexual offender registration is sufficient to deter Mr. Fierros from reoffending.

- *18 U.S.C.A. § 3553(2)(C): to protect the public from further crimes of the defendant;*
- *18 U.S.C.A. § 3553(2)(D): to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;*

In this case, 18 U.S.C.A. §§ 3553(2)(C) and 3553(2)(D) can be considered in conjunction. Protecting the public from "future crimes" of Mr. Fierros, can be accomplished by continuing his treatment through psychological counseling and supervised release. Furthermore, considering the fact that Mr. Fierros has been out on supervised release since June 21, 2019, and the fact that he has complied with all of the terms and conditions of his release, should be considered as evidence that Defendant is amenable to supervised release. To the extent this Court has specific concerns regarding Defendant's release, the Court has the discretion to impose any special conditions that it deems necessary, in addition to that which requires Mr. Fierros to enlist as a registered sex offender.

❖ **18 U.S.C.A. §3553(3): THE KINDS OF SENTENCES AVAILABLE**

This Honorable Court has discretion to impose a term of imprisonment, a term of supervised release, probation under the Statutory Provisions, as well as a fine. Each kind of sentence available is addressed below, under 18 U.S.C.A. §3553(4).

❖ **18 U.S.C.A. §3553(4): THE KINDS OF SENTENCE AND SENTENCING RANGE ESTABLISHED FOR –** *(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—(i) that, except as provided in section 3742(g), are in effect on the date the defendant was sentenced;*

*Imprisonment.* On Counts One and Two, Mr. Fierros is facing a maximum term of thirty (30) years imprisonment pursuant to 18 U.S.C.A. § 2251(e); on Counts Three and Four, he faces a maximum term of twenty (20) years imprisonment pursuant to 18 U.S.C.A. § 2252(b)(1); and on Counts Five through Eight, he faces a maximum term of two (2) years imprisonment pursuant to 18 U.S.C.A. § 875(d). Thus, Mr. Fierros is facing a maximum term of one-hundred and eight (108) years imprisonment. Based on the total offense level of forty-three (43) and a criminal history category of I, the guideline imprisonment sentence is life. However, the statutorily authorized maximum sentences are less than the applicable guideline sentence. As such, the guideline sentence is 1,296 months (or 108 years), pursuant to U.S.S.G § 5G1.2(b).

While the guideline sentence in Mr. Fierros' case is incredibly high, the Government has agreed not to ask this Court to impose a prison sentence of more than forty (40) years. *See* Exhibit A at 5. In and of itself, a forty-year term of imprisonment represents a 816 month downward variance from the guideline sentence.

*Supervised Release.* As to Counts One through Four, the Court shall impose a term of supervised release of five years to life, pursuant to 18 U.S.C.A. § 3583(k). As to Counts Five through Eight, the Court may impose a term of supervision of not more than one year, pursuant to 18 U.S.C.A. § 3583(b)(3).

*Probation.* As to Counts One and Two, Mr. Fierros is not eligible for probation because the offenses are Class B felonies and because he is being sentenced at the time to a term of imprisonment for the same or a different offense. *See* 18 U.S.C.A. § 3561(a)(1), (3). Additionally, as to Counts Three through Eight, Mr. Fierros is not eligible for

probation because he is being sentenced at the time to a term of imprisonment for the same or a different offense. *See* 18 U.S.C.A. § 3561(a)(3).

*Fines.* As to Counts One through Eight, the maximum fine is two-hundred and fifty thousand dollars ($250,000.00). *See* Exhibit B at 2-3. A special assessment of eight-hundred dollars ($800.00) (one-hundred dollars for each of the eight counts) is mandatory pursuant to 18 U.S.C.A. § 3013. *Id.* Additionally, as to Counts One through Four, a JVTA assessment of five-thousand dollars ($5,000.00) is applicable to any non-indigent person, pursuant to 18 U.S.C.A. § 3014(a)(1). *Id.*

Furthermore, Mr. Fierros is also subject to the provisions of the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018. Thus, in addition to any other criminal penalty, restitution, or special assessment authorized by law, the Court shall assess (1) not more than seventeen thousand dollars ($17,000.00) on any person convicted of an offense under 18 U.S.C.A. § 2252(a)(4) or § 2252(a)(5); (2) not more than thirty-five thousand dollars ($35,000.00) on any person convicted of any other offense for trafficking in child pornography; and (3) not more than fifty-thousand dollars ($50,000.00) on any person convicted of a child pornography production offense. When ordering this assessment, the Court shall consider the factors set forth in 18 U.S.C.A. §§ 3553(a), 3572, and 2259A.

In determining whether to impose a fine and if so, the amount of the fine, the sentencing court considers several factors including costs acquired by the government associated with Defendant's term of imprisonment, term of probation, or term of supervised release, under U.S.S.G §5E1.2(d)(7) and 18 U.S.C.A. § 3572(a)(6). The

Administrative Office of the United States Courts, dated July 13, 2017, offered estimates for post-conviction imprisonment ($103.00 daily/$3,121.00 monthly/$37,448.00 annually); residential reentry centers ($95.00 daily/$2,874.00 monthly/$34,493.00 annually); and post-conviction supervision ($12.00 daily/$373.00 monthly/$4,472.00 annually).

*Restitution.* Pursuant to 18 U.S.C.A. § 2259(c)(3), this is a child pornography trafficking offense and thus restitution is mandatory, as set forth in 18 U.S.C.A. § 2259(b)(2). Thus, the Court shall determine the full amount of the Victims' losses and shall order restitution in an amount that reflects the defendant's role in the casual process that underlies the Victims' losses, but which is no less than three-thousand dollars ($3,000.00).

❖ **18 U.S.C.A. §3553(6): THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES** *among defendants with similar records who have been found guilty of similar conduct;*

In order to avoid unwarranted sentencing disparities, this Court is required to "consider other similarly situated defendants -- criminal defendants in other cases who were convicted of similar crimes." *United States v. McQueen*, 727 F.3d 1144, 1160 (11th Cir. 2013) (*citing United States v. Pugh*, 515 F.3d 1179, 1195 (11th Cir. 2008). In determining the appropriate sentence in Mr. Fierros' case, this Court should give special consideration to similarly situated defendants, as the facts of this case are much different than the typical production case.

While Mr. Fierros concedes that the facts of his case meet the statutory requirements of the charged offenses, he urges this Court to evaluate the seriousness of

his offense as one "for nonproduction child pornography offenses," as the facts of Mr. Fierros' case are nearly identical to those discussed in *United States v. Sutton*, 496 F.App'x 948 (11th Cir. 2012). Though the defendant in *Sutton* was only charged with distribution of child pornography, in violation of 18 U.S.C.A. § 2252(a)(2), (b), the court noted that the defendant's "actions bordered on the production of child pornography," and that he "engaged in numerous online conversations with children and parents of minor children, encouraging them to engage in bizarre sexual acts and send him nude photographs." *Id.* at 949. At sentencing, the defendant sought a downward departure on the basis that his diminished capacity directly led to his offense." *Id.* at 949. Upon considering all the relevant factors, the District Court sentenced the defendant to ninety-six (96) months (or eight years) in federal prison. *Id.*

Like the defendant in *Sutton*, the Defendant in this case engaged in several online conversations with minor females, in which he encouraged them to engage in sexual acts and send him nude photographs. Despite having never met the Defendant, the Victims in this case used their cell phones to produce and send sexual images and videos to the Defendant. While the self-production of such images does not excuse or negate Mr. Fierros' conduct, it's important to note that he never met or otherwise had any physical contact with the Victims in this case. Furthermore, like the defendant in *Sutton*, Mr. Fierros clearly exhibits a diminished capacity that directly impacted his actions and led to the charged offenses. Thus, following the holdings of *McQueen* and *Sutton*, this Court should impose a fifteen-year prison sentence, which is the lowest permissible sentence and the would be the closest available sentence to that which was rendered in *Sutton*.

In short, the totality of the circumstances in this case offers sufficient justification for this Court to depart from the advisory guidelines and sentence Mr. Fierros to fifteen years imprisonment, with any special conditions the Court finds necessary.

## CONCLUSION

Mr. Fierros respectfully requests this Honorable Court to order a sentence that constitutes a downward variance from the advisory guideline range sentence recommended by the United States Probation Office and a twenty-five year departure from the recommendation made by the Government.

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:  M. Catherine Koontz, Esquire, Assistant United States Attorney, United States Attorney's Office, 500 E. Broward Blvd., Ft. Lauderdale, FL 33394.

Respectfully submitted,

**TASSONE, DREICER, & HILL**
/s/ Jesse N. Dreicer
**JESSE N. DREICER, ESQUIRE**
Florida Bar No.:  47505
**JAMES P. HILL, ESQUIRE**
Florida Bar No.: 0073828
1833 Atlantic Boulevard
Jacksonville, Florida 32207
P:  904.396.3344
F:  904.396.3349
Email:  jesse@tassonelaw.com
Attorneys for Defendant

# EXHIBIT A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.   19-CR-60153-JIC**

**UNITED STATES OF AMERICA,**

v.

**ADRIAN FIERROS,**

                    **Defendant.**

_____/

**PLEA AGREEMENT**

The United States Attorney's Office for the Southern District of Florida ("this Office") and **ADRIAN FIERROS** (hereinafter referred to as the Adefendant@) enter into the following agreement:

1.      The defendant agrees to plead guilty to the Superseding Indictment which charges Defendant with two counts of Production of Child Pornography, in violation of Title 18, United States Code, Sections 2251(a) and (e) (Counts 1 and 2); two counts of Distribution of Child Pornography in violation of Title 18, United States Code, Sections 2252(a)(2) and (b)(1) (Counts 3 and 4) and four counts of Sending Extortionate Interstate Communications in violation of Title 18, United States Code, Section 875(d) (Counts 5, 6, 7, and 8).

2.      The defendant is aware that the sentence will be imposed by the court after consideration of the Federal Sentencing Guidelines and Policy Statements (hereinafter ASentencing Guidelines@).      The defendant acknowledges and understands that the court will compute an advisory sentence

under the Sentencing Guidelines and that the applicable guidelines will be determined by the court relying in part on the results of a Pre-Sentence Investigation by the Court's probation office, which investigation will commence after the guilty plea has been entered. The defendant is also aware that, under certain circumstances, the court may depart from the advisory sentencing guideline range that it has computed, and may raise or lower that advisory sentence under the Sentencing Guidelines. The defendant is further aware and understands that the court is required to consider the advisory guideline range determined under the Sentencing Guidelines, but is not bound to impose that sentence; the court is permitted to tailor the ultimate sentence in light of other statutory concerns, and such sentence may be either more severe or less severe than the Sentencing Guidelines= advisory sentence. Knowing these facts, the defendant understands and acknowledges that the court has the authority to impose any sentence within and up to the statutory maximum authorized by law for the offenses identified in paragraph 1 and that the defendant may not withdraw his plea solely as a result of the sentence imposed.

3.      The defendant understands and acknowledges that the maximum statutory term of imprisonment with regard to Production of Child Pornography in Counts 1 and 2 is thirty (30) years with a minimum mandatory of fifteen (15) years followed by a term of supervised release of 5 years up to Life. The maximum term of imprisonment with regard to Distribution of Child Pornography in Counts 3 and 4 is twenty (20) years with a mandatory minimum

2

of five (5) years followed by a term of supervised release of 5 years up to Life. The maximum term of imprisonment with regard to Sending Extortionate Interstate Communications in Counts 5 through 8 is two (2) years imprisonment, followed by a term of 1 year supervised release. In addition to a term of imprisonment, the Court may impose a fine of up to two hundred fifty thousand dollars ($250,000.00) on each count and an order of restitution.

4.     The defendant further understands and acknowledges that, pursuant to Title 18, United States Code, Section 3014, a special assessment in the amount of $5,000 will be imposed on the defendant because, as the defendant acknowledges and agrees, the defendant is not indigent and is pleading guilty to an offense under Chapter 110 (relating to sexual exploitation and other abuse of children). The defendant agrees that this special assessment shall not be payable until the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim-compensation arising from the criminal conviction, upon which this special assessment is based.

5.     The defendant further understands and acknowledges that, in addition to any sentence imposed under paragraph 3 of this agreement, a special assessment in the amount of $100 will be imposed on the defendant for each count to which he is pleading guilty for a total of $800.00.   The defendant agrees that any special assessment imposed shall be paid at the time of sentencing.   If the defendant is financially unable to pay the special assessment, the defendant

3

agrees to present evidence to this Office and the Court at the time of sentencing as to the reasons for the defendant's failure to pay.

6.     This Office reserves the right to inform the court and the probation office of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not, as well as concerning the defendant and the defendant=s background.   Subject only to the express terms of any agreed-upon sentencing recommendations contained in this   agreement,   this   Office   further   reserves   the   right   to   make   any recommendation as to the quality and quantity of punishment.

7.     This Office agrees that it will recommend at sentencing that the Court reduce by two levels the sentencing guideline level applicable to the defendant=s offense, pursuant to Section 3E1.1(a) of the Sentencing Guidelines, based upon the defendant=s recognition and affirmative and timely acceptance of personal responsibility. If at the time of sentencing the defendant=s offense level is determined to be 16 or greater, the government will file a motion requesting an additional one-level decrease pursuant to Section 3E1.1(b) of the Sentencing Guidelines, stating that the defendant has assisted authorities in the investigation   or   prosecution   of   his   own   misconduct   by   timely   notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently.   The United States, however, will not be required to make this motion or this recommendation if the defendant: (1) fails

4

or refuses to make a full, accurate and complete disclosure to the probation office of the circumstances surrounding the relevant offense conduct; (2) is found to have misrepresented facts to the government prior to entering into this plea agreement; or (3) commits any misconduct after entering into this plea agreement, including but not limited to, committing a state or federal offense, violating any term of release, or making false statements or misrepresentations to any governmental entity or official.

8.    Additionally, this Office has agreed to recommend that that this Honorable Court impose a term of imprisonment of not more than forty (40) years.

9.    The defendant is aware that the sentence has not yet been determined by the Court.  The  defendant also is aware that any estimate of the  probable sentencing range or sentence that the defendant may receive, whether that estimate comes from the defendant's attorney, the government, or the probation office, is a prediction, not a promise, and is not binding on the government, the probation office or the Court.  The defendant understands further that any recommendation that the government makes to the Court as to sentencing, whether pursuant to this agreement or otherwise, is not binding on the Court and the Court may disregard the recommendation in its entirety.   The defendant understands and acknowledges, as previously acknowledged in paragraph 2 above, that the defendant may not withdraw his plea based upon the Court's decision not to accept a sentencing recommendation made by the

defendant, the government, or a recommendation made jointly by both the defendant and the government.

10.    Defendant understands that by pleading guilty, he will be required to register as a sex offender upon his release from prison as a condition of supervised release pursuant to 18 U.S.C. ' 3583(d).    Defendant also understands that independent of supervised release, he will be subject to federal and state sex offender registration requirements, and that those requirements may apply throughout defendant's life.  Defendant understands that he shall keep his registration current, shall notify the state sex offender registration agency or agencies of any changes to defendant's name, place of residence, employment, or student status, or other relevant information. Defendant shall comply with requirements to periodically verify in person defendant's sex offender registration information.    Defendant understands that he will be subject to possible federal and state penalties for failure to comply with any such sex offender registration requirements.    If defendant resides in Florida following release from prison, defendant will be subject to the registration requirements of Florida State Statute 943.0435.   Defendant further understands that, under 18 U.S.C. ' 4042(c), notice will be provided to certain law enforcement agencies upon defendant's release from confinement following conviction.

11.    As a condition of supervised release, defendant shall initially register with the state sex offender registration in the state of Florida, and shall also register with the state sex offender registration agency in any state where

6

defendant resides, is employed, works, or is a student, as directed by the Probation Officer.   Defendant shall comply with all requirements of federal and state sex offender registration laws, including the requirement to update defendant's registration information.   Defendant shall provide proof of registration to the Probation Officer within 72 hours of release from imprisonment.

12.   The defendant is aware that Title 18, United States Code, Section 3742 affords the defendant the right to appeal the sentence imposed in this case. Acknowledging this, in exchange for the undertakings made by the United States in this plea agreement, the defendant hereby waives all rights conferred by Section 3742 to appeal any sentence imposed, including any restitution order, or to appeal the manner in which the sentence was imposed, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure or variance from the guideline range that the court establishes at sentencing.   The defendant further understands that nothing in this agreement shall affect the government's right and/or duty to appeal as set forth in Title 18, United States Code, Section 3742(b).   However, if the United States appeals the defendant's sentence pursuant to Section 3742(b), the defendant shall be released from the above waiver of appellate rights. By signing this agreement, the defendant acknowledges that he has discussed the appeal waiver set forth in this agreement with his attorney.   The defendant further agrees, together with the United States, to request that the district court enter a specific finding that the defendant's waiver of his right to appeal the sentence to be imposed in this case was knowing and voluntary.

13.   This is the entire agreement and understanding between this Office and the defendant.   There are no other agreements, promises, representations, or understandings.

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

Date: _____1/8/2020_____   By: _____
M. CATHERINE KOONTZ
SPECIAL ASSISTANT UNITED STATES ATTY

Date: _____1/8/2020_____   By: _____
JESSE DREICER
ATTORNEY FOR DEFENDANT

Date: _____1/8/2020_____   By: _____
ADRIAN FIERROS
DEFENDANT

8

# EXHIBIT B

C O N F I D E N T I A L
PROPERTY OF U.S. COURTS.

This document is not to be disclosed to any
party not officially involved in the pre and
post sentencing aspects of this case without
approval of the Court, Rule 32 (e)

**SD/FL PACTS #6274353**

Pursuant to the U.S. Supreme Court decision in **U.S. v Booker**, 125 S.Ct. 738(2005), the sentencing guidelines presented herein are advisory and not binding on the Court.

## UNITED STATES DISTRICT COURT
## FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | PRESENTENCE INVESTIGATION REPORT |
| | ) | |
| | ) | |
| v. | ) | **Docket No. 113C 0:19CR60153** |
| | ) | **Defendant No. 001** |
| **ADRIAN FIERROS** | ) | **Guidelines Manual: 2018** |

| | |
|---|---|
| **Prepared for:** | The Honorable James I. Cohn<br>Senior U.S. District Judge |
| **Prepared by:** | Shannon Culberson<br>U.S. Probation Officer<br>United States Courthouse<br>299 East Broward Boulevard, Suite 409<br>Fort Lauderdale, FL 33301<br>954-769-5543<br>Shannon_culberson@flsp.uscourts.gov |

| **Assistant U.S. Attorney** | **Defense Counsel** | |
|---|---|---|
| M. Catherine Koontz | Jesse Nolan Dreicer | Enrique M. Barquinero |
| 500 East Broward Boulevard | 1833 Atlantic Boulevard | 1035 Lasalle Street |
| Suite #700 | Jacksonville, FL 32207 | Jacksonville, FL 32207 |
| Fort Lauderdale, FL 33394 | 904-396-3344 | 904-361-3344 |
| 954-660-5940 | jesse@tassonelaw.com | enrique@barquinero-law.com |
| Catherine.Koontz@usdoj.gov | | |

**Sentence Date:**   March 26, 2020, Fort Lauderdale, FL

1

| **Offense:** | **Count One:**<br>Production of material involving the sexual exploitation of minors, 18 U.S.C. § 2251(a), a Class B felony |
|---|---|
| **Penalty:** | 15 to 30 years imprisonment, 5 years to life supervised release, $250,000 fine, $100 special assessment, an additional $5,000 assessment (JVTA, pursuant to 18 U.S.C. § 3014(a)(1)) and an additional AVAA assessment of up to $50,000 (AVAA, pursuant to 18 U.S.C. § 2259A(a)(3)) |
| **Offense:** | **Count Two:**<br>Production of material involving the sexual exploitation of minors, 18 U.S.C. § 2251(a), a Class B felony |
| **Penalty:** | 15 to 30 years imprisonment, 5 years to life supervised release, $250,000 fine, $100 special assessment, an additional $5,000 assessment (JVTA, pursuant to 18 U.S.C. § 3014(a)(1)) and an additional AVAA assessment of up to $50,000 (AVAA, pursuant to 18 U.S.C. § 2259A(a)(3)) |
| **Offense:** | **Count Three:**<br>Distribution of material involving the sexual exploitation of minors, 18 U.S.C. § 2252(a)(2), a Class C felony |
| **Penalty:** | 5 to 20 years imprisonment, 5 years to life supervised release, $250,000 fine, $100 special assessment, an additional $5,000 assessment (JVTA, pursuant to 18 U.S.C. § 3014(a)(1)) and an additional AVAA assessment of up to $35,000 (AVAA, pursuant to 18 U.S.C. § 2259A(a)(2)) |
| **Offense:** | **Count Four:**<br>Distribution of material involving the sexual exploitation of minors, 18 U.S.C. § 2252(a)(2), a Class C felony |
| **Penalty:** | 5 to 20 years imprisonment, 5 years to life supervised release, $250,000 fine, $100 special assessment, an additional $5,000 assessment (JVTA, pursuant to 18 U.S.C. § 3014(a)(1)) and an additional AVAA assessment of up to $35,000 (AVAA, pursuant to 18 U.S.C. § 2259A(a)(2)) |

| | |
|---|---|
| **Offense:** | <u>Count Five</u>:<br>Sending extortionate interstate communications, 18 U.S.C. § 875(d), a Class E felony |
| **Penalty:** | Not more than 2 years imprisonment, $250,000 fine, and $100 special assessment |
| **Offense:** | <u>Count Six</u>:<br>Sending extortionate interstate communications, 18 U.S.C. § 875(d), a Class E felony |
| **Penalty:** | Not more than 2 years imprisonment, $250,000 fine, and $100 special assessment |
| **Offense:** | <u>Count Seven</u>:<br>Sending extortionate interstate communications, 18 U.S.C. § 875(d), a Class E felony |
| **Penalty:** | Not more than 2 years imprisonment, $250,000 fine, and $100 special assessment |
| **Offense:** | <u>Count Eight</u>:<br>Sending extortionate interstate communications, 18 U.S.C. § 875(d), a Class E felony |
| **Penalty:** | Not more than 2 years imprisonment, $250,000 fine, and $100 special assessment |
| **Arrest Date:** | June 4, 2019: Arrested in the Central District of California<br>June 21, 2019: Initial appearance in the Southern District of Florida |
| **Release Status:** | June 4, 2019: Released on a $100,000 signature bond<br>June 21, 2019: Continued on a $100,000 personal surety bond cosigned by his father and mother |
| **Detainers:** | None |
| **Codefendants:** | None |
| **Related Cases:** | None |

3

.

**Date Report Prepared:**
February 18, 2020

**Date Report Revised:**

## Identifying Data:

| | |
|---|---|
| **Date of Birth:** | June 3, 1998 |
| **Age:** | 21 |
| **Race:** | White |
| **Hispanic Origin:** | Non-Hispanic origin |
| **Sex:** | Male |
| **SS#:** | 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 |
| **FBI#:** | V5FDJM9TN |
| **USM#:** | 78254-112 |
| **State ID#:** | None |
| **Other ID#:** | CA Driver's License #: Y4011335 |
| **DNA Collected:** | No |
| **Education:** | Some College |
| **Dependents:** | None |
| **Citizenship:** | U.S. Citizen |

Adrian Fierros
SDFL PACTS 6274353

| | |
|---|---|
| **Legal Address:** | 13481 Harley Avenue |
| | Sylmar, CA 91342 |
| | 818-833-9501 (Home) |
| **Aliases:** | DOB: 06/06/1998 |

*Restrictions on Use and Redisclosure of Presentence Investigation Report.* Disclosure of this presentence investigation report to the Federal Bureau of Prisons and redisclosure by the Bureau of Prisons is authorized by the United States District Court solely to assist administering the offender's prison sentence (i.e., classification, designation, programming, sentence calculation, pre-release planning, escape apprehension, prison disturbance response, sentence commutation, or pardon) and other limited purposes, including deportation proceedings and federal investigations directly related to terrorist activities. If this presentence investigation report is redisclosed by the Federal Bureau of Prisons upon completion of its sentence administration function, the report must be returned to the Federal Bureau of Prisons or destroyed. It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.

4

### PART A. THE OFFENSE

#### Charge(s) and Conviction(s)

1. **On January 8, 2020, the defendant pled guilty to Counts One through Eight of an eight-count Superseding Indictment. Counts One and Two each charge production of material involving the sexual exploitation of minors, in violation of 18 U.S.C. § 2251(a). Counts Three and Four each charge distribution of material involving the sexual exploitation of minors, in violation of 18 U.S.C. § 2252(a)(2). Counts Five through Eight each charge sending extortionate interstate communications, in violation of 18 U.S.C. § 875(d).**

2. Pursuant to a written plea agreement, the defendant acknowledged that pursuant to 18 U.S.C. § 3014, a $5,000 special assessment will be imposed because, as the defendant acknowledged and agreed, the defendant is not indigent and is pleading to an offense under Chapter 110. The defendant agreed that this special assessment shall not be payable until the defendant has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim-compensation arising from the criminal conviction, upon which this special assessment is based.

3. The government agreed it will recommend a two or three level reduction for acceptance of responsibility, as appropriate, pursuant to § 3E1.1. This is conditioned upon, among other things, the defendant clearly demonstrating acceptance of responsibility for the offense and assisting authorities in the investigation or prosecution of the misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.

4. The government agreed to recommend the Court impose a term of not more than 40 years imprisonment.

5. The defendant understood that by pleading guilty, he will be required to register as a sex offender upon his release from prison as a condition of supervised release, pursuant to 18 U.S.C. § 3583(d). The defendant also understood that independent of supervised release, he will be subject to federal and state sex offender registration requirements, and that those requirements may apply throughout the defendant's life. The defendant understood that he shall keep his registration current, shall notify the state sex offender registration agency or agencies of any changes to his name, place of residence, employment, or student status, or other relevant information. The defendant shall comply with requirements to periodically verify in person his sex offender registration information. The defendant understood he will be subject to possible federal and state penalties for failure to comply with any such sex offender registration requirements. If the defendant resides in Florida following release from prison, he will be subject to the registration requirements of

5

Florida State Statute 943.0435. The defendant further understood that, under 18 U.S.C. § 4042(c), notice will be provided to certain law enforcement agencies upon his release from confinement following conviction.

6.   The defendant agreed as a condition of supervised release, he shall initially register with the state sex offender registration in the state of Florida, and shall also register with the state sex offender registration agency in any state where he resides, is employed, works, or is a student, as directed by the Probation Officer. The defendant shall comply with all requirements of federal and state sex offender registration laws, including the requirement to update his registration information. The defendant shall provide proof of registration to the Probation Officer within 72 hours of release from imprisonment.

7.   The defendant agreed to waive all rights conferred by 18 U.S.C. § 3742.

8.   Pretrial services records indicate the defendant has complied with all Court ordered conditions of release.

### The Offense Conduct

9.   On March 5, 2019, the parents of Victim 1, who was an 11-year-old female, filed a report with the Coral Springs Police Department in reference to a subject, later identified as Adrian Fierros, utilizing Instagram to pressure their daughter to send him nude images and videos of herself. Fierros used the Instagram name "jenniorvo" and befriended Victim 1 on Instagram by telling her she was pretty. They began chatting and Fierros asked Victim 1 for a photograph. Victim 1 complied and sent a clothed picture of herself to Fierros via Instagram. Fierros told Victim 1 that she was beautiful and asked to see her body. Victim 1 acquiesced and sent a full body photograph in her bra and panties. Fierros subsequently asked for a photograph of Victim 1's vagina and when she declined, Fierros told her that he would "expose the photograph of her in her bra and panties to everybody" if she did not comply. Victim 1 complied and sent an up-close photograph of her vagina, but after she sent it, Fierros demanded photographs of her breasts. Fierros again told Victim 1 that he would expose her to her friends on Instagram if she did not comply with his demands.

10.   Victim 1 sent the nude photographs of herself and Fierros then asked her to take a photo or video of her mother nude in the shower. The victim refused and Fierros again used the threat of exposing her nude photographs to everyone. Victim 1 also reported that Fierros demanded she take a video of her dog licking her vagina. Victim 1 complied and sent a sexually explicit video and photograph of herself with the dog.

6

11.  Fierros continued to demand Victim 1 commit sexual acts, such as putting her fingers in her vagina, putting a pen in her vagina, putting a hairbrush in her vagina and putting a pen in her anus. Fierros then requested that Victim 1 put her five-year-old non-verbal autistic brother's hand in or on her vagina. Victim 1 refused these demands. Fierros then demanded that Victim 1 go into her five-year-old brother's room, pull his underwear down and videotape her licking his penis.

12.  Victim 1 got scared and finally went to her parents and told them of Fierros' demands. This prompted the investigation by the Coral Springs Police Department. Victim 1 had blocked Fierros on Instagram; however, Fierros used a second Instagram account, "jxneed," to reinitiate contact with her. Victim 1 did not respond.

13.  On or about March 11, 2019, shortly after Victim 1 ceased contact with Fierros, he sent out her nude photographs to six of her friends at school via Instagram. These children's ages ranged from 9 to 11 years old.

14.  On March 12, 2019, a subpoena was served on Instagram for information relating to user "jenniorvo" and "jxneed." Results of the subpoena to Instagram included IP addresses that the subject utilized to access his Instagram accounts. Those IP addresses were identified as belonging to Verizon and Spectrum Wireless. Subpoenas were sent to Verizon and Spectrum Wireless. Verizon provided that the subscriber of the identified IP addresses was Adrian Fierros residing at 13481 Harley Avenue in Sylmar, California. Verizon also provided, per subpoena instruction, the credit card information used to pay for the service and identified an account belonging to JP Morgan Chase Bank.

15.  On April 26, 2019, a subpoena served on JP Morgan Chase Bank for the above-mentioned Verizon account identified the sole account holder as Adrian Fierros, residing at 13481 Harley Avenue in Sylmar, California.

16.  The subpoena results from Instagram further revealed that Fierros not only victimized Victim 1, but he was also in contact with other females on Instagram, a majority of whom were under the age of 14. Fierros used the same tactics as he did with Victim 1. He friended them, told them they are pretty, had them send a photograph and then extorted them to send nude photographs in various poses that he ordered them taken. The returned Instagram records also yielded various sexually explicit photographs from underage females, as well as the texts in full, from all the victims.

17.  The Instagram subpoena results further revealed that Victim 1, as well as another unidentified victim, begged for Fierros to stop; that it was ruining their lives. Fierros refused and continued his threats. Both victims again begged and told Fierros they were going to end their lives and commit suicide to make it all stop. Fierros wrote,

7

"idc send it and I'll stop." "Idc" stands for "I don't care." Fierros continued after the suicide threats to threaten them with exposure to their friends and families. Fierros proved these threats by taking screen shots of the victims' Instagram friends lists.

18.  An online law enforcement databased revealed that Adrian Fierros resided at 13481 Harley Avenue in Sylmar, California.

19.  Law enforcement officers were able to determine through the Instagram records that Fierros using either Instagram name "jenniorvo" or "jxneed" had contact with Victim 1 from March 2, 2019 to March 8, 2019.

20.  On June 4, 2019, a federal search warrant was executed at 13481 Harley Avenue in Sylmar, California. Fierros was present at the home and was advised of his *Miranda* rights, which he waived verbally and in writing. Fierros advised he used Instagram as his primary social media platform. He admitted he posed as a teenager on the application and used Instagram direct messaging to solicit girls around the ages of 12 or 13 for nude pictures. Fierros advised he threatened to release the nude pictures sent to him to people in the girls' contact lists if they refused to send him additional sexually explicit images. Fierros also wrote an apology letter, wherein he indicated he was not thinking about the people he hurt and that he was truly sorry. He noted he "was in a dark time going through depression and [he] did not mean the hurtful things [he] did." Fierros further indicated he "was holding something deep inside that [he] should of [sic] spoke about."

21.  The investigation also revealed that Victim 2, date of birth September 6, 2006, and her sister, Victim 3, date of birth August 22, 2003, were both targeted on Instagram by Fierros between November 1, 2018, and December 20, 2018. Victim 2, the younger of the two sisters, was coerced by Fierros into producing sexually explicit images of herself. Fierros then coerced Victim 2 into sending those sexually explicit photographs to him. Fierros initially approached Victim 2 as he did Victim 1 and told her she was beautiful and asked her to send him sexually suggestive photographs. Once she sent him some initial photographs, he threatened to expose those photographs to her friends, and he also threated to harm her family if she did not produce more sexually explicit photographs. Victim 2 complied and produced and sent Fierros more sexually explicit photographs, to include photographs that completely exposed her vaginal area. Fierros then threatened her sister, Victim 3, by telling her he would send out all the sexually explicit photographs he had of Victim 2 to all her friends. On January 3, 2019, Fierros distributed images of Victim 2 to Victim 3 to prove he had sexually explicit photographs of her.

22.  Another victim, identified as Victim 4, date of birth March 13, 2006, was also identified as one of Fierros' victims. Fierros targeted Victim 4 on Instagram and attempted to get her to produce sexually explicit images of herself. Victim 4 refused

8

and on March 11, 2019, Fierros distributed the video of Victim 1 engaging in explicit sexual activity to Victim 4 and told her if she did not comply and produce sexually explicit images of herself, he would expose both her and Victim 1.

23.    According to the investigating case agent, there were 11 images and 1 video of Victim 1, and 4 images and 4 videos of Victim 2.

### Victim Impact

24.    The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. Pursuant to 18 U.S.C. § 2259(b), the defendant is required to pay any victim the full amount of their losses which include any costs incurred by the victim for medical services relating to physical, psychiatric, or psychological care; physical and occupational therapy or rehabilitation; necessary transportation, temporary housing, and child care expenses; lost income; attorney's fees, as well as other costs incurred; and any other losses suffered by the victim as a proximate result of the offense. Pursuant to 18 U.S.C. §§ 2259(b)(2) and 3663A(d), an order of restitution shall be issued and enforced in accordance with 18 U.S.C. § 3664.

25.    Each of Victims 1, 2, 3 and 4 are entitled to restitution in this case. No information was provided as to whether any of the victims are seeking restitution. As such, the probation officer has been unable to determine the amount of restitution owed in the instant offense.

26.    Further, the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 is applicable in this case. The offense of conviction is a child pornography trafficking offense, as defined in 18 U.S.C. § 2259(c)(3); therefore, the Court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000. 18 U.S.C. § 2259(b)(2).

27.    Pursuant to 18 U.S.C. § 3664(d)(5), if the victims' losses are not ascertainable by the date that is ten days prior to sentencing, the attorney for the government or the probation officer shall so inform the Court, and the Court shall set a date for the final determination of the victims' losses, not to exceed 90 days after sentencing.

### Adjustment for Obstruction of Justice

28.    The probation officer has no information indicating the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

29.    The defendant was interviewed by the U.S. Probation Officer, and he provided a verbal statement, wherein he admitted his involvement in the offense. He informed

9

he relies on the documents filed with the Court, to include the factual proffer, and defense counsel will file a separate memorandum.

**Offense Level Computation**

30. Counts One and Two each charge production of material involving the sexual exploitation of minors, in violation of 18 U.S.C. § 2251(a). The guideline for these counts is § 2G2.1.

31. Counts Three and Four each charge distribution of material involving the sexual exploitation of minors, in violation of 18 U.S.C. § 2252(a)(2). The guideline for these counts is § 2G2.2.

32. Counts Five through Eight each charge sending extortionate interstate communications, in violation of 18 U.S.C. § 875(d). The guideline for each of these counts is § 2B3.2.

33. Counts One and Five are grouped for guideline calculation purposes because they involve the same victim (Victim 1) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan, § 3D1.2(b). Moreover, Count Three is grouped with Counts One and Two, as it embodies conduct that is treated as a specific offense characteristic in, or adjustment to, the guideline applicable to another of the counts, § 3D1.2(c).

34. Counts Two and Six are grouped for guideline calculation purposes because they involve the same victim (Victim 2) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan, § 3D1.2(b). Moreover, Count Four is grouped with Counts One and Two, as it embodies conduct that is treated as a specific offense characteristic in, or adjustment to, the guideline applicable to another of the counts, § 3D1.2(c).

35. In the case of counts grouped together pursuant to § 3D1.2(a) through (c), the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group. In this case, § 2G2.1 results in the highest offense level for each of these two groups.

36. Pursuant to the rules of groups of closely related counts, § 3D1.2, Counts Seven and Eight cannot be grouped, as they each represent separate instances of subjecting the victim to fear and risk of harm. According to § 3D1.1(a)(3), the Court shall determine the combined offense level applicable to all groups taken together that shall be determined by applying the rules in § 3D1.4 of the Guidelines Manual.

37. Based on the above, the combined offense level will be determined pursuant to § 3D1.4, by identifying each count of conviction as a separate harm, or "group." The combined offense levels are then computed pursuant to the provisions of § 3D1.4, Determining the Combined Offense Level. The combined offense level is then determined by taking the offense level applicable to the group with the highest adjusted level and increasing that adjusted level by appropriate number of levels, in accordance with the units assigned, as reflected in the table provided in § 3D1.4.

**Group One, Counts One, Three and Five: Production of material involving the sexual exploitation of minors (Victim 1)**

38. **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 2251(a) is § 2G2.1, which provides for a base offense level of 32, § 2G2.1(a). **32**

39. **Specific Offense Characteristics:** Because the offense involved a minor who had not attained the age of 12 years, the offense level is increased by 4 levels, § 2G2.1(b)(1). **+4**

40. Because the defendant knowingly engaged in distribution, the offense level is increased by two levels, § 2G2.1(b)(3). **+2**

41. Because for the purpose of producing sexually explicit material or for the purpose of transmitting such material live, the offense involved (A) the knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage sexually explicit conduct; or (B) the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct, the offense level is increased by two levels, § 2G2.1(b)(6)(B). **+2**

42. **Victim Related Adjustment:** None **0**

43. **Adjustment for Role in the Offense:** None **0**

44. **Adjustment for Obstruction of Justice:** None **0**

45. **Adjusted Offense Level (Subtotal):** **40**

**Group Two, Counts Two, Four and Six: Production of material involving the sexual exploitation of minors (Victim 2)**

46. **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 2251(a) is § 2G2.1, which provides for a base offense level of 32, § 2G2.1(a). **32**

47.  **Specific Offense Characteristics:** Because the offense involved a minor who had attained the age of 12 years but not attained the age of 16 years, the offense level is increased by 2 levels, § 2G2.1(b)(1)(B).                                          **+2**

48.  Because the defendant knowingly engaged in distribution, the offense level is increased by two levels, § 2G2.1(b)(3).                                          **+2**

49.  Because for the purpose of producing sexually explicit material or for the purpose of transmitting such material live, the offense involved (A) the knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage sexually explicit conduct; or (B) the use of a computer or an interactive computer service to (i) persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct; or (ii) solicit participation with a minor in sexually explicit conduct, the offense level is increased by two levels, § 2G2.1(b)(6)(B).                                          **+2**

50.  **Victim Related Adjustment:** None                                          **0**

51.  **Adjustment for Role in the Offense:** None                                          **0**

52.  **Adjustment for Obstruction of Justice:** None                                          **0**

53.  **Adjusted Offense Level (Subtotal):**                                          **38**

**Group Three, Count Seven: Sending extortionate interstate communications (Victims 2 and 3)**

54.  **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 875(d) is § 2B3.2, which provides for a base offense level of 18, § 2B3.2(a).                                          **18**

55.  **Specific Offense Characteristics:** None                                          **0**

56.  **Victim Related Adjustment:** None                                          **0**

57.  **Adjustment for Role in the Offense:** None                                          **0**

58.  **Adjustment for Obstruction of Justice:** None                                          **0**

59.  **Adjusted Offense Level (Subtotal):**                                          **18**

**Group Four, Count Eight: Sending extortionate interstate communications (Victims 1 and 4)**

60.  **Base Offense Level:** The guideline for a violation of 18 U.S.C. § 875(d) is § 2B3.2, which provides for a base offense level of 18, § 2B3.2(a).                                          **18**

61.   **Specific Offense Characteristics:** None                                                **0**

62.   **Victim Related Adjustment:** None                                                         **0**

63.   **Adjustment for Role in the Offense:** None                                        **0**

64.   **Adjustment for Obstruction of Justice:** None                                   **0**

65.   **Adjusted Offense Level (Subtotal):**                                                **18**

66.   **Multiple Count Adjustment:** Units are assigned pursuant to § 3D1.4(a), (b) and (c). One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 | 40 | 1.0 |
| Group 2 | 38 | 1.0 |
| Group 3 | 18 | 0.0 |
| Group 4 | 18 | 0.0 |
| **Total Number of Units:** | | 2.0 |

67.   **Greater of the Adjusted Offense Levels Above:**                              **40**

68.   **Increase in Offense Level:** The offense level is increased pursuant to the number of units assigned by the amount indicated in the table at § 3D1.4.                   **+2**

69.   **Combined Adjusted Offense Level:** The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at § 3D1.4.                                                                                             **42**

70.   **Chapter Four Enhancement:** The offense of conviction is a covered sex crime, neither § 4B1.1 (Career Offender) nor subsection (a) of § 4B1.5 applies and the defendant engaged in a pattern of activity involving prohibited sexual conduct. As such, the defendant is a repeat and dangerous sex offender against minors. The offense level shall be five plus the offense level determined under Chapters Two and Three. In this case the applicable offense level is 47, § 4B1.5(b)(1).           **47**

71.   **Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels, § 3E1.1(a).                                                                                    **-2**

72.  Pursuant to § 3E1.1(b), for the defendant to receive the additional one-level decrease, the government must file a motion stating the defendant assisted authorities in the investigation of his own misconduct by timely notifying authorities of his intention to plead guilty.                                                              **-1**

73.  **Total Offense Level:** Pursuant to Chapter 5, Part A (comment n.2), in those rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43.                                                              **43**

## PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

74.  None

### Adult Criminal Conviction(s)

75.  None

### Criminal History Computation

76.  The defendant has zero criminal history points. According to the Sentencing Table in Chapter 5, Part A, zero criminal history points establish a criminal history category of I.

### Other Criminal Conduct

77.  None

### Pending Charges

78.  None

### Other Arrests

79.  None

## PART C. OFFENDER CHARACTERISTICS

### Personal and Family Data

80.  The defendant was interviewed in the presence of counsel on January 8, 2020, at the probation office in Fort Lauderdale, Florida. He provided the following personal history information, which was corroborated by his mother, Maria Mancillas, unless otherwise noted.

81.     Adrian Fierros was born on June 3, 1998, in Sylmar, California, to Miguel A. Fierros (age 50) and Maria Mancillas (age 51). The defendant stated his parents only recently married. Fierros advised his father was a successful car salesman; however, he no longer works and receives disability benefits, as he suffers from amyotrophic lateral sclerosis (ALS). The defendant was unsure as to when his father was diagnosed with ALS but indicated his condition has worsened. Ms. Mancillas informed her husband was diagnosed with ALS in October 2017. Fierros' mother is employed as an aesthetician. Fierros reported he maintains good relationships with his parents, who are aware of his conviction and although disappointed, remain supportive.

82.     The defendant's mother was interviewed via telephone. She stated Fierros remains home because he is unable to work, adding he cares for his father by cooking for and feeding him. Ms. Mancillas advised she never had problems with the defendant, who was always very obedient. She informed she believes having him attend a private Catholic school helped. Ms. Mancillas noted the defendant struggled through school because of a learning disability, but she kept him in the magnet program, and he graduated. Ms. Mancillas reiterated that she never had a problem with the defendant or Omar.

83.     The defendant has two siblings. Miguel Fierros, Jr. (age 30) resides with his girlfriend in Sylmar, California. They have one child together, and Miguel's girlfriend has two children from prior relationships. Miguel is employed as a tattoo artist and canvas artist. Notably, information from the discovery material reflects the defendant's brother, Miguel Fierros, has the following criminal history: burglary, petty theft, domestic violence, assault with a deadly weapon and criminally insane. The defendant informed he does not maintain a good relationship with Miguel, adding it has been "up and down," but "mostly down" and is improving. Fierros explained his brother was always on drugs, to include crystal methamphetamine. The defendant advised Miguel is aware of his conviction but is not very supportive. Omar Fierros (age 23) resides in San Diego, California, is married with no children, and he is in the U.S. Marine Corp. Fierros advised he maintains a very close relationship with Omar, adding they always did everything together. Omar is aware of the defendant's conviction and remains supportive.

84.     Fierros reported that his brother, Miguel Fierros, mentally abused him. The defendant recalled his brother exposed him to pornography videos when he was three years old. This continued sporadically for approximately one year. Fierros informed their mother was unaware this occurred until approximately a year and a half ago. He was unsure as to why it stopped occurring but described it as traumatizing. The defendant also recalled that when he was in the third or fourth grade, Miguel showed him a sex video of Miguel with this then-girlfriend. The defendant stated that even when he was in high school, his brother showed him

15

sexual material of himself (Miguel) with women. Fierros stated his brother never touched him in a sexual way but beat him up and hung him from a staircase. He added Miguel also insulted him. The defendant advised he feels his brother's behavior is unrelated to his drug use, as he acts the same way toward him when he is not using drugs.

85.     The defendant stated his father also regularly hit him when he was younger, adding he did not hit Fierros' brothers. Fierros recalled one occasion when he was 11 or 12 years old and his father got very mad and hit him in the chest, threw him on the floor and beat him. The defendant stated his brother cried and begged their father to stop. Fierros indicated this was traumatizing, as his father had never punched him.

86.     Fierros reported his brother, Omar, is very competitive. He recalled that once while they played games, Omar got upset that he lost and smacked the defendant's head against a window, which caused the window to break. Omar then threw the defendant on the floor. Fierros recalled another occasion when Omar lost a hockey game and threw the puck at him.

87.     Ms. Mancillas reported the only history of abuse in the family was by her son, Miguel. She stated he was mentally and emotionally abusive to everyone, adding that he also once punched the defendant in the face. Ms. Mancillas stated that in 2016, she obtained a restraining order against Miguel, as he broke windows, doors and walls, and she could no longer take it.

88.     The defendant has always resided in the family home in California. Since October 1999 he has resided with his parents at 13481 Harley Avenue in Sylmar, California. Fierros stated his parents own the three bedroom, three bathroom residence. A home assessment was conducted by U.S. Probation Officer Gregory Kwon, who advised the residence is two-story home with three bedrooms located on the second floor. The residence was clean and modestly furnished. No contraband or safety issues were observed in plain view. Fierros reported no pets or weapons kept in the house.

89.     The defendant's United States passport was surrendered. He reported foreign travel to Mexico.

90.     Fierros is single, has never married, and he has no children.

91.     Fierros advised he used the e-mail address Adrian.fierros06398@gmail.com. The discovery material for this case reflects the following additional email addresses associated with the defendant: Adrianfierros69@yahoo.com and thebatmobiel55@gmail.com. Fierros stated he maintained social media accounts on Instagram, Twitter and Facebook.

### Physical Condition

92. The defendant is five feet, ten inches tall, and he weighs 180 pounds. He is a white, Hispanic male with brown eyes and black hair. Fierros reported no tattoos and none were observed during the presentence interview. The defendant has scarring on his right hand that resulted from self-inflicted bites. He advised that he mindlessly bites his hand when anxious and although he was unable to recall exactly when this began, he indicated it was after he graduated high school. Fierros informed he started biting again after his arrest for the instant offense and does not realize when he is doing it.

93. Fierros stated he suffers from a sunken chest, which developed as he got older. He advised he suffered from shortness of breath while participating in sports in the eighth grade. The defendant indicated he had a tonsillectomy when he was approximate a year old. He was unsure as to where he was hospitalized for the procedure. Fierros reported that his brother, Miguel, pushed him while he was learning to ride a bicycle, and he fell and needed stiches. He was unable to recall at which hospital he was treated. Ms. Mancillas was unable to corroborate any of this medical information.

94. The defendant stated that in 2018, he was involved in a motor vehicle accident with his family and suffered a neck injury. He advised it is bothersome on occasion. Ms. Mancillas was unable to corroborate this information.

95. Fierros has never had sexual intercourse, and he has no history of sexually transmitted disease or sexual health problems. Fierros advised that when he was in kindergarten, a girl liked him and fondled his penis during nap time. He recalled this continued for the entire school year, and he did not reciprocate. The defendant indicated the girl also kissed him. Fierros reported that when he was 12 years old and in the eighth grade, he kissed a girl, touched her breasts, and she performed oral sex on him. He stated he prefers females, and he does not view pornography.

### Mental and Emotional

96. The defendant stated that when he was in the seventh or eighth grade, he attended therapy. He explained that he had recurring dreams wherein he was very tiny and his brother, Miguel, was very big, almost cartoonish, and his brother would step on him. Fierros advised he attended weekly therapy sessions for less than six months. He was unable to recall the name of the treatment provider and as such, this information could not be verified.

97. Fierros advised he often cried himself to sleep from the eighth to the tenth grade and then again after he graduated high school. He attributed this to his father's ALS diagnosis, his brother (Omar) did not often visit, the stressors of his job, etc.

98. Fierros reported that he suffered severe depression following a breakup in the beginning of tenth grade. He noted he felt like everyone was putting him down but added that a former girlfriend was very supportive during that time. The defendant noted he fantasized about her being there with him. He recalled feeling "lost" and stated he thought about suicide but never attempted it, adding that was the only time he contemplated it.

99. The defendant stated that in 2018, he fell into another depression, as his father's ALS was worsening, his brother "was bringing bad things into the house," his mother was "on him about his games," and he was cut off from his friends. Fierros advised his brother, Omar, suggested therapy, but he never followed through. He added Omar is the only person to whom he can confide. When questioned about what he meant when he stated his brother brought bad things into the house, Fierros explained Miguel brought negativity, bad vibes, and drugs into the home. He added his brother stole from their father, to include a chain that was a family heirloom. The defendant reported there was an incident where the police arrested Miguel, adding he pushed their father down and chased their mother around the house. Fierros advised his brother suffers from bipolar disorder and self-medicates. He added his mother had him (Fierros) tested for it, with negative results. Fierros further explained that his mother often says he is a lot like Miguel, and he wishes she "would give [him] a chance" because it makes him feel bad. The defendant stated Miguel stole their parents' cars frequently and once crashed one. He also broke windows and doors and put holes in the walls.

100. Fierros is attending court-ordered treatment as a condition of his bond. He stated he attends weekly individual sessions, which he finds beneficial. The defendant indicated he attended one group session at his therapist's recommendation, but he did not like it.

101. Ms. Macillas reported that the defendant suffers from depression. She informed that when he was nine or ten years old, she took him to counseling for approximately three months. She noted that other than his current treatment, he has never received any other mental health treatment. Ms. Mancillas stated the defendant "always talked about being depressed but [she] never got him the help he needed." She added that after all her son, Miguel, put them through, she was also diagnosed with depression. Ms. Mancillas informed she got herself help but not her children.

102. In November 2019, Fierros underwent a psychosexual evaluation with Stephen I. Bloomfield, Ed.D., a licensed psychologist in Jacksonville, Florida. The defendant reported being sexually molested several times as a child or teenager by a relative. He recalled physically maturing earlier than most of the boys he knew and felt that he could discuss nothing about sex with his parents. Fierros began dating at the age of 18 or younger and usually dated less than once a month. He usually dated one person at a time and remembered that his parents did not comment upon the

18

individuals he dated. Fierros reported that he has never had heterosexual intercourse. He did not have a homosexual experience before age 18 but reported that he did afterward. The Minnesota Multiphasic Personality Inventory Second Edition (MMPI-II) was administered, and Fierros indicated peculiar and strange thoughts. He had elevations in several areas, including significant issues with mental dullness and physical functioning, as well as brooding and anxiety, depression, and the possibility of some bipolar tendencies. Dr. Bloomfield found this very problematic and indicated the defendant needs rather intensive psychotherapy, as well as an evaluation for medication. The Personality Assessment Inventory was also administered, and Dr. Bloomfield noted the defendant's response style may have been affected by certain validity indicators that fell outside the normal range, suggesting he may not have answered in a completely forthright manner. The nature of responses may lead to a somewhat inaccurate impression. This is significantly different than his scores on the Minnesota Multiphasic Personality Inventory. Fierros was experiencing some degree of anxiety and stress and described himself as being moody. He reported no problems in any of the psychopathological issues that were reported on the Minnesota Multiphasic Personality Inventory discrepancy, which Dr. Bloomfield noted was somewhat problematic. The diagnostic considerations included: Adjustment Disorder with Anxiety; Dysthymic Disorder and Generalized Anxiety Disorder. The Sexual Adjustment Inventory (SAI) was also administered. The SAI identifies sexually deviant and pedophilia behavior in people accused or convicted of sexual offenses. Fierros presented that he is somewhat asocial and that he is incredibly impulsive and is suffering a great deal of distress. The Impulsiveness Scale was in the severe problem range. Recommendations included treatment that includes medication, individual and group therapy. Dr. Bloomfield noted sexual impulsiveness is often seen in people with sex problems. Fierros also scored extremely high in the Distress Scale, both in terms of anxiety and depression. He stated that his sex life is unsatisfying. The Sex Item Truthfulness Scale was in the problem risk range and Dr. Bloomfield noted problem risk scorers attempt to minimize their sex related problems and concerns. Nonetheless, the defendant scored high in the Sexual Adjustment Scale, which was in the problem range. Fierros manifests sexual adjustment concerns. He also scored in the medium risk range in terms of Child Molest Scales.

103. Fierros completed a psychosexual life history, wherein he reported never having seen anyone molest a young child and that no one ever exposed themselves to him sexually; however, he said that when he was a child someone touched him sexually. The defendant indicated they touched his penis over his shorts, which made him both confused and excited. It was reportedly a cousin or relative; however, he felt he is over it. Fierros reported he began to masturbate at five or six years of age, which Dr. Bloomfield noted is young, and felt an excitement about it. He masturbated while he was young, he looked at pornography magazines and thought about being with different classmates. The defendant never masturbated with other

19

men. He had sexual feelings for the first time when he was eight years old. Fierros was twelve years old when he first touched another person in a sexual way and that person was twelve years old. He reported he has never had sexual intercourse. Fierros feels a little insecure around women but he flirts a lot. He reported he masturbates one to three times a day and his fantasy is picking up a woman in a bar. The defendant denied fantasies about spanking anyone, tying someone up, beating someone. The only relative Fierros has had sexual fantasies about is a female cousin, which Dr. Bloomfield noted is not terribly abnormal. The defendant had peeped on an adult stating, "My cousin was taking a shower and I tried peeping but saw nothing but her butt; I felt disgusted; I apologized to her."

104. Dr. Bloomfield indicated it was his opinion that Fierros needs a course of treatment that involves psychosexual treatment individually and on a group basis to deal with his issues, but he also shows other psychological problems. These include extreme impulsivity, anxiety and depression, which need to be attended to both psychopharmacologically in the form of an evaluation by a psychiatrist to determine the need for medication, as well as therapeutically. It was noted the defendant is young and the issues of young adult and adolescent brain development play a factor. Dr. Bloomfield opined that given Fierros' age, he is most likely amenable to change given the appropriate treatment.

### Substance Abuse

105. The defendant reported he first drank alcohol between the fourth and sixth grade, when his father gave it to him. He advised he began drinking again in the 11th grade, and he has not consumed alcohol since his arrest for the instant offense. Fierros stated he drinks only on holidays and special occasions, and he consumes a couple of beers per occasion.

106. Fierros stated he first smoked marijuana when he was 16 years old and his brother, Miguel, offered it to him. He informed that when he was 18 years old, he began smoking marijuana daily after work, which continued for approximately six months, at which time, he terminated use.

107. The defendant informed he experimented with mushrooms once when he was 20 years old.

108. Ms. Mancillas was unable to corroborate any drug use by the defendant and advised he does not drink alcohol. She stated he does not party, adding he is "not a street kid," and he likes to be home.

109. A urinalysis conducted on January 8, 2020, proved negative for the presence of illicit substances.

20

110. When asked about any family history of drug use, Fierros advised his brother, Omar, smokes medical marijuana and uses CBD oil. He stated his brother, Miguel, uses marijuana and crystal methamphetamine. The defendant informed Miguel began using drugs in middle school and has been in treatment multiple times.

### Educational and Vocational Skills

111. As verified by a copy of his diploma, the defendant he graduated from Sylmar Charter High School in Sylmar, California, in June 2016. The school is a math/science technology magnet school. Fierros stated that he played football in high school. Academically, he was afforded an individualized education program (IEP) that allowed for easier courses and additional testing time. Fierros explained that he was diagnosed with attention deficit disorder while in elementary school. He was never medicated for the condition but benefitted from an IEP. The defendant advised that during the second semester of ninth grade, he began struggling, as he was placed in more advanced magnet classes. In tenth grade, he enrolled in some mainstream classes, to include math and English, and had magnet classes, to include history, government and economics, and additional English classes. Verification from the school is pending.

112. Fierros stated he attended a half semester at Mission College in Santa Clara, California. He terminated his studies to obtain employment. Verification from the college is pending.

113. The defendant reported specialized training as an aviation technician, which he learned via one of his employers. He stated he has no specialized computer skills, but noted his therapist indicated he should consider coding.

114. Fierros indicated he began playing piano at the age of 16 and can play by ear.

115. The defendant advised he is not involved in community service or volunteer work.

### Employment Record

116. Fierros has been unemployed since early 2019, and he is financially supported by his parents.

117. For nine months, from 2018 to early 2019, the defendant was employed as an aviation technician with HRD Aero Systems, Inc., in Valencia, California. He informed was employed in a full-time capacity and earned $2,000 biweekly. Fierros stated he resigned from this position because of the problems at home. He advised he cried in the bathroom at work and could not keep pace. Verification from this employer is pending.

118. From 2017 to 2018, Fierros was unemployed and financially supported by his parents.

119. From 2016 to 2017, the defendant was employed as a package handler with FedEx in Los Angeles, California. He advised he worked part-time hours and earned $13.50 per hour. Fierros stated he resigned from this position because the job was too demanding. Verification from this employer is pending.

### Financial Condition: Ability to Pay

120. The defendant completed a Net Worth Statement and Monthly Cash Flow Statement on January 8, 2020. The following information was obtained by interviewing the defendant and by conducting an independent investigation through other sources as outlined in the analysis below.

#### Assets

| | |
|---|---|
| Personal Checking Account | $300.00 |
| Personal Savings Account | $61.35 |
| **Total Assets** | $361.35 |

#### Liabilities

| | |
|---|---|
| None | $0 |
| **Total Liabilities** | $0 |
| **Total Net Worth** | $361.35 |

#### Analysis

121. The defendant reported an individually held personal checking account and an individually held personal savings account with Chase bank. He advised he is unsure as to the balance of the checking account, but informed it is approximately $300, as it must have a minimum balance of $300. Fierros stated the savings account has a $300 balance; however, he provided a recent statement that reflects a balance of $61.35. Fierros did not provide a statement for the checking account.

122. Fierros stated his cousin has a whole life insurance policy on him for $150,000. He advised the policy is with Primerica, and his cousin makes the payments. The defendant's parents and brother, Omar, are the beneficiaries.

123. The defendant reported no liabilities. An Equifax credit inquiry was made for the defendant, which reflects there is no hit based on his identifiers. Ferrios advised his parents are paying his attorney fees.

124. Fierros has no income and is financially supported by his parents, who cover all household expenses.

125. The defendant reported he last filed personal income tax returns for tax year 2018. Verification from the Internal Revenue Service is pending.

126. Based on his reported financial condition and mandatory restitution obligation it does not appear the defendant has the ability to pay a fine, or the assessment under the AVAA Act; however, per the plea agreement he agreed to pay the $5,000 JVTA assessment. It appears he can pay this assessment as to only one of the four qualifying counts of conviction.

## PART D. SENTENCING OPTIONS

### Custody

127. **Statutory Provisions:** As to each of Counts One and Two, the minimum term of imprisonment is 15 years and the maximum term is 30 years, 18 U.S.C. § 2251(e). As to each of Counts Three and Four, the minimum term of imprisonment is 5 years and the maximum term is 20 years, 18 U.S.C. § 2252(b)(1). As to each of Counts Five through Eight, the maximum term of imprisonment is two years, 18 U.S.C. § 875(d).

128. **Guideline Provisions:** Based upon a total offense level of 43 and a criminal history category of I the guideline imprisonment sentence is life; however, the statutorily authorized maximum sentences are less than the applicable guideline sentence. As such, the guideline sentence is 1,296 months, § 5G1.2(b).

### Impact of Plea Agreement

129. Paragraph four of the plea agreement reflects that a special assessment in the amount of $5,000 will be imposed on the defendant, pursuant to 18 U.S.C. § 3014. Notably, this assessment should be imposed as to each of Counts One through Four. It is unclear as to whether this provision of the plea agreement was intended to limit the defendant to one $5,000 assessment, or whether he acknowledged it was per qualifying count of conviction.

130.   The government agreed to recommend the Court impose a term of not more than 40 years imprisonment. This represents an 816-month downward variance from the guideline sentence.

**Supervised Release**

131.   **Statutory Provisions:** As to each of Counts One through Four, the Court shall impose a term of supervised release of five years to life, 18 U.S.C. § 3583(k). As to each of Counts Five through Eight, the Court may impose a term of supervised release of not more than one year, 18 U.S.C. § 3583(b)(3).

132.   Multiple terms of supervised release shall run concurrently, 18 U.S.C. § 3624(e).

133.   **Guideline Provisions:** The guideline requirement for a term of supervised release is five years to life, § 5D1.2(b)(2).

**Probation**

134.   **Statutory Provisions:** As to each of Counts One and Two, the defendant is ineligible for probation because the offenses are Class B felonies and because the defendant is being sentenced at the time to a term of imprisonment for the same or a different offense, 18 U.S.C. § 3561(a)(1), (3). As to each of Counts Three through Eight, the defendant is ineligible for probation because he is being sentenced at the time to a term of imprisonment for the same of a different offense, 18 U.S.C. § 3561(a)(3).

135.   **Guideline Provisions:** The defendant is ineligible for probation because the offenses are Class B felonies and because the defendant is being sentenced at the time to a term of imprisonment for the same or a different offense, § 5B1.1(b)(1), (3).

**Fines**

136.   **Statutory Provisions:** As to each of Counts One through Eight, the maximum fine is $250,000, 18 U.S.C. § 3571(b)(3). A special assessment of $800 ($100 per count) is mandatory, 18 U.S.C. § 3013.

137.   Pursuant to 18 U.S.C. § 3014(a)(1), the additional JVTA assessment of $5,000, as to each of Counts One through Four, is applicable to any non-indigent person. Additionally, according to the plea agreement, the defendant agreed to pay the additional $5,000 special assessment pursuant to 18 U.S.C. 3014(a)(1).

138.   The defendant is also subject to the provisions of the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018. In addition to any other criminal penalty, restitution, or special assessment authorized by law, the court shall assess

(1) not more than $17,000 on any person convicted of an offense under 18 U.S.C. § 2252(a)(4) or § 2252A(a)(5); (2) not more than $35,000 on any person convicted of any other offense for trafficking in child pornography; and (3) not more than $50,000 on any person convicted of a child pornography production offense. The court shall consider the factors in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3572 when ordering this assessment, 18 U.S.C. § 2259A.

139. **Guideline Provisions:** The fine range for this offense is from $50,000 to $250,000, § 5E1.2(c)(3).

140. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed, § 5E1.2(d)(7) and 18 U.S.C. § 3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the United States Courts provides the following monthly cost data:

|  | **Bureau of Prisons Facilities** | **Community Correction Centers** | **Supervision by Probation Officer** |
|---|---|---|---|
| Daily | $103 | $95 | $12 |
| Monthly | $3,121 | $2,874 | $373 |
| Annually | $37,448 | $34,493 | $4,472 |

**Restitution**

141. **Statutory Provisions:** Pursuant to 18 U.S.C. § 2259(c)(3), this is a child pornography trafficking offense and thus restitution is mandatory as set forth in 18 U.S.C. § 2259(b)(2). The court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000.

142. **Guideline Provisions:** Restitution shall be ordered, § 5E1.1.

**Denial of Federal Benefits**

143. **Statutory Provisions:** Not applicable.

144. **Guideline Provisions:** Not applicable.

156. **Sex Offender Treatment:** The defendant shall participate in a sex offender treatment program to include psychological testing and polygraph examination. Participation may include inpatient/outpatient treatment, if deemed necessary by the treatment provider. The defendant will contribute to the costs of services rendered (co-payment) based on ability to pay or availability of third party payment.

157. **Restricted from Possession of Sexual Materials:** The defendant shall not buy, sell, exchange, possess, trade, or produce visual depictions of minors or adults engaged in sexually explicit conduct. The defendant shall not correspond or communicate in person, by mail, telephone, or computer, with individuals or companies offering to buy, sell, trade, exchange, or produce visual depictions of minors or adults engaged in sexually explicit conduct.

158. **Adam Walsh Act Search Condition:** The defendant shall submit to the U.S. Probation Officer conducting periodic unannounced searches of the defendant's person, property, house, residence, vehicles, papers, computer(s), other electronic communication or data storage devices or media, include retrieval and copying of all data from the computer(s) and any internal or external peripherals and effects at any time, with or without warrant by any law enforcement or probation officer with reasonable suspicion concerning unlawful conduct or a violation of a condition of probation or supervised release. The search may include the retrieval and copying of all data from the computer(s) and any internal or external peripherals to ensure compliance with other supervision conditions and/or removal of such equipment for the purpose of conducting a more thorough inspection; and to have installed on the defendant's computer(s), at the defendant's expense, any hardware or software systems to monitor the defendant's computer use.

159. **Sex Offender Registration:** The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works, is a student, or was convicted of a qualifying offense.

160. **Unpaid Restitution, Fines, or Special Assessments:** If the defendant has any unpaid amount of restitution, fines, or special assessments, the defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay.

Respectfully Submitted,

*Shannon Culberson*  Shannon Culberson
Feb 18 2020 3:29 PM

by: _____

Shannon Culberson
U.S. Probation Officer

Reviewed and approved:

Tracey L. Webb
2020.02.18 15:18:40 -05'00'

_____
Tracey Webb
Supervising U.S. Probation Officer

# EXHIBIT C

Armando Campos
13846 MIndora Ave.
Sylmar Ca, 91342

02/28/2020

To the Presiding Judge

My name is Armando Campos, I'm uncle and family friend of Adrian Fierros who I have known since his birth, over 20 years.

I am writing to urge leniency in the sentencing of Adrian Fierros. Adrian and I know the gravity of the crime he is being convicted of, but it is still hard for me to wrap my head around. This is not the young man I know to do such a crime and I'd like to give you a perspective that shows that he is more than the sum of his actions.

Adrian is the first to admit that he has severe depression and wanted the proper counseling, without being directed by any court. He just wants to be a better person, to help others. I am very familiar with the circumstances he grew up in,including an abusive brother, but he is amazingly resilient to have survived it. I don't see him as a trouble maker, he is someone with a kind heart.

Adrian has always been there for his family willing to go out of his way to help with anything and everything without a problem. I honestly believe he is trustworthy and respectful. He is a person of good moral and family oriented.

To this day Adrian continued to do all that is in his power to become a more self aware and in control of his emotions and actions by being responsible.

Sincerely,

3/6/20

Armando Campos

# ALL-PURPOSE ACKNOWLEDGMENT

State of __California__

County of __Los Angeles__

On __3/6/2020__ before me, __Oralia G. Barrios__

DATE                                                                       NAME OF NOTARY PUBLIC

personally appeared __Armando Campos__

NAME(S) OF SIGNER(S)

☐ personally known to me  **OR**    ☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), an that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

**ORALIA G. BARRIOS**
**Notary Public - California**
**Los Angeles County**
**Commission # 2213393**
**My Comm. Expires Sep 9, 2021**

Place Notary Seal or Stamp Here

SIGNATURE OF NOTARY

---

ATTENTION NOTARY: Although the information requested below is OPTIONAL, it may prove valuable to persons relying on this Acknowledgment and could prevent fraudulent reattachment of this certificate to another document.

## DESCRIPTION OF ATTACHED DOCUMENT

**THIS CERTIFICATE**
**MUST BE ATTACHED**
**TO THE  DOCUMENT**
**DESCRIBED AT RIGHT**

Letter

TITLE OR TYPE OF DOCUMENT

1

NUMBER OF PAGES

02/28/2020

DATE OF DOCUMENT

SIGNER(S) OTHER THAN NAMED ABOVE

# EXHIBIT D

February 27, 2020

Diana Deleon
20970 Costa Brava #202
Santa Clarita Ca, 91321
Ph: 818-390-5501

Re: Adrian Fierros

Your Honor,

Adrian and I are cousins and I have known him since he was a child, we have grown up together. He comes from a good family with good values and we have always been supportive towards each other. We have Family night once a month to celebrate everyone's birthday in that Month. I have come to see that Adrian is responsible and very helpful. He always helps carry the food, drinks, and he helps set up the tables without anyone having to bring it to his attention. Adrian is a caring person his dad is currently having some health issues and I have seen Adrian be supportive to his dad. He cooks him breakfast, motivates him, and he's very loving and affectionate.

Im aware that Adrian has a learning disability and he has had some traumatic experiences with his older brother Miguel Jr that may have affected him emotionally, however Adrian has always been a kind, generous, and respectful person. I feel that he has the ability to make changes in his life, he is still young and has a lot of potential. I am willing to support him in any way that I can and help him so he can be in a better situation. Thank you for taking the time to read this letter, Kindly consider his situation when making your decision.

Sincerely

Diana Deleon

# CALIFORNIA ALL-PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

On _February 29, 2020_ before me, _Ann Elizabeth Hernandez,_ , Notary Public,
(Here insert name and title of the officer)

personally appeared _Diana Deleon_ ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

(Notary Seal)

ANN ELIZABETH HERNANDEZ
COMM. #2171213
Notary Public · California
Los Angeles County
My Comm. Expires Nov. 8, 2020

---

## ADDITIONAL OPTIONAL INFORMATION

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

DESCRIPTION OF THE ATTACHED DOCUMENT

_Character Letter_
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages _2_ Document Date _2/29/2020_

_____
(Additional information)

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they, is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

CAPACITY CLAIMED BY THE SIGNER
- ☑ Individual (s)
- ☐ Corporate Officer

_____
(Title)
- ☐ Partner(s)
- ☐ Attorney-in-Fact
- ☐ Trustee(s)
- ☐ Other _____

C 2004-2015 ProLink Signing Service, Inc. – All Rights Reserved www.TheProLink.com – Nationwide Notary Service

# EXHIBIT E

Elena Gonzalez Mancillas
15157 Cobalt St.
Sylmar, Ca. 91342
(818) 335-9201

February 27, 2020

Your Honor,

I am writing on behalf of Adrian Fierros who is appearing before your court.

My name is Elena Gonzalez Mancillas the aunt of Adrian Fierros who I have known for 18 years. In the time that I have known Adrian I have seen him grown to be a trustworthy and respectful individual. When Adrian sets his mind to accomplish something, he achieves it with dedication and sheer force of will. Adrian is a person of good moral character and family oriented. Since the start of our family night gathering in 2010, Adrian has been actively participating by helping organize and host our monthly get-togethers. I believe Adrian to be an honorable individual, and a valuable member of our family.

It is my sincere hope the court will consider the tenacity, self-awareness and courage that Adrian is facing during a troubled period in his life.

Please do not hesitate to contact me if you should require any further information.

Sincerely,

Elena Gonzalez Mancillas

SEE ATTACHED   CALIFORNIA   ALL-PURPOSE   ACKNOWLEDGMENT

# CALIFORNIA ALL- PURPOSE ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of **LOS ANGELES**

On _02/27/2020_ before me, LAURA ESPINOZA OSORIO, **Notary Public**
Date                              Here Insert Name and Title of Officer

personally appeared --------------ELENA GONZALEZ MANCILLAS-------------------------------------
Name (s) of Signer (s)

LAURA ESPINOZA OSORIO
Notary Public - California
Los Angeles County
Commission # 2253942
My Comm. Expires Aug 13, 2022

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signature (s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Place Notary Seal Above

Signature _____
                          Signature of Notary Public

————— *OPTIONAL* —————

Though this section is optional, completing this can deter alteration of the document or fraudulent reattachment of this form to an unintended document.

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Individual
☐ Corporate Officer – Title(s): _____
☐ Partner - ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER

Top of thumb here

Signer Is Representing: _____

Signer's Name: _____
☐ Individual
☐ Corporate Officer – Title(s): _____
☐ Partner - ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER

Top of thumb here

Signer Is Representing: _____

# EXHIBIT F

Estela Cottle
8250 Ventura Canyon Ave. #C
Panorama City, CA 91402
(818)997-8478

February 29, 2020

Dear Judge,

I am writing this character reference letter on behalf of Adrian Fierros, a young man that I really admire and care for.

My name is Estela Cottle and I have had the pleasure of knowing Adrian Fierros since June 2008 and been a friend of the Fierros family ever since. I consider Adrian to be a young man of great character because he had the courage to admit, he was going through a tough time. Ever since he found out that his father was diagnose with ALS he became angry and depress. Adrian had asked his mother for help in different occasions, but the help never got to him. At that time his mother was going thought Post-traumatic stress disorder and under treatment by a Licensed Therapist. Adrian and Omar both have gone through traumatic experience with Miguel Jr. older brother that suffers from schizophrenia, bipolar disorder and drug addiction and put the entire family in a very difficult situation for many years. Adrian has shown citizenship for being there protecting his parents from his older brother cray episode. I have also seen how caring he is, making sure his father doesn't lose balance and fall. He is taking the responsibility of cooking and cleaning making sure his father is feed. Adrian has always been trustworthy and respectful towards others.

I am really concerned about his future and truly believe with support from his family and professional help he can overcome his past trauma.

Sincerely,

*Estela Cottle*          07-03-2020

Estela Cottle

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of this document.

State of **California**
County of **Los Angeles**

Subscribed and sworn to (or affirmed) before me on this ___03___ day of ___MARCH___,
20_20_, by _ESTELA COTTLE_____,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

HAMID RAZZAZAN
COMM. #2248756
Notary Public - California
LOS ANGELES COUNTY
My Comm. Exp. Jul. 31, 2022

Notary Public

# EXHIBIT G

Tuesday, 1/07/2020, 05:00:49 PM



Regarding: Adrian Fierros
DOB: 06/03/1998
Probation Officer: Ileen Rodriguez
Probation Conditions: Pre-Trial

To Whom It May Concern;

Mr. Fierros enrolled with Anew Therapeutic Services (a California Sex Offender Management Board approved provider) on September 4, 2019 for weekly individual sessions. Subsequent to his enrollment, Mr. Fierros attended individual treatment appointments on 9/04/2019, 9/11/2019, 9/18/2019, 9/25/2019, 10/02/2019, 10/09/2019, 10/16/2019, 10/23/2019, 10/30/2019, 11/13/2019, 11/27/2019, 12/04/2019, 12/11/2019, and 12/18/2019 (Session on 11/06/2019 was canceled due to client being in court and session was canceled on 11/20/2019 due to clinician being out of the office).

This programs general sex-offender treatment is based on the 'Good Lives Model' of sex offender treatment; a strength-based approach designed to assist individuals with identifying the needs that have historically acted to inform their offense cycle (ultimately resulting in the offense itself) and finding adaptive alternatives around how such needs can be expressed and met in a healthy manner. Emphasis is also placed on building victim consciousness in order to help ensure that there are in fact no more victims going forward. Given Mr. Fierros status as a pre-trial client however, his treatment is focused on addressing themes of grief and loss associated with his charges in addition to assessing for risk to self and others.

Mr. Fierros maintains regular attendance and fully participates within each clinical session. He struggles with fully comprehending and accepting the magnitude of the consequences associated with the charges he is facing given his developmental mindset which seems firmly embedded within an adolescent framework. This has given way to the onset of moderate depression and significant anxiety that impacts his day to day functioning.

Respectfully,

Manuel Mercado, LMFT
manuel@anewtherapeutics.com

# EXHIBIT H

# Bloomfield Psychological Services
*Forensic and Clinical Psychology*

**Serena Lurie Bloomfield, Ed.D.**
Licensed Psychologist
FL License # PY4692
MA License # 3957

**Stephen I. Bloomfield, Ed.D.**
Licensed Psychologist
FL License # PY4901
MA License # 3695

November 16, 2019

Jessie Dreicer, Esq.
d/b/a Tassone, Dreicer & Hill
1833 Atlantic Boulevard
Jacksonville, FL 32207

RE:   <em>Adrian Fierros</em>

Dear Mr. Dreicer:

Pursuant to your request and his voluntary presentation, I conducted a Psychological/Psychosexual Evaluation of Mr. Fierros, a young man who is charged with a number of offenses.

I had the opportunity to review a Los Angeles Unified School District Psychological Service Report completed in 2011 when he was approximately thirteen years of age.

It was a Psychoeducational Report. He scored in the below average to average range in most of the areas measured. He was performing within the average range of cognitive ability according to the test and the areas of psychological processing appeared commensurate with cognitive ability. There are some strengths and some weaknesses. He has problems with focusing, listening, concentrating, ignoring distractions. The report indicates "At this time the results of this evaluation does not indicate a severe discrepancy appears to exist between ability and achievement…"

I also had the opportunity to review a large amount of information that was provided to me including information from the FBI, what appears to be an Indictment, as well as a number of emails and text messages

I gathered Biopsychosocial History both directly, as well as using the Quickview Social History.

---

The Quickview Social History Clinical Version is used to assist in collecting and reporting routine social history. It also asks the respondent about psychological and medical issues. It is a standardized test where the respondent answers questions on an answer sheet.

Adrian Fierros is a 21-year-old Hispanic/Latino Catholic male. He considers himself to be less devoutly religious than others of his faith. He lives in a house and has lived there for more than five years. He lives with his mother and his father. When asked about his dietary habits, he indicated that his diet is nutritious. He says he eats only breakfast. In his spare time Mr. Fierros enjoys team sports, artistic activities, literary activities, sporting events, and television. He has also indicated that he regularly participates in an additional hobby or activity that is not listed on the inventory.

As a child Mr. Fierros was very happy and recalls that he was rarely ill. As a teenager he was somewhat happy and remembers being healthy. Before age 18 he had a close friend with whom he could discuss nearly anything. He has no such friend now. Mr. Fierros is not aware of childhood problems with toilet training or with learning to sit up, crawl, stand, walk, talk, feed himself, or dress himself. He does, however, report a childhood problem with stuttering. He recalls being very afraid of certain animals, "monsters", the dark, and of going to school. He remembers that before age 13 he was excitable, was a show-off, had difficulty learning skills that require coordination, and had difficulty completing tasks that require concentration. He recalls being a roughneck, being a daredevil, hurting animals, stealing repeatedly, and engaging in vandalism.

Mr. Fierros does not report a history of running away from home, having suicidal preoccupations, or attempting suicide as a child or teenager. He reports being sexually molested several times as a child or teenager by a relative. He reports no unusual eating habits as a teenager. He recalls physically maturing earlier than most of the boys he knew. He felt that he could discuss nothing about sex with his parents. He began dating at the age of 18 or younger. He usually dated less than once a month. He usually dated one person at a time and remembers that his parents did not comment upon the individuals he dated. He reports that he has never had heterosexual intercourse. He did not have a homosexual experience before age 18 but reports that he did afterward.

Mr. Fierros was raised by his natural parents. Mr. Fierros reports having brothers. His natural mother suffered from depression. He also recalls that his natural father drank excessively. He reports that a sibling suffered from depression, attempted suicide, acted hyperenergetic at times, and used drugs excessively. Mr. Fierros reports that his mother loved him and gave him enough time and attention. He recalls that he could rarely talk to his mother about problems. He claims that his mother criticized everything he did.

He reports that his mother always praised him for his accomplishments. She was reasonably strict and always wanted to know where he was going and what he would be doing. His mother always punished him when he misbehaved. To punish Mr. Fierros psychologically, his mother would ignore him, yell at him, take away privileges, tell him that she was ashamed of him, make him feel that he had hurt her, embarrass him, or put him in "time-out". Corporal punishment

2

typically included spanking or slapping,\ pinching, and ear or hair pulling. Mr. Fierros reports that at least once, his mother hit him with an object as a form of punishment. He reports that his father loved him but gave him insufficient time and attention. He was never able to talk to his father about problems. He claims that his father criticized everything he did. His father was an extremely strict disciplinarian who always wanted to know where he was going and what he would be doing. Punishment always resulted when his father discovered that he had misbehaved. To punish the client psychologically, his father would yell at him or make him feel that he had hurt him. Corporal punishment usually included spanking or slapping, pinching, ear or hair pulling, and shoving or pushing. At least once, his father punched him and hit him with an object as a form of punishment.

He reports that his elementary school performance was below average, that he had problems learning to read, write, spell, and do arithmetic, and that he was placed in special classes for students with learning problems. He admits having repeated trouble with school authorities during his elementary school years, but he was not placed in any special classes for students with behavioral problems. In general, he liked elementary school and describes himself as being popular with most schoolmates. In high school he took remedial classes. His extracurricular activities included athletics. He remembers having difficulty in high school because of problems at home. He admits to having repeated trouble with school authorities in high school. Mr. Fierros describes himself as being somewhat popular with other students and as being generally happy in high school. Mr. Fierros reports graduating from high school.

Mr. Fierros reports his primary sexual orientation to be heterosexual. He has never been married or had a marriage annulled. Mr. Fierros has no children.

Mr. Fierros is currently unemployed and looking for work. He has quit jobs in the past. He reports resigning from a previous job because of dissatisfaction with his job and dissatisfaction with his entire line of work. He has quit a job more than once without having another one to go to. This past year, his household income was more than sufficient to pay for basic necessities.

Mr. Fierros reports having been charged with a criminal offense and is currently on parole. A charge is currently pending against him.

Mr. Fierros has never served in the United States military.

The last physical examination Mr. Fierros had was more than a year ago; he recalls having no problems at that time. Mr. Fierros's last dental exam was within the last six months. He is currently having problems with his teeth. He has never had surgery. He believes that he is currently in very poor health. Mr. Fierros has indicated that there is a medical condition, which was not specified on the inventory, that has affected a blood relative. His history includes high blood sugar. He is far-sighted. His history also includes high blood pressure.
Mr. Fierros has recently had a problem with being overweight. In addition, he has experienced heart palpitations. Mr. Fierros reports that he has recently been troubled by back pain. Mr. Fierros currently drinks alcohol once or twice a month. He usually drinks beer. He does not

3

report any usual diagnostic signs of current pathological alcohol use, and he has not experienced an increase in tolerance over time. No usual diagnostic signs of psychosocial impairment caused by alcohol use were reported. He has used cannabis but he does not use it now. No usual diagnostic signs of current pathological drug use were reported by Mr. Fierros. He reports no increase in drug tolerance. No usual diagnostic signs of psychosocial impairment caused by drug use were reported by Mr. Fierros. No episodes of depressed mood, diminished energy, loss of appetite, sleep disturbance, or suicidal ideation lasting two or more weeks were reported by Mr. Fierros. He indicates that he has experienced an episode of persistent elated mood and ncontrollable talkativeness accompanied by inflated self-confidence. He does not report having experienced thought broadcasting, thought insertion, thought withdrawal, auditory distortions and hallucinations, grandiose beliefs, persecutory beliefs, or feelings of being controlled. He has experienced two or three anxiety or panic attacks that may or may not have been situation-specific. Mr. Fierros reports an unreasonable fear of certain animals/insects, leaving home, and of being alone. He also admits having had unwanted, repetitive thoughts. He denies having performed repetitive acts. He has experienced a highly stressful situation with prolonged consequences including intrusive memories, recurrent dreams about the event, and avoidance of certain situations. His current sleep pattern is characterized by excessive daytime somnolence and feeling unrefreshed by sleep.

I also administered various tests of mental control and mental status and he presents within normal limits in terms of adult mental status and mental control.

Based upon mental status there were no limitations in any of the domains assessed by my examination. There is no evidence or signs of a thought disorder or a major cognitive behavioral disorder, no such signs or symptoms were elicited. He showed no abnormalities of thought, affect, or behavior and no gross abnormalities. I did not find any unusual kinds of logic or strange associations. There were no obvious indications of psychosis or organicity and no hallucinations in any field. He experienced thoughts in a spontaneous and normal manner while remaining lucid and coherent. There was no indication of disordered mentation in the form of incoherent or incomprehensible speech. His speech was relevant, spontaneous, and productive.

He showed an average number of thoughts which were neither speeded nor slowed. His thinking seemed normal from the perspective of productivity, relevance, and coherence. He presented his thoughts in an appropriately paced, understandable, and relevant fashion. His thoughts were coherent well organized and relevant to the subject at hand. He reached the goal of his thought process without introducing any irrelevant material. His train of thought was goal directed, relevant, logical, coherent, focused, without digressions. There was no tangentiality, circumstantiality or distractibility. His speech was relevant, appropriate, without evidence of unusual ideation.

I also administered, scored and interpreted the Minnesota Multiphasic Personality Inventory .

The Minnesota Multiphasic Personality Inventory Second Edition (MMPI-II) is a psychometric instrument designed to provide scores on all the more clinically important phases of personality. It is a 567 question true and false test and it is the most widely used personality instrument in

psychological assessment and has been adopted in a number of countries outside of the United States.

The test consists of validity and reliability scales and scales which measure the major clinical issues involved in ones personality and emotional functioning.   There are a number of other scales including supplemental and content scales.

On this instrument he indicated a great deal of problems. He indicated peculiar and strange thoughts. He had elevations in a number of areas including significant issues with mental dullness and physical functioning, as well as brooding and anxiety, a great deal of depression, as well as the possibility of some bipolar tendencies. This is very problematic and clearly he is in need of rather intensive psychotherapy, as well as an evaluation for medication.

I also administered and scored the Personality Assessment Inventory.

The Personality Assessment Inventory is a self-administered inventory of adult personality designed to provide information on critical clinical variables.

The PAI contains 344 items, which comprise 22 non-overlapping full scales, 4 validity scales, 11 clinical scales, 5 treatment considerations, and 2 inter-personal scales.   The PAI was developed and standardized for use in the clinical assessment of individuals in the age range of 18 through adulthood.   A fourth grade reading level is required to understand the items.

The administration and scoring is straightforward. Results provide diagnostic schemers as well as personality assessment and assessment of psychopathology.

His response style may have been affected by certain validity indicators which fell outside the normal range suggesting he may not have answered in a completely forthright manner. The nature of responses may lead to a somewhat inaccurate impression. There is no evidence to suggest he wanted to portray himself as relatively free of common shortcomings or minor faults, however certain aspects of the profile raise the possibility of denial of problems with drinking or drug abuse.

There are no marked elevations that should be considered to indicate the presence of psychopathology. Scores on one or more scales however show moderate elevations.

This is significantly different than his scores on the Minnesota Multiphasic Personality Inventory.

He is experiencing some degree of anxiety and stress. He describes himself as being rather moody. He reports no problems in any of the psychopathological issues that were reported on the Minnesota Multiphasic Personality Inventory discrepancy. This is somewhat problematic. He describes his temper within normal limits. He was not reporting distress or thoughts of self-harm.

5

Diagnostic considerations include: Adjustment Disorder with Anxiety; Dysthymic Disorder and Generalized Anxiety Disorder.

I administered, scored and interpreted the Sexual Adjustment Inventory.

The Sexual Adjustment Inventory, or SAI, identifies sexually deviant and pedophilia behavior in people accused or convicted of sexual offenses. There is an adult SAI and a juvenile version designated the SAI-J.

The SAI has 214 items and has thirteen measures. The SAI has been standardized on thousands of accused and actual sex offenders. It includes sexual deviance and commonly associated problematic attitudes, substance (alcohol and other drugs) abuse, and behavioral disorder screens. The SAI is a comprehensive and popular sex offender assessment instrument. There are Truth Corrected Scores that assist when people attempt to subvert the testing. The SAI assesses attitudes and behaviors that yield a sex offender profile.

There are Truthfulness Scales which deal with test item truthfulness and this refers to answers to none sex related test items and those appear to be accurate. These include scales, none sex scales include: violence, antisocial, alcohol and drug distress. He scored honestly in that regard. He does present that he is somewhat asocial and that he is incredibly impulsive and is suffering a great deal of distress. The Impulsiveness Scale is in the severe problem range. Recommendations include treatment that includes medication, individual group therapy. Sexual impulsiveness is often seen in people with sex problems.

He also scores extremely high in the Distress Scale both in terms of anxiety and depression.

He states that his sex life is unsatisfying.

The Sex Item Truthfulness Scale is in the problem risk range. Problem risk scorers attempt to minimize their sex related problems and concerns.

Nonetheless, he scores high in the Sexual Adjustment Scale and that is in the problem range. He manifests sexual adjustment concerns. He also scored in the medium risk range in terms of Child Molest Scales.

Mr. Fierros completed a Psychosexual Life History.

He believes that his health is okay. He feels that he has suffered depression, anxiety and high blood pressure. He feels lonely, anxious, stressed but also feels love and kind.

He reports learning problems, family problems, memory problems and fear problems and reports being lonely.

He reports never having seen anyone molest a young child and he reports that no one ever exposed themselves to him sexually, however he says when he was a child someone touched him

6

sexually and they touched his penis over his shorts which made him both confused and excited. It was a cousin or relative. He feels however he is over it.

He reports beginning to masturbate at five or six years of age which is young and felt an excitement about it. He masturbated while he was young, he looked at porn magazines and thinking about being with different classmates. He never masturbated with other men.

He had sexual feelings for the first time when he was eight years old. He was twelve years old when he first touched another person in a sexual way and that person was twelve years old. He reports he has never had sexual intercourse.

He feels a little insecure around women. He flirts a lot. He reports he masturbates one to three times a day and his fantasy is picking up a woman in a bar.

He denies fantasies about spanking anyone, tying someone up, beating some.

The only relative he has had sexual fantasies about are a girl cousin which is not terribly abnormal. He had peeped on an adult stating "My cousin was taking a shower and I tried peeping but saw nothing but her butt; I felt disgusted; I apologized to her."

He has looked at sex pictures on the internet and peeped on family members but denies the following sexual behaviors:

- Obscene phone calls
- Calling sex lines on the phone
- Joining in sex talk on the internet
- Molesting someone younger than himself
- Pressing his penis against someone unknowingly
- Having sex with a close relative
- Having sex with a male
- Having sex with someone who is passed out
- Peeping on strangers or neighbors but he has peeped on family members
- Forcing someone to have sex
- Using rape pornography
- Sex with an animal
- Cross dressing
- Exposed himself to strangers
- Exposed himself to family members
- Exposed himself to friends
- Used child pornography
- Raped a date
- Raped with a gang of boys
- Stolen female underwear.

7

He indicates that he acknowledges his culpability in the alleged offense, that he is seeing a therapist and he "forced her to send pictures of herself naked." He understands that it was wrongful and states "Throughout my life I have done things as if I was a kid and everybody around me would treat me as if I was one." He said he had a girlfriend he broke up with at age twelve and that had an important effect on him. He contacted minors on Instagram and was reasonably straight forward in regard to what I have read.

There is some discrepancy in his testing between the Personality Assessment Inventory and the Minnesota Multiphasic Personality Inventory, however the Sexual Adjustment Inventory and the Minnesota Multiphasic Personality Inventory show significant distress and significant concerns.

Clearly the information on hand from Law Enforcement, as well as a review of text messages is extremely problematic. It is my opinion that this young man needs a course of treatment that not only involves psychosexual treatment which I would strongly recommend, in fact I would think he needs to participate in a program of psychosexual treatment individually and on a group basis to deal with his issues but he also shows other psychological problems.

These include extreme impulsivity, anxiety and depression, and these need to be attended to both psychopharmacologically in the form of an evaluation by a psychiatrist to determine the need for medication, as well as therapeutically. Psychosexual treatment and this treatment are not the same and have to be done differently. Finally, he is young and the issues of young adult and adolescent brain development certainly play a factor. Given his age he is most likely amenable to change given the appropriate treatment.

If I can provide additional and/or clarifying information, please feel free to contact me.

Very truly yours,

*Stephen I. Bloomfield /s/*

Stephen I. Bloomfield, Ed.D.
Licensed Psychologist

SIB/tk

8

# EXHIBIT I



# Sylmar High School

Math/Science



Technology Magnet

This certifies that

## Adrian Fierros

has been found worthy in Character and Citizenship and has satisfactorily completed the Course of Study in accordance with the requirements for graduation of the Los Angeles Unified School District and is therefore awarded this

# Diploma

Given at Los Angeles, California, this tenth day of June, two thousand and sixteen.

President, Board of Education

Superintendent

Principal

# EXHIBIT J

Los Angeles Unified School District

## *Sylmar Charter High School*

*Math Science Technology Magnet*
13050 Borden Avenue, Sylmar, California 91342
Telephone: (818) 833-3776
Fax Number: (818) 364-1037

**Austin Beutner**
*Superintendent of Schools*

**Rodney Wright**
*Principal*

February 3, 2020

To Whom It May Concern:

I am writing this letter for Adrian Fierros. Adrian was a student at Sylmar Charter High School Math Science Magnet and was enrolled in my Honors Advanced Composition/Honors English Literature class during the 2015-2016 school year.

Adrian was a likable young man who was always respectful to staff and peers. He tried his best in the classroom but did struggle with maintaining a passing grade. At the end of the first semester he passed the class with a "D." Even though he was cooperative, his work habits suffered, mostly in terms of completing homework assignments. During the second semester, he tried to apply himself with various ups and downs throughout the term. He started off strong, earning a "B" the first grading period. However, as the material and assignments became more difficult, he struggled. However, he tried to remedy the situation and he ended the school year, earning a "C."

All in all, Adrian was a student who tried to better his situation and circumstance. Although he experienced setbacks, he worked to better his education and his behavior.

Sincerely,

Irese T. Moxley- English Teacher
Sylmar Charter High School Math Science Magnet
(818) 833-3776

# EXHIBIT K

**CHASE** ○
JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus, OH 43218-2051

November 19, 2019 through December 16, 2019
Account Number: **000003707567336**

00126826 1 AV 00,303
սպիվիդորկիկիվիկովրդիվիդովիվիդիայիդովկիկ

00126826 DRE 703 143 35119 NNNNNNNNNNN T 1 000000000 11 766000 P3090
ADRIAN FIERROS
13481 HARLEY AVE
SYLMAR CA 91342-3071

## CUSTOMER SERVICE INFORMATION

| Web site: | Chase.com |
|---|---|
| Service Center: | 1-800-935-9935 |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-877-312-4273 |
| International Calls: | 1-713-262-1679 |

| **SAVINGS SUMMARY** | Chase Savings |
|---|---|

| | AMOUNT |
|---|---|
| Beginning Balance | $129.33 |
| Other Withdrawals | -67.98 |
| **Ending Balance** | **$61.35** |
| Annual Percentage Yield Earned This Period | 0.00% |
| Interest Paid Year-to-Date | $0.01 |

Your monthly service fee was waived because this account was linked to your Chase College Checking account for Overdraft Protection.

## TRANSACTION DETAIL

| DATE | DESCRIPTION | AMOUNT | BALANCE |
|---|---|---|---|
| | Beginning Balance | | $129.33 |
| 12/02 | ODP Transfer To Checking 000000890115251 | -59.99 | 69.34 |
| 12/16 | ODP Transfer To Checking 000000890115251 | -7.99 | 61.35 |
| | **Ending Balance** | | **$61.35** |

IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS: Call us at 1-866-564-2262 or write us at the address on the front of this statement (non-personal accounts contact Customer Service) immediately if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt.
For personal accounts only: We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
 • Your name and account number
 • The dollar amount of the suspected error
 • A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.
We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS: Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account. Deposit products and services are offered by JPMorgan Chase Bank, N.A. Member FDIC

 JPMorgan Chase Bank, N.A. Member FDIC



This Page Intentionally Left Blank .

# EXHIBIT L



## ST. FERDINAND CATHOLIC CHURCH
### Missionary Oblates of Mary Immaculate

February 27, 2020

Your Honor,

Ms. Maria Mancillas and family are registered parishioners since August of 2007 to the present.
Her son Adrian Fierros attended St. Ferdinand School from 4th through 8th grade in the years 2007-2012.

If you have any questions, please feel free to contact us at (818) 365-3967.

Sincerely in Christ,

Rev. Juan Ayala, O.M.I.
Pastor of St. Ferdinand Church

Armando Campos
13846 MIndora Ave.
Sylmar Ca, 91342

02/28/2020

To the Presiding Judge

My name is Armando Campos, I'm uncle and family friend of Adrian Fierros who I have known since his birth, over 20 years.

I am writing to urge leniency in the sentencing of Adrian Fierros.  Adrian and I know the gravity of the crime he is being convicted of, but it is still hard for me to wrap my head around. This is not the young man I know to do such a crime and I'd like to give you a perspective that shows that he is more than the sum of his actions.

Adrian is the first to admit that he has severe depression and wanted the proper counseling, without being directed by any court.  He just wants to be a better person, to help others.  I am very familiar with the circumstances he grew up in, including an abusive brother, but he is amazingly resilient to have survived it.  I don't see him as a trouble maker, he is someone with a kind heart.

Adrian has always been there for his family willing to go out of his way to help with anything and everything without a problem.  I honestly believe he is trustworthy and respectful. He is a person of good moral and family oriented.

To this day Adrian continued to do all that is in his power to become a more self aware and in control of his emotions and actions by being responsible.

Sincerely,

3|6|20

Armando Campos

## ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of Los Angeles

On 3/6/2020 before me, Oralia G. Barrios
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
DATE NAME OF NOTARY PUBLIC

personally appeared Armando Campos
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯,
NAME(S) OF SIGNER(S)

☐ personally known to me  OR  ☒ proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), an that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

ORALIA G. BARRIOS
Notary Public - California
Los Angeles County
Commission # 2213393
My Comm. Expires Sep 9, 2021

Place Notary Seal or Stamp Here

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
SIGNATURE OF NOTARY

ATTENTION NOTARY: Although the information requested below is OPTIONAL, it may prove valuable to persons relying on this Acknowledgment and could prevent fraudulent reattachment of this certificate to another document.

### DESCRIPTION OF ATTACHED DOCUMENT

**THIS CERTIFICATE MUST BE ATTACHED TO THE DOCUMENT DESCRIBED AT RIGHT**

Letter
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
TITLE OR TYPE OF DOCUMENT

1
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
NUMBER OF PAGES

02/28/2020
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
DATE OF DOCUMENT

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
SIGNER(S) OTHER THAN NAMED ABOVE

February 27, 2020

Diana Deleon
20970 Costa Brava #202
Santa Clarita Ca, 91321
Ph: 818-390-5501

Re: Adrian Fierros

Your Honor,

Adrian and I are cousins and I have known him since he was a child, we have grown up together. He comes from a good family with good values and we have always been supportive towards each other. We have Family night once a month to celebrate everyone's birthday in that Month. I have come to see that Adrian is responsible and very helpful. He always helps carry the food, drinks, and he helps set up the tables without anyone having to bring it to his attention. Adrian is a caring person his dad is currently having some health issues and I have seen Adrian be supportive to his dad. He cooks him breakfast, motivates him, and he's very loving and affectionate.

Im aware that Adrian has a learning disability and he has had some traumatic experiences with his older brother Miguel Jr that may have affected him emotionally, however Adrian has always been a kind, generous, and respectful person. I feel that he has the ability to make changes in his life, he is still young and has a lot of potential. I am willing to support him in any way that I can and help him so he can be in a better situation. Thank you for taking the time to read this letter, Kindly consider his situation when making your decision.

Sincerely

Diana Deleon

# CALIFORNIA ALL-PURPOSE CERTIFICATE OF ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of **Los Angeles**

On **February 29, 2020** before me, **Ann Elizabeth Hernandez,** , Notary Public,
(Here insert name and title of the officer)

personally appeared **Diana Deleon** ,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

(Notary Seal)

ANN ELIZABETH HERNANDEZ
COMM. #2171213
Notary Public - California
Los Angeles County
My Comm. Expires Nov. 8, 2020

---

## ADDITIONAL OPTIONAL INFORMATION

### DESCRIPTION OF THE ATTACHED DOCUMENT

**Character Letter**
(Title or description of attached document)

_____
(Title or description of attached document continued)

Number of Pages **2**  Document Date **2/29/2020**

_____
(Additional information)

### CAPACITY CLAIMED BY THE SIGNER

☒ Individual (s)
☐ Corporate Officer
_____
(Title)
☐ Partner(s)
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Other _____

### INSTRUCTIONS FOR COMPLETING THIS FORM

*Any acknowledgment completed in California must contain verbiage exactly as appears above in the notary section or a separate acknowledgment form must be properly completed and attached to that document. The only exception is if a document is to be recorded outside of California. In such instances, any alternative acknowledgment verbiage as may be printed on such a document so long as the verbiage does not require the notary to do something that is illegal for a notary in California (i.e. certifying the authorized capacity of the signer). Please check the document carefully for proper notarial wording and attach this form if required.*

- State and County information must be the State and County where the document signer(s) personally appeared before the notary public for acknowledgment.
- Date of notarization must be the date that the signer(s) personally appeared which must also be the same date the acknowledgment is completed.
- The notary public must print his or her name as it appears within his or her commission followed by a comma and then your title (notary public).
- Print the name(s) of document signer(s) who personally appear at the time of notarization.
- Indicate the correct singular or plural forms by crossing off incorrect forms (i.e. he/she/they- is /are ) or circling the correct forms. Failure to correctly indicate this information may lead to rejection of document recording.
- The notary seal impression must be clear and photographically reproducible. Impression must not cover text or lines. If seal impression smudges, re-seal if a sufficient area permits, otherwise complete a different acknowledgment form.
- Signature of the notary public must match the signature on file with the office of the county clerk.
  - ❖ Additional information is not required but could help to ensure this acknowledgment is not misused or attached to a different document.
  - ❖ Indicate title or type of attached document, number of pages and date.
  - ❖ Indicate the capacity claimed by the signer. If the claimed capacity is a corporate officer, indicate the title (i.e. CEO, CFO, Secretary).
- Securely attach this document to the signed document

C 2004-2015 ProLink Signing Service, Inc. – All Rights Reserved www.TheProLink.com – Nationwide Notary Service

Elena Gonzalez Mancillas
15157 Cobalt St.
Sylmar, Ca. 91342
(818) 335-9201

February 27, 2020

Your Honor,

I am writing on behalf of Adrian Fierros who is appearing before your court.

My name is Elena Gonzalez Mancillas the aunt of Adrian Fierros who I have known for 18 years. In the time that I have known Adrian I have seen him grown to be a trustworthy and respectful individual. When Adrian sets his mind to accomplish something, he achieves it with dedication and sheer force of will. Adrian is a person of good moral character and family oriented. Since the start of our family night gathering in 2010, Adrian has been actively participating by helping organize and host our monthly get-togethers. I believe Adrian to be an honorable individual, and a valuable member of our family.

It is my sincere hope the court will consider the tenacity, self-awareness and courage that Adrian is facing during a troubled period in his life.

Please do not hesitate to contact me if you should require any further information.

Sincerely,

Elena Gonzalez Mancillas

SEE ATTACHED   CALIFORNIA  ALL-PURPOSE   ACKNOWLEDGMENT

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of **LOS ANGELES**

On ___02/27/2020___ before me, LAURA ESPINOZA OSORIO, **Notary Public**
    Date                                 Here Insert Name and Title of Officer

personally appeared -------------ELENA GONZALEZ MANCILLAS--------------------------------
                                                 Name (s) of Signer (s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity (ies), and that by his/her/their signature (s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

LAURA ESPINOZA OSORIO
Notary Public - California
Los Angeles County
Commission # 2253942
My Comm. Expires Aug 13, 2022

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                                 Signature of Notary Public

Place Notary Seal Above

--------------------- *OPTIONAL* ---------------------
Though this section is optional, completing this can deter alteration of the document or fraudulent reattachment of this form to an unintended document.

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Individual
☐ Corporate Officer – Title(s): _____
☐ Partner - ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER

Top of thumb here

Signer's Name: _____
☐ Individual
☐ Corporate Officer – Title(s): _____
☐ Partner - ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER

Top of thumb here

Estela Cottle
8250 Ventura Canyon Ave. #C
Panorama City, CA 91402
(818)997-8478

February 29, 2020

Dear Judge,

I am writing this character reference letter on behalf of Adrian Fierros, a young man that I really
admire and care for.

My name is Estela Cottle and I have had the pleasure of knowing Adrian Fierros since June 2008
and been a friend of the Fierros family ever since. I consider Adrian to be a young man of great
character because he had the courage to admit, he was going through a tough time. Ever since he
found out that his father was diagnose with ALS he became angry and depress. Adrian had asked
his mother for help in different occasions, but the help never got to him. At that time his mother
was going thought Post-traumatic stress disorder and under treatment by a Licensed Therapist.
Adrian and Omar both have gone through traumatic experience with Miguel Jr. older brother that
suffers from schizophrenia, bipolar disorder and drug addiction and put the entire family in a
very difficult situation for many years. Adrian has shown citizenship for being there protecting
his parents from his older brother cray episode. I have also seen how caring he is, making sure
his father doesn't lose balance and fall. He is taking the responsibility of cooking and cleaning
making sure his father is feed. Adrian has always been trustworthy and respectful towards others.

I am really concerned about his future and truly believe with support from his family and
professional help he can overcome his past trauma.

Sincerely,

*Estela Cottle*    07-03-2020

Estela Cottle

A notary public or other officer completing this certificate verifies only the identity of the individual who signed
the document to which this certificate is attached, and not the truthfulness, accuracy or validity of this document.

State of **California**
County of **Los Angeles**

Subscribed and sworn to (or affirmed) before me on this  03  day of  MARCH  ,
20 20 , by  ESTELA COTTLE  ,
proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

HAMID RAZZAZAN
COMM. #2248756
Notary Public - California
LOS ANGELES COUNTY
My Comm. Exp. Jul. 31, 2022

Notary Public

Los Angeles Unified School District

*Sylmar Charter High School*

*Math Science Technology Magnet*
13050 Borden Avenue, Sylmar, California 91342
Telephone: (818) 833-3776
Fax Number: (818) 364-1037

**Austin Beutner**
*Superintendent of Schools*

**Rodney Wright**
*Principal*

February 3, 2020

To Whom It May Concern:

I am writing this letter for Adrian Fierros. Adrian was a student at Sylmar Charter High School Math Science Magnet and was enrolled in my Honors Advanced Composition/Honors English Literature class during the 2015-2016 school year.

Adrian was a likable young man who was always respectful to staff and peers. He tried his best in the classroom but did struggle with maintaining a passing grade. At the end of the first semester he passed the class with a "D." Even though he was cooperative, his work habits suffered, mostly in terms of completing homework assignments. During the second semester, he tried to apply himself with various ups and downs throughout the term. He started off strong, earning a "B" the first grading period. However, as the material and assignments became more difficult, he struggled. However, he tried to remedy the situation and he ended the school year, earning a "C."

All in all, Adrian was a student who tried to better his situation and circumstance. Although he experienced setbacks, he worked to better his education and his behavior.

Sincerely,

Irese T. Moxley- English Teacher
Sylmar Charter High School Math Science Magnet
(818) 833-3776

# EXHIBIT M

Sincerely To the people I Hurt,

I want to sincerely apologize for the things I said and did. I was not thinking about the people I was hurting and I'm truley sorry with the bottom of my heart. I was in a dark time going through depression and I did not mean the hurtful things I did. That still doesn't make things I did ok. I should of stopped long ago, I want to stop, I will stop for everyone I hurt including my Family. ~~Kno~~ Know that you have Family, friends, people who love you and care about you and if you have something your holding in, speak upon it. I was holding something deep inside that I should of spoke about. I'm sorry I did this and I will not be doing anything of this.

Sincerely, Adrian

I want to sincerely apologize for the things I said and did. I did not think about the people who I was hurting and I'm truly, with the bottom of my heart sorry. I was in a dark time and going through depression and I did not mean the things I did. That still doesn't make the things I did ok. I should of stopped ~~splatter~~ long ago, I want to stop and I will stop. For everyone that I hurt, know that you have family, friends, people who love you. and if you have something your holding in, speak upon it. I ~~show~~ ~~that~~ was holding something deep in that I should of spoke ~~upon~~ about, but ~~didn't~~ but didn't and ~~in the end result~~ I got introuble ~~I am glad I~~ am ~~to~~ now and I will be

# EXHIBIT N

(Rev. 03/2016)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### APPEARANCE BOND:

### CASE NO.: 19-60153-CR-COHN

UNITED STATES OF AMERICA:
          Plaintiff,

v.                                 **JAIL #:**

ADRIAN FIERROS,
          Defendant,

I, ADRIAN FIERROS the undersigned defendant and I or we, the undersigned sureties, jointly and severally acknowledge that we and our personal representatives, jointly and severally, are bound to pay the United States of America, the sum of $ *Continued on Bond Set in Los Angeles, CA*

$100,000 PSB **STANDARD CONDITIONS OF BOND**

The conditions of this bond are that the defendant:

    1.  Shall appear before this court and at such other places as the defendant may be required to appear, in accordance with any and all orders and directions relating to the defendant's appearance in this case, including appearance for violation of a condition of the defendant's release as may be ordered or notified by this court or any other United States District Court to which the defendant may be held to answer or the cause transferred. The defendant is to abide by any judgment entered in such matter by surrendering to serve any sentence imposed and obeying any order or direction in connection with such judgment. This is a continuing bond, including any proceeding on appeal or review, which shall remain in full force and effect until such time as the court shall order otherwise.

    2.  May not at any time, for any reason whatever, leave the Southern District of Florida or other District to which the case may be removed or transferred after he or she has appeared in such District pursuant to the conditions of this bond, without first obtaining written permission from the court, except that a defendant ordered removed or transferred to another district may travel to that district as required for court appearances and trial preparation upon written notice to the Clerk of this court or the court to which the case has been removed or transferred. The Southern District of Florida consists of the following counties: **Monroe, Miami-Dade, Broward, Palm Beach, Martin, St. Lucie, Indian River, Okeechobee, and Highlands.**

    3.  May not change his or her present address as recorded on this bond without prior permission in writing from the court.

    4.  Is required to appear in court at all times as required by notice given by the court or its clerk to the address on this bond or in open court or to the address as changed by permission from the court. The defendant is required to ascertain from the Clerk of Court or defense counsel the time and place of all scheduled proceedings on the case. In no event may a defendant assume that his or her case has been dismissed unless the court has entered an order of dismissal.

    5.  The defendant must cooperate with law enforcement officers in the collection of a DNA sample if the collection is required by 42 U.S.C. Section 14135a.

    6.  Shall not commit any act in violation of state or federal laws.

**DEFENDANT: ADRIAN FIERROS,**
**CASE NUMBER: 19-60153-CR-COHN**
**PAGE TWO**

<u>**SPECIAL CONDITIONS OF BOND**</u>

In addition to compliance with the previously stated conditions of bond, the defendant must comply with the special conditions checked below:

✓ a. Surrender all passports and travel documents, if any, to the Pretrial Services Office and not obtain any travel documents during the pendency of the case;

✓ b. Report to Pretrial Services as follows: ( (as directed or) _ time(s) a week in person and__ time(s) a week by telephone;

__ c. Submit to substance abuse testing and/or treatment;

✓ d. Refrain from excessive use of alcohol, or any use of a narcotic drug or other controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. §802), without a prescription by a licensed medical practitioner;

✓ e. Participate in mental health assessment and/or treatment;

__ f. Participate and undergo a sex offense specific evaluation and treatment;

✓ g. Maintain or actively seek full-time employment;

__ h. Maintain or begin an educational program;

✓ i. Avoid all contact with victims of or witnesses to the crimes charged, except through counsel;

✓ j. Refrain from possessing a firearm, destructive device or other dangerous weapons;

__ k. None of the signatories may sell, pledge, mortgage, hypothecate, encumber, etc., any property they own until the bond is discharged, or otherwise modified by the Court;

__ l. May not visit commercial transportation establishment: *airports, seaport/marinas, commercial bus terminals, train stations, etc.*;

✓ m. No access to the internet via any type of connectivity device (*i.e., computers, pda's, cellular phones, tv's*), and follow instructions as outlined in the agreement waiver provided to you by Pretrial Services;

✓ n. **HOME CONFINEMENT PROGRAM** The defendant shall participate in one of the following home confinement program components and abide by all the requirements of the program which ( ) **will not** or (✓) **will include electronic monitoring or other location verification system, paid for by the defendant** *based upon his/her ability to pay* ( ) **or paid for by Pretrial Services** ( ).

__ **Curfew:** You are restricted to your residence every day from___ to___, or as directed by the Court.

✓ **Home Detention:** You are restricted to your residence at all times except for: (✓) **medical needs or treatment,** (✓) **court appearances,** (✓) **attorney visits or court ordered obligations, and** ( ) **other** _____

__ o. **HALFWAY HOUSE PLACEMENT** The defendant shall reside at a halfway house or community corrections center and abide by all the rules and regulations of the program.
You are restricted to the halfway house at all times except for: ( ) **employment;** ( ) **education;** ( ) **religious services;** ( ) **medical, substance abuse, or mental health treatment;** ( ) **attorney visits;** ( ) **court appearances;** ( ) **court ordered obligations;** ( ) **reporting to Pretrial Services; and** ( ) **other** _____

__ p. May travel to and from: <u>SOUTHERN DISTRICT OF FL</u>, and must notify Pretrial Services of travel plans before leaving and upon return. AND CENTRAL DIST. OF CAIFORNIA.

✓ q. Comply with the following additional conditions of bond: All ADAM WALSh Conditions APPLIED. NO ACCESS TO INTERNET, NO CONTACT With Children Under age 18

**DEFENDANT: ADRIAN FIERROS,**
**CASE NUMBER: 19-60153-CR-COHN**
**PAGE THREE**

## PENALTIES AND SANCTIONS APPLICABLE TO DEFENDANT

Violation of any of the foregoing conditions of release may result in the immediate issuance of a warrant for the defendant's arrest, a revocation of release, an order of detention, as provided in 18 U.S.C. §3148, forfeiture of any bail posted, and a prosecution for contempt as provided in 18 U.S.C. §401, which could result in a possible term of imprisonment or a fine.

The commission of any offense while on pretrial release may result in an additional sentence upon conviction for such offense to a term of imprisonment of not more than ten years, if the offense is a felony; or a term of imprisonment of not more than one year, if the offense is a misdemeanor. This sentence shall be consecutive to any other sentence and must be imposed in addition to the sentence received for the offense itself.

Title 18 U.S.C. §1503 makes it a criminal offense punishable by up to five years of imprisonment and a $250,000 fine to intimidate or attempt to intimidate a witness, juror or officer of the court; 18 U.S.C. §1510 makes it a criminal offense punishable by up to five years of imprisonment and a $250,000 fine to obstruct a criminal investigation; 18 U.S.C. §1512 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to tamper with a witness, victim or informant; and 18 U.S.C. §1513 makes it a criminal offense punishable by up to ten years of imprisonment and a $250,000 fine to retaliate against a witness, victim or informant, or threaten to do so.

It is a criminal offense under 18 U.S.C. §3146, if after having been released, the defendant knowingly fails to appear as required by the conditions of release, or to surrender for the service of sentence pursuant to a court order. If the defendant was released in connection with a charge of, or while awaiting sentence, surrender for the service of a sentence, or appeal or certiorari after conviction for:

(1) an offense punishable by death, life imprisonment, or imprisonment for a term of fifteen years or more the defendant shall be fined not more than $250,000 or imprisoned for not more than ten years, or both;

(2) an offense punishable by imprisonment for a term of five years or more, but less than fifteen years, the defendant shall be fined not more than $250,000 or imprisoned for not more than five years, or both;

(3) any other felony, the defendant shall be fined not more than $250,000 or imprisoned not more than two years, or both;

(4) a misdemeanor, the defendant shall be fined not more than $100,000 or imprisoned not more than one year, or both.

A term of imprisonment imposed for failure to appear or surrender shall be consecutive to the sentence of imprisonment for any other offense. In addition, a failure to appear may result in the forfeiture of any bail posted, which means that the defendant will be obligated to pay the full amount of the bond, which may be enforced by all applicable laws of the United States.

**DEFENDANT: ADRIAN FIERROS**
**CASE NUMBER: 19-60153-CR-COHN**
**PAGE FOUR**

### PENALTIES AND SANCTIONS APPLICABLE TO SURETIES

Violation by the defendant of any of the foregoing conditions of release will result in an immediate obligation by the surety or sureties to pay the full amount of the bond. Forfeiture of the bond for any breach of one or more conditions may be declared by a judicial officer of any United States District Court having cognizance of the above entitled matter at the time of such breach, and if the bond is forfeited and the forfeiture is not set aside or remitted, judgment may be entered upon motion in such United States District Court against each surety jointly and severally for the amount of the bond, together with interest and costs, and execution may be issued and payment secured as provided by the Federal Rules of Criminal Procedure and other laws of the United States.

### SIGNATURES

I have carefully read and I understand this entire appearance bond consisting of four pages, or it has been read to me, and, if necessary, translated into my native language, and I know that I am obligated by law to comply with all of the terms of this bond. I promise to obey all conditions of this bond, to appear in court as required, and to surrender for service of any sentence imposed. I am aware of the penalties and sanctions outlined in this bond for violations of the terms of the bond.

If I am an agent acting for or on behalf of a corporate surety, I further represent that I am a duly authorized agent for the corporate surety and have full power to execute this bond in the amount stated.

> **NOTE: Page 5 of this form MUST be completed before the bond will be accepted for filing.**

### DEFENDANT

Signed this _____ day of _____, 20 19 at FORT LAUDERDALE , Florida

Signed and acknowledged before me:

_____  DEFENDANT: (Signature) _____
Witness                                                      *Sylmar*              *CA*
                                                                  City                    State

### CORPORATE SURETY

Signed this _____ day of _____, 20 19 at FORT LAUDERDALE , Florida

SURETY: _____  AGENT: (Signature) _____

                                                                 PRINT NAME: _____
_____
City                          State

### INDIVIDUAL SURETIES

Signed this 21 day of June, 20 19 at FORT LAUD , Florida     Signed this 21 day of June, 20 19 at FORT LAUD , Florida

SURETY: (Signature) _____     SURETY: (Signature) _____

PRINT NAME: _____ NISUEL FMO     PRINT NAME: Maria Mancillas

RELATIONSHIP TO DEFENDANT: FATHER     RELATIONSHIP TO DEFENDANT: MOTHER

SYLMAN            CA     Sylmar            CA.
City                    State                                City                    State

Signed this ____ day of _____, 20 19 at FORT LAUD , Florida     Signed this ____ day of _____, 20 19 at FORT LAUD , Florida

SURETY: (Signature) _____     SURETY: (Signature) _____

PRINT NAME: _____     PRINT NAME: _____

RELATIONSHIP TO DEFENDANT: _____     RELATIONSHIP TO DEFENDANT: _____

_____     _____
City                    State                                City                    State

### APPROVAL BY THE COURT

Date: JUNE 21ST, 2019

_____
BARRY S. SELTZER
UNITED STATES MAGISTRATE JUDGE

**ADAM WALSH CHILD PORTECTION AND SAFETY CONDITIONS ACT OF 2006**

**Special Conditions of Release**

**MANDATORY CONDITIONS OF RELEASE:**

1. Electronic monitoring and curfew;
2. Report to Pretrial Services as directed;
3. Travel restricted to the Southern District of Florida;
4. Avoid contact with victims' and witnesses;
5. Refrain from possessing a firearm or destructive weapon

**ADDITIONAL CONDITIONS OF RELEASE:**

1. Surrender passport to Pretrial Services and not to obtain any during the pendency of the case;
2. Defendant shall participate in specialized sex offender evaluation and treatment, if necessary, and to contribute to the costs of services rendered based on ability to pay, as determined by the U.S. Probation Office;
3. Participate in the Location Monitoring Program, and shall abide by all the requirements of the program, which will be monitored by electronic monitoring (RF). The defendant is to be in home detention and shall be restricted to their residence at all times except for medical, treatment, court appearances and attorney visits as approved by U.S. Probation. The cost to be paid by the defendant based on his ability to pay;
4. Defendant shall not possess, procure, purchase or otherwise obtain any internet capable device and/or computer. Additionally, the defendant is prohibited from using another individual's computer or device that has internet capability.
5. Defendant is prohibited from establishing or maintaining any email account or social media account. Additionally, the defendant is prohibited from using another individual's email account or social media account. Must provide monthly or upon request, personal phone and credit card billings to Pretrial Services to confirm there are no services with any internet services provider;
6. Defendant is not permitted to enter or to use any local, state, federal or private libraries or any bookstore;
7. Defendant is prohibited from viewing, owning or possessing any obscene, pornographic, or sexually stimulating visual or auditory material, including telephone, electronic media, computer programs, or computer services; and
8. The defendant shall submit to a search of his person or property conducted in a reasonable manner and at a reasonable time by the U.S. Probation Officer.
9. If allowed computer access, the defendant shall consent to the U.S. Probation Officer conducting periodic unannounced examinations of the defendants computer(s) equipment at his/her place of employment or on the computer at the residence which may include retrieval and copying of all data from the computer(s) and any internal or external peripherals to ensure compliance with this condition and/or removal of such equipment for the purpose of conducting a more thorough inspection; and consent at the direction of the U.S. Probation Officer to have installed on the defendants computer(s), at the defendants expense, any hardware or software systems to monitor the defendants computer use.