1      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF FLORIDA
2        CASE NO. 19-CR-60153-COHN

3

4    UNITED STATES OF AMERICA,          )   Page 1-87
                                        )
5              vs.                      )   Fort Lauderdale,
                                        )   Florida
6    ADRIAN FIERROS,                    )
                                        )   June 30, 2020
7                   Defendant.          )   9:30 A.M.

8
            TRANSCRIPT OF SENTENCING VIA ZOOM
9         BEFORE THE HONORABLE JAMES I. COHN
                 U. S. DISTRICT JUDGE
10

11   APPEARANCES:

12   For the Government:      M. CATHERINE KOONTZ
                              United States Attorney's Office
13                            500 East Broward Boulevard
                              Suite 700
14                            Fort Lauderdale, Florida  33394

15   For the Defendant:      JESSIE NOLAN DREICER
                              Tassone Dreicer & Hill
16                            1833 Atlantic Boulevard
                              Jacksonville, Florida  32207
17
                              ENRIQUE BARQUINERO
18                            Barquinero, P.A.
                              1035 Lasalle Street
19                            Jacksonville, Florida  32207

20

21

22   Reported by:            VERNITA ALLEN-WILLIAMS
     Vernita_Allen-Williams   Official Court Reporter
23   @flsd.uscourts.gov      United States District Court
                              400 North Miami Avenue
24                            Miami, Florida  33128

25

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1                     INDEX OF WITNESSES
 2   Dr. Stephen I. Bloomfield:
 3                          Direct Examination......Page 7
 4                          Cross-Examination.......Page 21
 5                          Redirect Examination....Page 35
 6   Omar Fierros:
 7                          Statement...............Page 37
 8   Maria Mancillas Fierros:
 9                          Statement...............Page 46
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

1          THE COURT:  Folks, good morning.  We're on the

2     record now.  Cathy Koontz is not here, so we've got to wait

3     for the prosecutor.

4          (Brief pause)

5          THE COURT:  We're on the record now.

6          The matter before the Court is the United States of

7     America vs. Adrian Fierros.  This is Case No. 19-60153-CR.

8          Mr. Fierros is appearing by videoconferencing.  He

9     is represented by Jessie Dreicer and Enrique Barquinero, who

10    are both appearing by video this morning.

11         The government is represented by assistant United

12    States Attorney Cathy Koontz, who is appearing by video as

13    well.

14         Now, the Court would note that a waiver of physical

15    presence in court and consent to appearing by video or

16    teleconference under the CARES Act, that's Docket Entry 56,

17    has been filed on behalf of Mr. Fierros.

18         Mr. Fierros, did you authorize the execution of the

19    waiver of physical presence and consent to appear by video?

20         BY THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Okay.  All right.  On January 8th of

22    this year Mr. Fierros entered a plea of guilty to Counts 1

23    through 8 of an 8-count superseding indictment.

24         Counts 1 and 2 charge production of material

25    involving the sexual exploitation of minors in violation of

1    18 United States Code, Section 2251(a).

2         Counts 3 and 4 charge distribution of material

3    involving the sexual exploitation of minors in violation of

4    18 United States Code, Section 2252(a)(2).

5         And finally Counts 5 through 8 each charge sending

6    extortionate interstate communications in violation of 18

7    United States Code, Section 875(d).

8         Upon acceptance of Mr. Fierros' plea, the Court

9    adjudged him guilty of Counts 1 through 8, ordered a

10   presentence investigation report, and deferred sentence --

11   actually, it was initially deferred, I think, until --

12        Was it April, Ms.  Culberson?  Ms. Culberson, was

13   it originally deferred to April?

14        MS. CULBERSON:  It was originally deferred to

15   March 26th, Your Honor.

16        THE COURT:  To March, okay.  And then at the

17   request of the defendant, the Court continued the sentencing

18   until today's date.

19        So with that backdrop, have counsel for the

20   respective parties received a copy of the presentence

21   investigation report, Ms. Koontz?

22        MS. KOONTZ:  Yes, Your Honor.

23        THE COURT:  And Mr. Dreicer?

24        MR. DREICER:  Yes, Your Honor.

25        THE COURT:  And, Mr. Fierros, have you received and

 1   reviewed the presentence investigation report, along with the
 2   two addendum?  I believe there's two addendum; right?
 3            BY THE DEFENDANT:  Yes, Your Honor.
 4            THE COURT:  You have received and reviewed that,
 5   Mr. Fierros?
 6            BY THE DEFENDANT:  Yes, Your Honor.
 7            THE COURT:  All right.  Are there any objections?
 8            MS. KOONTZ:  Not from the government, Your Honor.
 9            THE COURT:  Mr. Dreicer?
10            MR. DREICER:  No, Your Honor.
11            THE COURT:  Then the Court makes the following
12   findings with respect to the advisory guidelines:
13            The total offense level is 43, the criminal history
14   category is one, the advisory imprisonment range is
15   1,296 months, probation ineligible, the supervised release
16   range is five years to life.  The fine range is $50,000 to
17   $250,000.  Restitution has not been determined.  There is a
18   mandatory special assessment of $100 per count, for a total
19   of $800, there is AVAA assessment of $170,000, a JVTA
20   assessment of $20,000.
21            The Court would note both parties have filed a
22   sentencing memorandum.  The government is Docket Entry 55,
23   and Mr. Fierros's sentencing memorandum is Docket Entry 47.
24            The Court has reviewed both sentencing memoranda,
25   together with all of the exhibits that were attached to the

1    defendant's; in addition, a number of character letters.

2              So with that backdrop, let me hear from Mr. Dreicer

3    first.

4              MR. DREICER:  Your Honor, I have a few witnesses

5    that I would like to call.  So if this is the time to do that

6    --

7              THE COURT:  This would be the time.

8              MR. DREICER:  Yes, sir.  I just wasn't sure when

9    you said hear from me, if you wanted some brief opening

10   argument.

11             THE COURT:  No, we don't need any opening.

12   Obviously, you'll have an opportunity to allocute; but I

13   don't need an opening.

14             MR. DREICER:  Yes, sir.  May I call Dr. Bloomfield?

15   He's in my office.  I'll get him right now, and we'll get him

16   all set up.

17             THE COURT:  Please do so.

18             MR. DREICER:  Dr. Bloomfield.

19             THE COURT:  Doctor, good morning.

20             THE WITNESS:  Good morning.

21             THE COURT:  I'm going to ask that you please raise

22   your right hand.

23             (Witness duly sworn)

24             THE WITNESS:  I do.

25             THE COURT:  Okay.  You can put your hand down now.

1   Doctor, would you state your full name, please.

2            THE WITNESS:  Yes.  Stephen, S-t-e-p-h-e-n, the

3   middle initial is I, Bloomfield, B-l-o-o-m-f-i-e-l-d.

4            THE COURT:  All right.  Mr. Dreicer, you may

5   inquire.

6            MR. DREICER:  Thank you.

7         DR. STEPHEN BLOOMFIELD, DEFENSE WITNESS, SWORN

8                    DIRECT EXAMINATION

9   BY MR. DREICER:

10  Q.   Dr. Bloomfield, where do you --

11           Well, what's your date of birth, Dr. Bloomfield?

12  A.   My date of birth is January 10, 1945.

13  Q.   And where do you work, sir?

14  A.   I work -- I'm in private practice.  My office address is

15  -- it remains, as of today, 3725 DuPont Station Court South,

16  in Jacksonville, Florida; but we will be relocating shortly.

17  That currently is my address.

18  Q.   And what do you do for a living?

19  A.   I'm a licensed psychologist.  I'm licensed in Florida

20  and licensed in Massachusetts as well.  I don't practice in

21  Massachusetts per se.  I am a forensic and clinical

22  psychologist.  That's what I do.

23  Q.   How long have you been doing this work?

24  A.   I graduated from the University of Massachusetts in 1984

25  -- in 1982; became licensed in 1984.  I've been doing this

1    work continuously since 1984.  I did this work in

2    Massachusetts, and then I relocated to Florida about 28 years

3    ago and have been practicing in Florida throughout the state,

4    as well as in the federal court, predominantly in the Middle

5    District.

6    Q.   And have you ever had a contract with the Middle

7    District of Florida in federal court?

8    A.   I did.  I had three contracts for three different

9    services; with U.S. Probation and Presentence Services, one

10   to provide mental health services for men and women on

11   supervised release; one to provide substance abuse services;

12   and one to provide psychosexual services to men and women on

13   supervised release or on pretrial services.

14   Q.   Is it fair to say that you work with a number of folks

15   who are charged with sex crimes?

16   A.   Extensively, yes.

17   Q.   Have you testified in state court?

18   A.   I have.

19   Q.   Roughly, how many times have you testified as an expert

20   in state court?

21   A.   In general or in sex cases?

22   Q.   In general.

23   A.   Over a thousand.

24   Q.   What about in sex cases?

25   A.   I'd say about 50 or 60 times, maybe a hundred.  I don't

1    keep an exact record, but I testify often.

2    Q.   Have you testified in federal court as an expert?

3    A.   I have.

4    Q.   And how many times in regards to sex cases have you

5    testified in federal court?

6    A.   Certainly over a dozen, maybe close to two dozen.

7    Q.   Has there ever been a time where you were not qualified

8    as an expert in either state or federal court?

9    A.   No, there hasn't.

10   Q.   And are you current in following up with taking -- we

11   call them CLEs in law school -- your continuing medical

12   education?

13   A.   Yes.  We call them CE.  The Board of Psychology in

14   Florida just extended because of the COVID virus, but I

15   already completed them and have -- I'm re-licensed as of

16   May -- as of June 1st.

17           Prior to this, I was actually on the Board of

18   Psychology itself.  I was appointed by the governor, and

19   served on the Board of Psychology.

20           MR. DREICER:  Your Honor, at this time I would

21   tender Dr. Bloomfield as an expert in psychology and forensic

22   psychology.

23           THE COURT:  Any voir dire?

24           MS. KOONTZ:  No objection, Your Honor.

25           THE COURT:  All right.  The Court will recognize

1    Dr. Bloomfield as an expert in that given field of expertise.

2    BY MR. DREICER:

3    Q.   In the end of 2019, Dr. Bloomfield, were you asked to

4    perform a psychosexual evaluation on Mr. Fierros; my client?

5    A.   I did, yes.

6    Q.   And did he come to your office, or how did you meet him?

7    A.   He did come to my office.

8    Q.   And was that in Jacksonville, Florida?

9    A.   In Jacksonville, yes.

10   Q.   And before he came to your office, were you provided

11   with some documents to be familiar with his charges and

12   background prior to meeting with him?

13   A.   I was.  A rather extensive list of documents.  I just

14   counted them this morning.  There were 37 different PDFs.

15   Q.   And did you review all of them?

16   A.   I did review all of them.  I relied on some more than

17   others, because they fit into the evaluative process.

18   Q.   As part of those documents, were there FBI reports so

19   that you knew what the allegations were?

20   A.   Yes.  I review FBI reports, including the FBI

21   investigation report and others.

22   Q.   Communications between Mr. Fierros and the victims?

23   A.   Yes.

24   Q.   His charging documents?

25   A.   Yes.

1    Q.   Were you able to review any of his prior learning or

2    educational analysis?

3    A.   I did.  I reviewed a report that was done when he was --

4    I'm trying to remember -- I think about 13.  It was a

5    psychoeducation evaluation.  I have it with me, if you want

6    me to refer to it, but I did review it.  That was the only

7    psychological psychoeducation report that, I believe, was

8    done, except for mine, so I did review it.

9            He performed in the average to low average range in

10   terms of cognitive functioning, which precluded the need for

11   me to do IQ testing or cognitive functioning.  He had some

12   problems noted in terms of attention and concentration.  He

13   was diagnosed with a learning disability.  It was done by the

14   Los Angeles Unified School District, and he was 13 years of

15   age at the time, and the testing was done on 6/6 of 2011.

16   Q.   Let me move you along, Dr. Bloomfield, if I may.

17   A.   Yes.  I'm sorry.

18   Q.   Did you do any social history yourself?

19   A.   I did several aspects of social history.  I interviewed

20   him, I administered the quick-view social history, which is a

21   questionnaire that I use.  It's a 27-page questionnaire, he

22   answered it, and it is reported upon in my report; I did a

23   psychosexual life history based upon a protocol that I use;

24   and I did various tests of mental control and mental status.

25   Q.   And through all of those, did you get at least an

1    understanding of who he was, who his family was, and his

2    sexual history or lack of sexual history, those types of

3    things?

4    A.   Yes.

5    Q.   What other tests did you perform?

6    A.   Well, the way I do my evaluation is I start off with

7    mental status and mental control.

8         Would it be easier if I just reviewed the tests and

9    went through them?

10   Q.   It's up to you.  That's fine.

11   A.   Okay.  So I started off with mental status and mental

12   control.  Is he oriented?  Is he responding to internal

13   stimuli?  Is he psychotic?  Are there cognitive deficits?

14   There weren't any.

15        So then I move on to have him -- I interview him in

16   terms of his history and background, both biopsychosocial, as

17   well as biopsychosocial sexual, and I have him complete the

18   quick-view social history which is reported extensively in my

19   summary report.

20        We move from there to a psychosexual history, where

21   I gather information from him about his sexual activities,

22   his sexual history, and then I move into more standardized

23   questionnaires, which are less self-report, more objective.

24   And I administered three such instruments; the Personality

25   Assessment Inventory, the Minnesota Multiphasic Personality

1    Inventory, and the Sexual Adjustment Inventory.  And I also

2    use a protocol called Static Instruments, which measured

3    potential for recidivism.

4    Q.   Let's talk about the MMPI or the Minnesota --

5    A.   The Minnesota Multiphasic Personality Inventory.

6    Q.   What did you find noteworthy about Mr. Fierros after

7    administering that examination?

8    A.   I found that he responded in a forthright manner.  He,

9    as reported -- I summarized it in my report, and I described

10   the instrument for the Court's information -- he indicated a

11   great deal of problems, he indicated he's having some

12   peculiar and strange thoughts.  There are elevations in a

13   number of significant issues; physical functioning, brooding

14   or depression, and anxiety, a great deal of anxiety, some

15   sense of bipolar tendencies, and it's both a combination --

16         The MMPI is the most widely used psychological

17   instrument in the world.  It's been translated into 60

18   languages.  It measures state and trait.  State is how the

19   person is responding to now, right at the moment; and he was

20   in a great deal of stress.  And trait is:  What are his

21   personality traits?

22         So he showed a number of state-related issues, but

23   very little personality deficits.  So he didn't have

24   personality disorder, but he did show a great deal of

25   distress, predominantly around impulsivity, anxiety, and

1  depression.

2  Q.   Is that something that you would expect to see when

3  someone is charged with crimes such as these?

4  A.   Would I expect?  It's a good prognosis if I see it.  It

5  means that the person isn't engaging in denial, minimization,

6  or cognitive distortions, that they're feeling the impact of

7  their actions, the consequences.

8        And overall I thought that he was showing signs

9  that would be considered remorseful, and he wasn't engaging

10  in a minimization or denial of what he was doing, and that it

11  was having a negative -- I don't know if that's the right

12  word -- but a distressful impact on him, which from a

13  psychological perspective is healthy.

14        If someone is involved in criminal activity and

15  they don't show it, they're psychopaths; but if they do show

16  it, they're people who have potential for rehabilitation.

17  Q.   And did you perform another evaluation called a Sexual

18  Adjustment Inventory?

19  A.   I did.  He completed the Sexual Adjustment Inventory,

20  another standardized instrument.  Again, he was high in

21  distress and anxiety.  He understands that his sex life has

22  been problematic, and he scored high in certain areas.

23  Impulsivity, I thought it was very high.

24        And also relevant to his age, one has to remember

25  that he's a young adult.

1    Q.    Let me ask you some questions about that.  Are you

2    familiar through your education, training, and experience,

3    Dr. Bloomfield, with brain development?

4    A.    I am.

5    Q.    Do you follow this course of study regularly in your

6    practice?

7    A.    I do, and I've testified on it numerous times in terms

8    of juvenile resentencing hearings, as well as sentencing

9    hearings for adolescents and young adults.

10   Q.    Can you explain to the Court what you understand the

11   brain development to be of a 19- and 20-year-old?

12   A.    Sure.  There is the underdevelopment of the frontal lobe

13   or the prefrontal cortex and the limbic system.  What that

14   means is the front of the brain develops last.  The brain

15   develops from the back to the front -- primitively, motor

16   skills, et cetera -- and then it develops the executive

17   function, which lie in the frontal lobe and the prefrontal

18   cortex.

19           While it's developing -- we used to think that

20   people would develop by 16, 18 years of age; but that turned

21   out not to be true based upon neurological,

22   neuropsychological, and psychological research.

23           And we think that the age of development is about

24   25.  We see greater development in a 20-year-old than a

25   12-year-old; but, nonetheless, the brain is not fully

1     developed.  So what that means is the person engages in more

2     impulsive and impetuous acts, less knowledgeable and

3     concerned with -- normally, with consequences.  And so as

4     that brain develops, also the personality develops.

5             I'm sure the Court's aware this was developed in

6     response to the Supreme Court making some decisions about

7     juvenile sentencing.  It's been well known in our fields that

8     adolescents, young adults, are different than adults; but we

9     didn't know exactly why, and we became more aware because of

10    the court system, because the court system demanded that we

11    be able to explain this scientifically.  So amicus briefs

12    were written for the United States Supreme Court by the

13    American Psychological Association, the American Psychiatric

14    Association, the National Association of Social Workers, and

15    the Mental Health Association.

16            I told Mr. Dreicer recently that, parenthetically,

17    that this is one of the few times that psychiatrists,

18    psychologists, and social workers actually agreed on

19    everything; that there is a difference in brain development.

20    Q.   And in this particular case, Dr. Bloomfield, what you

21    found in this Minnesota Inventory to be in the severe problem

22    range, is that consistent with the behavior that Mr. Fierros

23    was charged with?

24    A.   Absolutely.

25    Q.   So my question is:  If a person was evaluated by you and

1    they did not have these elevated controls of impulsiveness or

2    indicators that you would note, would that be problematic?

3    A.   Yes, it would be.

4    Q.   And why would that be problematic?

5    A.   Well, either they would be lying or they would be

6    engaged in what we call cognitive distortions.  Cognitive

7    distortions are what we look for in terms of people who are

8    charged with sex acts:  I didn't do it, it was her.  I'm

9    really not responsible.  You know:  It was somebody else.

10   Those kinds of things.  I didn't know how old she was.  So

11   those cognitive distortions are what we see; and so then when

12   we do our evaluations, that translates into minimization and

13   denial.

14            And he was very forthright in his problematic

15   issues on all the instruments I used; Personality Assessment

16   Inventory, Minnesota Instrument, and the Sexual Adjustment

17   Inventory.  And it all made sense.  It all fit together.  One

18   of the jobs of a psychologist is to see how all this data

19   fits together.  Does it make sense?  Or is the person

20   distorting information?  And I didn't find that.

21            I also found that there was some very positive,

22   proactive issues; one, his age.  Just the normal course of

23   development, he would become less impulsive, less impetuous,

24   and more concerned about consequences.

25   Q.   In your findings, Dr. Bloomfield, were you able to

1    review a simple report that was done by the counselor who he

2    is seeing in California?

3    A.   Yes, I was.

4    Q.   And did the counselor also make any findings as to what

5    he believed Mr. Fierros' brain development or maturity was?

6    A.   The counselor felt that he was immature.  I have a note

7    from the counselor that:  He struggles with fully

8    comprehending and accepting the magnitude of consequences --

9    which is what I just talked about -- naturally with his brain

10   development.

11              And he is facing his -- this is what Manuel Mercado

12   (phonetic), LMFT, said, quote:  He is facing, given his

13   developmental mindset, which seems firmly embedded within an

14   adolescent framework.  So the counselor -- I don't know the

15   counselor.  I did a little Google of the agency.  It seems

16   like a credible agency.  It's called Anew Therapeutic

17   Services.

18              So the counselor found the same thing hands-on that

19   I found from the testing and from my knowledge of adolescent

20   young adult brain development.

21   Q.   And does that give you any reasonable expectation as to

22   how Mr. Fierros may respond to treatment in order -- well,

23   how he responds to treatment, given the findings that you

24   found?

25   A.   Well, I was impressed for a couple of reasons.  One, is

1  he's been consistent with his treatment.  The therapist

2  listed dates.  It seems like he's been in therapy every week

3  since 9/4/2019, so that's a good sign.  It's a good sign that

4  he's engaged with the therapist, and it's a good sign that

5  the therapist was able to see.

6          And this is a sex offender management program.

7  It's an approved program.  I believe it's approved by

8  probation and pretrial, the same way my program was, so

9  familiar with charges, familiar with the legal system,

10  familiar with how sex offenders try and distort, and whether

11  they distort.  So I was very impressed reading the summary

12  evaluation by Mr. Mercado.

13          And I think it points yet again to a prognosis for

14  change, his ability, that he is a not incorrigible, that he's

15  not irreparably damaged.  And with a combination of maturity,

16  as well as treatment --

17  Q.   Let me break those down.  If the Court -- the minimum

18  mandatory sentence the Court has no choice but to sentence

19  here is 15 years.

20          When you say maturity, 15 years from now will Mr.

21  Fierros, without any treatment, just naturally have finished

22  his brain development?

23  A.   Absolutely.

24  Q.   And then how does treatment play into whether a person

25  can be salvageable or society can be protected from

1    recidivism?

2    A.   Well, I don't know exactly what words to use, but the

3    federal system has the best psychosexual treatment I have

4    ever seen at Butner.  I visited Butner a couple of times, and

5    I've also read some of the research -- not some, all of the

6    research that they have done.  State-of-the-art facility, and

7    it provides psychosexual counseling.  It's a very effective

8    program.  Very effective program.  Their writing is

9    state-of-the-art research.  And not only that, but if he's on

10   supervised release, he'll be sent to a certified program

11   where psychosexual treatment will continue.

12         So in the federal system, as opposed to the state

13   system, there's tremendous opportunity for change,

14   rehabilitation through the -- even while someone is

15   incarcerated.  I wouldn't be saying this in terms of the

16   state system or any state system, because they don't have the

17   facilities or the programs.

18         Now, I know the Bureau of Prisons will make the

19   decision about where he goes; but given the nature of the

20   crime, given the nature of the evaluations, it's likely he

21   will be sent to a psychosexual program.

22   Q.   And if he is sent to a psychosexual program and he is in

23   a system for such a period of time that his brain development

24   will, in fact, grow past the age of 25, can you make any

25   findings as to his level of recidivism?  A low level?  High

1    level?

2    A.   It's likely that it will be a low level.  Certainly I

3    can't predict everything about the future, but everything

4    stands -- everything points to his capacity to be

5    rehabilitated.

6    Q.   Is he amenable to change and treatment?

7    A.   He is absolutely amenable to treatment.  He has been

8    going to treatment during this period of time, and his

9    therapist says good things about him and good things about

10   his participation in treatment.

11   Q.   Are all of those things consistent with findings through

12   the evaluations that you made?

13   A.   They are absolutely consistent.

14        MR. DREICER:  Your Honor, I don't have any further

15   questions.

16        THE COURT:  All right.  Ms. Koontz?

17        MS. KOONTZ:  Yes.  Thank you, Your Honor.

18                        CROSS-EXAMINATION

19   BY MS. KOONTZ:

20   Q.   Good morning, Dr. Bloomfield.

21   A.   Good morning.

22   Q.   You indicated that he may have a lack of brain

23   development given his age; is that correct?

24   A.   Given his age, yes.

25   Q.   Okay.  And do you know whether or not he graduated from

| 1 | high school? |
| 2 | A.   I have to check.  I can't say without looking through my |
| 3 | notes or my report; it just doesn't come quickly to me. |
| 4 | Q.   I can save you, Your Honor -- I mean, Dr. Bloomfield.  I |
| 5 | think he did graduate from high school. |
| 6 | A.   I thought he did. |
| 7 | Q.   Okay.  And he's held some jobs, correct, since high |
| 8 | school? |
| 9 | A.   Absolutely, yes. |
| 10 | Q.   Okay.  And you indicated throughout your report that he |
| 11 | has exhibited some impulsive behavior; is that correct? |
| 12 | A.   That's correct. |
| 13 | Q.   And you also indicated that he had some -- reported some |
| 14 | peculiar or strange thoughts; is that right? |
| 15 | A.   That's right. |
| 16 | Q.   Now, this impulsive behavior, combined with these |
| 17 | peculiar and strange thoughts, couldn't that potentially put |
| 18 | children in our society at great risk? |
| 19 | A.   Well, he acknowledges the thoughts, so we understand |
| 20 | there has been a risk.  The question is -- |
| 21 |         He would become less impulsive because his brain |
| 22 | will develop, and he'll become more aware of appropriate |
| 23 | thinking patterns because of the treatment that he'll |
| 24 | receive.  So both of those issues led, probably, to the |
| 25 | commission of the crimes.  And there is no -- as I understand |

1    from Mr. Dreicer, there is no dispute about the crimes, and

2    I've read the other documentation.

3          So what we would expect is that at some point he's

4    going to be less impulsive.  We know that to be true.  We

5    know that he's amenable to change, and we know that he'll

6    stop having peculiar thoughts.  He acknowledges that his

7    actions were peculiar and out of the ordinary.  It doesn't

8    make him psychotic.

9          In fact, in terms of my evaluation, what it makes

10   him is more amenable to change and more likely to be

11   remorseful.

12   Q.   Why do you believe that he is going to stop having these

13   peculiar and strange thoughts that's something that he

14   reported that he has?

15   A.   Because they involved the criminal activity; and once he

16   is in treatment for a sufficient amount of time, they'll

17   deal -- that's what treatment does, is it deals with having

18   people understand their thought patterns.  And cognitively

19   what we use is cognitive behavioral therapy.  Cognition are

20   thoughts.  Behavior are what happens as a result of those

21   thoughts.

22         So we work with people in a cognitive behavioral

23   modality, where we change the way they think about things,

24   and that immediately changes -- not immediately, but that

25   changes the way they behave.  That's the goal of therapy; all

1    therapy.

2          Psychosexual therapy is geared to psychosexual

3    issues.  He does not deal in cognitive distortions.  Very

4    positive.  He does not engage in minimization or denial, and

5    he has attended therapy on a weekly basis for, you know,

6    six months or so, I guess.

7          So I think the prognoses are good, and that we

8    noted he's had those thoughts because he acknowledged them.

9    He didn't deny them.  If he had denied them, we'd be looking

10   at psychopathy, sociopathic issues; but we don't see that

11   with him.  We see a troubled person in distress which, you

12   know, unfortunately, is positive when someone commits a

13   crime.  We like to see people who commit crimes be in

14   distress about what they did.  It's a positive factor.  It's

15   called a protective factor.

16         If they come in and say:  Well, it wasn't a big

17   deal or, you know, I just wanted to do this or that, and

18   they're glib about it and facile and manipulative, we start

19   wondering about issues like psychopathy and sociopathy, but

20   that didn't happen.

21         So the frontal lobe issues, his brain will develop.

22   Therapy will deal with odd thoughts, peculiar thoughts, and

23   how to engage those in appropriate behavior.  And because

24   it's the federal system, he will have continued psychosexual

25   treatment on supervised release.

```
 1    Q.    Doctor, there are many, many individuals out there that
 2    are sexually attracted to children; and when they see a
 3    child, they become sexually attracted.
 4          In this case we had this defendant requesting
 5    images for children as young as 11 years old.
 6    A.    That's right.
 7    Q.    And when they didn't, he threatened them.
 8    A.    That's right.
 9    Q.    And you also indicated that he was remorseful.
10          Isn't it quite possible he is remorseful because he
11    was caught?
12          He wasn't remorseful when the victims said:  If you
13    don't stop, I'm going to kill myself.  He didn't care.
14    A.    Typically, when people engage in aberrant criminal
15    behavior, they're so involved in the behavior that they're
16    not remorseful while they're doing it.  If they were
17    remorseful while they were doing it, they wouldn't be doing
18    it.
19          So we look for remorse when people are caught, are,
20    in fact, arrested, and we compare that to other criminals who
21    are not remorseful and who don't really care and just want to
22    talk about:  How many years can I get?  How can I get
23    probation?  I mean I've done thousands, too many thousands of
24    criminal evaluations, and people malinger, people present in
25    ways to distort the information.  This young man didn't.
```

1    I'm not condoning his crime, and neither is he.

2    And he is going to be sentenced, I understand that, and it's

3    appropriate.  But I think he is amenable to change, based

4    upon the therapy that he's had and based upon my evaluation.

5    There are people who I don't think are amenable to

6    change, and I'll say that.  The truth is I usually don't say

7    that in court, because it doesn't get to court because the

8    attorney says:  Well, I'm not going to have you testify if

9    you're going to tell the judge my client's not amenable to

10   change.  But I've testified numerous times about the issues

11   of change and the probability of change, and it's a difficult

12   task.  I find it hard work.

13   There was one point in my career when I was

14   younger, early on in my career, where I didn't do

15   psychosexual issues because I didn't want to work with those

16   people.  But as I became more experienced and trained and

17   understood the issues, I started doing them.  And I'm

18   certainly not an early-career psychologist; I'm a late-career

19   psychologist, so I know about as much as I'm ever going to

20   know.  I continually learn stuff.  But, you know, I'm just

21   trying to offer my opinion to the Court from a psychological

22   perspective for this young adult male.

23   And certainly he committed crimes.  They were, you

24   know, bad, bad crimes -- I don't know what word to use -- but

25   bad stuff, but.

1            So the question for me as a psychologist is maybe

2      find out why this happened, how it could be corrected, and is

3      he amenable to that correction, and I think he is.

4            THE COURT:  Doctor, if I may interrupt.  Do you

5      have an opinion as to what motivated Mr. Fierros to commit

6      these crimes?

7            THE WITNESS:  You know, I -- that's a great

8      question, Judge.  Some of it had to do with power and

9      dominance, and some of it had to do with attraction.  And I

10     don't know where the balance of that is, but that's certainly

11     what would be explored in counseling.

12            I've worked with several people who committed

13     similar crimes and evaluated several people who committed

14     several similar crimes, and so it's -- there is a balance

15     between feeling dominant and feeling powerful because you

16     feel lack of power and control in the rest of your life, and

17     so you take advantage of vulnerable people.  That's certainly

18     not a good thing, and I don't excuse it; but that's some of

19     what goes into this, separate from the sexual gratification.

20     The sexual -- it was a sexual act, so I'd be naive to say

21     there is not some sexual component to it; but there is also

22     this other component of power dynamic.

23            The other thing is he was sexually abused somewhat

24     as a child and wasn't treated, and so that goes into this

25     victim-perpetrator cycle that will also be dealt with in

1    therapy.

2          So all of those aspects -- the power, the sexual

3    attraction, the victim-perpetrator cycle, and of course the

4    age -- will all be looked at within the context of the

5    therapy, and they'll try and get a better handle on it.

6          I wish I had a better answer, Judge, but that's the

7    best I can come up with.

8          THE COURT:  Well, do you have an opinion -- and

9    this may relate to the dominance -- do you have an opinion as

10   to why Mr. Fierros selected victims in the age range of 11 to

11   14?

12         THE WITNESS:  Opportunism, ease, Internet.  The

13   world has changed, obviously, in my lifetime from contact

14   sexual issues to Internet issues.  It becomes very easy.

15   People who are committing crimes like this have early

16   success, and then they do it because they were successful --

17   I know it's a weird way to think about it -- but they were

18   successful at their crime, and so there is opportunity and

19   vulnerability of the victims, victims that age.

20         You know, I don't want us to talk about anecdotes,

21   but I evaluated a fellow once who was taking a medication,

22   and he said:  Well, my medication makes me hypersexual,

23   wanting to have more sex.  And I said:  Yeah, I understand

24   that's true.  But it doesn't make you want to have more sex

25   with kids; it makes you want to have more sex.  Why did you

1    prey on kids as opposed to adults?  And the real reason was

2    because he couldn't deal with preying on -- doing this with

3    an equal, somebody who has the same power level as him, so he

4    needed to be able to exert his power.

5           In this particular young man's case, I think what's

6    overlooked a lot is the sexual abuse of him as a young child

7    by a relative.  It wasn't brutal, but it was there and it was

8    never treated and never dealt with.  So with all the other

9    factors I talked about and the issues that Mr. Dreicer asked

10   me about, the fact that he himself was sexually abused makes

11   him (unintelligible) right about this.

12          So he had vulnerable victims, unfortunately, and he

13   found them.  And I think that he will learn how to deal with

14   those issues, both in terms of him aging, as well as the

15   deterrence of incarceration, and the rehabilitative aspects.

16          THE COURT:  You know, I'm sure in reading the

17   factual history of this crime that you saw that with respect

18   to one victim, Mr. Fierros demanded that she go into her

19   five-year-old brother's room -- who happened to be autistic

20   -- pull his underwear down, and videotape her licking his

21   penis.

22          THE WITNESS:  Yes, I understand that's an

23   allegation.  I'm not certain -- I asked Mr. Dreicer about it.

24   I'm not certain that that was -- that that really happened or

25   it didn't happen.

```
 1              But, yeah, it's a bad thing, Judge, there's no
 2    question.  It became -- it escalated on itself, so I don't
 3    know if he actually did that or not.
 4              THE COURT:  Well, here's my thought process.  I
 5    understood what you said when I asked you about what,
 6    perhaps, motivated Mr. Fierros to commit these crimes.
 7              And one possibility was dominance, which I can well
 8    understand.
 9              THE WITNESS:  Right.
10              THE COURT:  And the other possibility is sexual
11    gratification of sorts.
12              THE WITNESS:  Yes.
13              THE COURT:  But when the defendant demands that the
14    victim go into her five-year-old brother's room, pull his
15    underwear down, and videotape her licking his penis, is that
16    dominance or sexual gratification?  Or what is that?
17              THE WITNESS:  I think what happens is when
18    people -- in my experience, and I've seen about a half dozen
19    cases like this, not exactly like this, but what happens is
20    it feeds on itself.
21              So the person says to the girl:  Do this.  Take off
22    your shirt, and she does.  And then the next time he says:
23    Well, now take off your shirt and your underwear, and she
24    does.  So then he comes up with other bizarre things, more
25    peculiar things for a victim to do, and then they may or may
```

```
 1    not do it.  And so I don't know, Judge.
 2              I think it feeds on itself and it gets into this
 3    opportunistic life of its own.  And I think that the -- I
 4    think that's an issue that really, really has to --
 5              I don't think we can come up with a good answer.  I
 6    really wish I could.
 7              THE COURT:  I appreciate your candor, and I find
 8    you to be one of the more credible experts in this area.
 9              THE WITNESS:  Thank you.
10              THE COURT:  But he takes it another step further.
11              THE WITNESS:  Yes.
12              THE COURT:  When this particular victim stopped
13    contact with Mr. Fierros, Mr. Fierros turns around and sends
14    out her nude photographs to six of her friends at school via
15    Instagram.
16              THE WITNESS:  Yes.
17              THE COURT:  Where would that fit in terms of
18    motivation?
19              THE WITNESS:  Nothing good.  I think he's trying to
20    gain control and he's out of control himself and he's trying
21    to gain control.  And he's doing it totally inappropriately,
22    obviously; we don't disagree about that.  I think he's trying
23    to gain some kind of control over the situation.
24              As I said earlier, I think he chooses younger
25    victims because of their vulnerability, the opportunism, and
```

1   the ability to be in a dominant role versus an equal role,

2   so.  And I think he understands that at this point.

3         I'm not condoning the behavior.  I don't want

4   anybody to misunderstand that.  It's hard behavior to

5   explain.  In my experience, in therapy we're able to delve

6   into these things.  And the therapists, the ones who work

7   like I did on supervised release with people, work closely

8   with their probation officers to try and figure it out.

9         And there are some people -- I don't think he's one

10  of them -- there are some people -- I once told a probation

11  officer in the Middle District that his client could not come

12  to my office because I didn't trust that -- and that was a

13  55-year-old man -- that he was not going to groom some of the

14  women that were being seen in our office with the Department

15  of Children and Families because they were vulnerable.  You

16  have to be willing to do that when you're doing psychosexual

17  treatment or you're doing bogus treatment.  But I told the

18  probation officer:  This man's not changing.  He's not.  He

19  should be.  Something else has to happen, but treatment is

20  not changing him.  His years being incarcerated did not

21  change him.

22        Here we have a young guy who is going to develop

23  his brain; just because he gets older, he'll become more

24  mature, a guy who tests pretty good, a guy who is going to

25  therapy and shows remorse.  And I can't excuse his behavior

1    and neither can he.  He doesn't try to.

2            He doesn't get into the cognitive distortions of --

3    a cognitive distortion, Judge, would be:  Oh, the girl wanted

4    to go and have her autistic brother lick his penis or dog

5    lick his penis, you know, or whatever.  But he's not -- when

6    I see him, he's not saying that.  He's remorseful, he's

7    distressed, those are the peculiar experiences that he

8    attests to on the testing; not hallucinations and delusions.

9    But why did I do this? He's struggling.  In my opinion, he's

10   struggling with what he did.

11           Why does it happen when he gets arrested?  Because

12   that's what it takes.  We know that in issues like this,

13   bottoming out is what happens.  And people go along and do

14   negative things until there's something that stops it.  And

15   in this case he was arrested and he was in court and he's

16   facing serious consequences, so he reacts; he reacts

17   appropriately in my opinion to those, as opposed to trying to

18   deny them, minimize them, use cognitive distortions, blaming

19   others.

20           And so I think that's where we're at.  I can't

21   pretend that we have all the answers to this.  The treatment

22   -- Judge, if Butner can't find out what's going on with him,

23   I don't think there is a program in the universe that can.

24           THE COURT:  I think to me the most disturbing

25   aspect of this crime is that after several of these victims

1    informed Mr. Fierros the extent to which they were tormented

2    by his conduct, that they were contemplating suicide, it

3    didn't faze him.  It didn't faze him.  He continued.  It's

4    like no empathy whatsoever for any of these young girls.

5                THE WITNESS:  There is no question it didn't stop

6    him.  I think he has empathy now.  I think he was in a vacuum

7    bubble doing all of this, and that he couldn't see himself or

8    the victims -- I'm not sure he saw the victims as people, but

9    that's because he was in this bubble of perpetration.

10               Now he's not and now he understands what was going

11   on and he thinks that those acts are repugnant; that he

12   should have known what was going on and should have been more

13   concerned.  I can't change that he didn't.  You're correct,

14   Judge, those are terrible things.  But they happened in the

15   context of this bubble that happened for him, and we have to

16   see what we have next.

17               You know, when I started working with probation, a

18   senior probation officer in the Middle District told me there

19   are four things that are involved in criminal justice;

20   punishment, deterrence of the individual, deterrence of the

21   community, and rehabilitation.

22               So obviously he's going to be punished, and the

23   punishment will deter him; and he needs to have

24   rehabilitation so that we're all safe, including him.

25               THE COURT:  All right.  Ms. Koontz, any additional

1    questions of Dr. Bloomfield?

2         MS. KOONTZ:  No, Your Honor.

3         THE COURT:  All right.  Any redirect, Mr. Dreicer?

4         MR. DREICER:  Just very briefly.

5                    REDIRECT EXAMINATION

6    BY MR. DREICER:

7    Q.   Dr. Bloomfield, after hearing the judge's questions and

8    bringing up the specific facts that we all agree are

9    egregious behavior, does that in any way change your opinion

10   as to the level of recidivism that you believe Mr. Fierros

11   may have coming out of the federal prison system, or his

12   ability to become treatable and safe to society?

13   A.   From a psychological perspective, I want to remind you

14   that I was aware of all of these things, and I'm certainly

15   aware that the Court's aware of them.  The Court and I have

16   different jobs.

17        But from a psychological perspective, I took that

18   into account in formulating all my opinions.  Didn't excuse

19   it.  Didn't say it wasn't egregious.  But the question then

20   becomes:  Given the egregiousness of the events, is he

21   amenable to treatment, remorse, and change?  And I think he

22   is.

23        MR. DREICER:  I have nothing further, Your Honor.

24        THE COURT:  Doctor, thank you very much.  I

25   appreciate your testimony.

 1                    THE WITNESS:  Thank you, Judge.  And thank you for

 2     doing this via Zoom.  I really appreciate that.

 3                    THE COURT:  That's not a problem.  In this day and

 4     age, we're doing that quite frequently.

 5                    THE WITNESS:  Thank you very much.

 6                    THE COURT:  You're welcome.

 7                    MR. DREICER:  You're excused, doctor.

 8                    THE COURT:  All right.  Mr. Dreicer, what do you

 9     have next?

10                    MR. DREICER:  Your Honor, if I may call Mr. Fierros

11     to read his allocution letter to the Court?

12                    THE COURT:  Absolutely.

13                    MR. DREICER:  Mr. Fierros, if you can hear me, if

14     you would unmute your microphone and please read whatever

15     statement it is that you prepared for the Court.

16                    BY THE DEFENDANT:  Sure.  I have it right here.

17     Good morning, Your Honor.

18                    THE COURT:  Good morning.

19                    MR. DREICER:  It appears that Omar is speaking,

20     which is okay.  I was intending -- it's okay, Omar.  I'll

21     call the brother, Omar Fierros, to read his statement; just

22     because he's ready to go, Your Honor.

23                    THE COURT:  All right.  I should probably place him

24     under oath, since Ms. Koontz should have an opportunity to

25     cross-examine.

```
 1              Sir, would you please raise your right hand.
 2              (Witness duly sworn)
 3              THE WITNESS:  Yes, Your Honor.
 4              THE COURT:  All right.  You can put your hand down
 5    now.  Would you state your name, please.
 6              THE WITNESS:  My name is Omar Fierros, and I am the
 7    brother of Adrian Fierros.
 8              THE COURT:  Okay.  You may proceed.
 9                 OMAR FIERROS, DEFENSE WITNESS, SWORN
10                        DIRECT EXAMINATION
11    BY MR. DREICER:
12    Q.   How old are you, sir?
13    A.   I am 23 years old.
14    Q.   And what do you currently do for a living?
15    A.   I work for the government.  I serve under the United
16    States Marine Corps.  I'm an avionics technician, so I work
17    on the CH-53 Echo.
18    Q.   And where are you testifying from at this moment?
19    A.   I am at Miramar.
20    Q.   With that being said, did you prepare a statement for
21    the Court, Mr. Fierros?
22    A.   I do have a letter.
23    Q.   If you would go ahead and read that at this time, we
24    would all appreciate it, and thank you.
25    A.   Thank you.  First I want to say that I am deeply sorry
```

1  and I apologize for the stress and discomfort my brother has

2  caused to everyone involved.  My brother and I have been

3  through a lot growing up.  It was hard facing distressed

4  times at a young age.  Both our parents worked for long hours

5  and our older brother Miguel, Jr., was always in and out of

6  the house.

7         Although Adrian had me by his side, we two would

8  take our frustration out on each other, but most of the time

9  I would win our disputes.  Adrian, being the youngest in the

10  family, never really had control of anything; like academics

11  or sports to play, and something simple as opinions.  With

12  all of the struggles of doing something -- with the struggles

13  of doing something for himself, he seemed like a difficult

14  and unmotivated child.  And because of this, he was belittled

15  by our parents, our older brother Miguel, Jr., and including

16  me as I matured.

17         Through emotional and difficult times Adrian would

18  play video games to fill the void he felt.  And him doing so

19  at emotionally difficult times, Adrian would -- sorry, I'm

20  rereading it -- at times seemed like laziness to the whole

21  family.  Adrian would constantly be ridiculed for this as we

22  grew older.

23         In my youth our parents focused on our older

24  brother Miguel, Jr., who was influenced by the wrong groups

25  of people, in which he used drugs and became violent.

1   Throughout high school, nights were hard to sleep and days

2   become tense as Miguel, Jr., would try to enter the house

3   with force.  When he did, physical damage and harm would

4   occur.

5   After I graduated high school, I left and joined

6   the service.  In doing so, Adrian was alone, still facing

7   pressures around him.  Things only became worse as time went

8   by and our father being diagnosed with ALS.

9   When Adrian needed to turn to someone for help, he

10   turned to me; but I was not around, and most of the time I

11   was busy with training.  When I was available, I would turn

12   away; having him try to figure it out as I was trying to

13   focus on my career.

14   Having to deal with my older brother Miguel, Jr.,

15   there were many times where I wanted them to quit on him.

16   There were times where I wanted him locked up.  I think that

17   would have been a mistake because he is now doing well and

18   has a family of his own.  The family stuck with him to make

19   sure he received the help and treatment he needed.  This

20   family can seem dysfunctional at times, but everyone loves

21   each other very much.

22   Adrian can be child like and may not seem mature,

23   but he is cheerful and friendly.  Adrian is remorseful for

24   what he has done, and this experience alone has helped him

25   open up more about how he feels.

```
 1              Adrian is also hardworking, taking the position for
 2    caring for our father and helping our mother.  I can see him
 3    contributing so society and joining the United States Marine
 4    Corps like he always wanted, and continuing his therapy will
 5    help him greatly as it did our older brother.
 6              My EAS -- end of active service -- is around the
 7    corner; and when I'm out, I want to support and guide my
 8    brother to a career path.  That's all I have, Your Honor.
 9              THE COURT:  Ms. Koontz, any questions?
10              MS. KOONTZ:  I do not.
11              THE COURT:  Any additional questions, Mr. Dreicer?
12              MR. DREICER:  No, sir.  Thank you.
13              THE COURT:  Thank you.
14              THE WITNESS:  Your Honor, may I try to clear some
15    questions that Kathy and that you had maybe?
16              THE COURT:  Sure -- well, look, I have to defer to
17    Mr. Dreicer because he's your brother's lawyer.
18              THE WITNESS:  Right.  Okay.
19              MR. DREICER:  Mr. Fierros -- Your Honor, this is
20    where it's difficult via Zoom.  We've never had to deal with
21    these.  Normally I'd tell you:  Get out of here.
22              But, Mr. Fierros, I appreciate any information
23    you'd want to offer the Court.  But I'm going to err on the
24    side of just having you read the statement that you prepared,
25    and I think I can fill in a lot of the gaps that I propose
```

1    that you want to.  Is that okay, sir?

2              THE WITNESS:  That's fine with me.

3              MR. DREICER:  Thank you.

4              THE COURT:  Okay.  Mr. Dreicer.

5              MR. DREICER:  I would now ask for Adrian Fierros.

6    Mr. Fierros, if you can unmute.

7              BY THE DEFENDANT:  Can you hear me?

8              MR. DREICER:  Yes, sir, we can now.  Would you

9    please read --

10             And, Your Honor, in every other hearing I've ever

11   had in my life, I've always had my client stand.  I don't

12   know if that's practical, given the cameras and all of that.

13   So I'll defer to the Court.

14             THE COURT:  Well, look, it's not necessary.  If you

15   want him to stand, fine.  It's up to you.

16             MR. DREICER:  It would just be out of respect for

17   the Court.

18             THE COURT:  Well, look, I will accept that he has

19   respect for the Court.

20             MR. DREICER:  Thank you, sir.  All right.  Mr.

21   Fierros, if you would prepare or read your prepared

22   allocution letter at this time.  And I believe there is a

23   copy in the binder I sent to the Court as well.

24             THE COURT:  Which I've read.

25             BY THE DEFENDANT:  May I start?

42

1        THE COURT:  Yes.

2        BY THE DEFENDANT:  To the many lives I have forever

3    impacted, as I sit down to put into words the millions of

4    thoughts that have come to my mind over the last many months,

5    I first realize I have negatively affected so many people.

6    However, there is no doubt that I must first acknowledge and

7    apologize to the primary -- to the actual primary victims in

8    this case.  I know there are many, and no one victim deserves

9    any less of an apology than any other victim.

10        To each and every person I have victimized, I am

11   truly sorry, and I hope you are able to put aside my

12   harassment and live your best lives moving forward.  There is

13   no excuse for the way I have treated any one of the victims I

14   communicated with online, and I know there is no amount of

15   punishment I can receive that will undo the terrible acts I

16   committed.

17        I am hopeful the victims will not be scarred for

18   life, that they will be able to fully heal, and will forget

19   any contact they had with me during my darkest hour.  I am

20   truly and deeply sorry to each and every victim I contacted,

21   and I sincerely hope my impact on your lives will be

22   forgotten forever so you will have happy and healthy lives

23   moving forward.  Please accept my deepest apologies.  I am so

24   sorry.

25        I also know there is a second level of victims who

1    deserve no less of an apology.  I know that all of the young

2    people I contacted have parents and loved ones and that will

3    forever be impacted by my actions.  I am sorry for everything

4    I have put your loved ones through, and I am equally sorry

5    for all the pain and suffering I know I've caused you as

6    well.  I am confident the Judge could put me in prison for

7    ten lifetimes, and it would not ease the suffering you must

8    feel for what I have done to your family members.

9         I am sure my apology feels like empty words, but

10   please know my words are heartfelt and my apologies are

11   genuine as any apology should be. (Unintelligible)

12        THE COURT:  Hold on.

13        BY THE DEFENDANT:  Of course there is also the

14   sorrow I feel for my loved ones, who are undoubtedly

15   disappointed and sickened with my conduct.  I am grateful

16   that many of you have stood by myself, and I am so sorry for

17   the embarrassment I have caused you.  Please accept my

18   apologies.  I am so sorry, and I will never act in the near

19   future in any way to harm any other human being or to do

20   anything to disgrace my family.

21        I know I am going to prison for what I have done,

22   and this I deserve.  I have committed atrocious behavior and

23   I deserve to be punished.  However, if this Court could only

24   see my life outside my darkest hours, I believe this Court

25   would know I am salvageable.  I truly believe one day I will

1    have real value to offer this world.  I have victimized those

2    who do not deserve it, I have disappointed those who have

3    always been my champion, I have deeply affected many who only

4    wanted safety and happiness for their children, and I am

5    never going to forget and stop apologizing for my sins.

6              These are the facts, and I don't ask that they be

7    forgotten.  But I do ask the Court to give me an opportunity

8    to prove to this world I am capable of not being a bully and

9    a monster, and show that I am capable of full love and

10   respect and contribution.

11             I know if this Court gives me an opportunity after

12   I am released from prison, I will be able to offer my

13   community, my country, and this world contributions that show

14   I am more than a once scared little boy acting as a bully.  I

15   will be a man who wants to give back, educate, and prove that

16   people do change.  I do not want to be a statistic of youth

17   wasted.  I want to be a statistic of provable positive

18   change.  I am only hoping that I have the opportunity one

19   day.

20             However, before I can conclude, I know that I must

21   not end talking about me.  I acknowledge this apology is not

22   about me.  This apology is for all the people that I have so

23   negatively affected.  I am sorry.  I am truly sorry.  And, of

24   course, I know there is no way to ease the past; but if there

25   was, I would do it for all of you in one instant.  I would do

45

```
1    anything in my power to take back any and every communication
2    I've ever had with all of my many victims.  I hope I am
3    forgotten by each and every victim I have created.
4         However, if there is one communication to everyone
5    that cannot be forgotten, I hope it is my sincerest apology.
6    I am sorry.  I am sorry.  I am so sorry.  May peace be
7    forever with you.  I'm done, Your Honor.
8         THE COURT:  All right.  Mr. Dreicer.
9         MR. DREICER:  I have no further questions for Mr.
10   Fierros, Your Honor.
11        THE COURT:  Okay.
12        MR. DREICER:  Mr. Fierros, you can mute your
13   microphone now -- actually, let me take -- while you have it
14   unmuted, why don't we call Mrs. Fierros or Mrs. Mancillas,
15   Mr. Fierros' mother, to read her statement, Your Honor.
16        THE COURT:  Okay.
17        MR. DREICER:  Ma'am, can you hear me?
18        THE WITNESS:  Yes.
19        MR. DREICER:  Your Honor, do you want to place her
20   under oath?
21        THE COURT:  Yes, let me do that.  Ma'am, would you
22   please raise your right hand.
23        (Witness duly sworn)
24        THE WITNESS:  Yes.
25        THE COURT:  All right.  You can put your hand down
```

1   now.  Would you please speak up, state your name, and spell

2   your name for the record.

3           THE WITNESS:  Yes.  My name is Maria Mancillas

4   Fierros.  And Maria, last name Mancillas, M-a-n-c-i-l-l-a-s,

5   and Fierros, F-i-e-r-r-o-s.

6           THE COURT:  Okay.  You may read your statement,

7   ma'am.

8           THE WITNESS:  Thank you, Your Honor.  My husband is

9   Miguel Fierros, and I am Maria Mancillas Fierros.  We are

10  parents of Adrian Fierros, who is appearing before your court

11  today.

12          Please accept our sincerest apology for our son's

13  actions.  We want to let you know we are truly sorry, and we

14  regret the harm that my son has done to all the victims and

15  families involved.  His behavior was extremely sickening,

16  inappropriate, immature, and lack of respect.  I am ashamed

17  and hurt by what my son has done.  We can't even imagine his

18  cruelty -- how his cruelty impacts all the victims and

19  families.  There is no excuse for what -- I'm sorry.

20          There is no excuse for what he did, and this makes

21  us sick not having control over the situation.  I can't say

22  what made him do what he did; whether it was frustration,

23  momentary anger, or just lapse of better judgment.  His

24  actions are unforgiven.  We know that the apology will not be

25  enough to make things better, but we still want to say we're

1    sorry.

2            Adrian showed early signs of learning disability in

3    his first year of preschool.  His speech was not like the

4    other children in his classroom.  When he entered

5    kindergarten, he had trouble paying attention and focusing in

6    class.  In 2003, in that same year, Adrian was diagnosed with

7    ADHD by his pediatric doctor, Dr. Timashera (phonetic).

8            In middle school through high school Adrian played

9    football, track and field, and never got in trouble in school

10   or with the law, always respectful to his peers.  He also had

11   an IEP all the way through high school; and although he

12   struggled, he graduated.

13           Adrian was exposed to pornography at a very young

14   age by his older brother Miguel, Jr., when he was three or

15   four years old.  I didn't notice it.  Adrian acted later

16   strange at times and his mind always wandering around.  He

17   has also gone through several traumatic experiences at home

18   as a young child and adult, seeing his older brother Miguel,

19   Jr., abuse drugs in and around the household, his own brother

20   pushing down on his father while he has ALS, while chasing

21   his mother around the house for breaking and entering while

22   having a restraining order.

23           Bringing up things like (unintelligible) activity

24   and forcing drugs on Adrian.  Always in and out of jail,

25   Miguel, Jr., would constantly be breaking down doors,

1    windows, and punching walls in the house.  Adrian being the
2    only one around the house when his brother Omar left for the
3    Marines, Adrian having to call the police on his own brother,
4    and the police constantly being around.

5              I'm sorry, Judge.  Can I just take a drink of
6    water?

7              THE COURT:  Of course.  Yes, ma'am.

8              THE WITNESS:  Thank you.  Times where Miguel, Jr.,
9    would be on drugs and would physically hit Adrian if Miguel
10   didn't get his way.  Even with that going on, Adrian would
11   still be there positively for his brother Miguel, Jr., taking
12   him to the emergency room or mental hospital for treatment
13   and medication, and wanting nothing but the best for him.

14             Adrian also experienced seeing his father drinking
15   at times, demanding and controlling towards him.  Ever since
16   his father was diagnosed with ALS and first stage of
17   Alzheimer's, Adrian got very angry, depressed, and his
18   anxiety got worse.  He has become closer to his father and
19   tried to help him in any way possible.  His father always
20   relies on Adrian for moral support and care.

21             Adrian always greets us in the morning and has a
22   goodnight kiss for us.  Adrian is no trouble at home.  His
23   kindness and love and support are unconditional.  At times I
24   blame myself and take full responsibility with the situation
25   that Adrian was going through at home with his older brother.

1    It was difficult to throw Miguel, Jr., out in the streets.

2    We did not know how to deal with the situation because we had

3    never experienced a mental or drug addiction problem with

4    anyone in my husband's or my family.

5         I know now that I should have paid closer attention

6    to my two younger boys when my older son was around them.

7    While everything -- with everything that my oldest son put us

8    through, I went into depression and was unable to function.

9    Seeing Adrian crying on several occasions, he had asked me

10   for help.  I did receive the proper therapy and medication,

11   which I still take until this time.  Adrian, Omar, and my

12   husband never received the proper help.

13        We want to show our full support to our son Adrian

14   by providing him with meals everyday.  We want to help him

15   continue his education by going to college or trade school,

16   continue with therapies, provide him with transportation for

17   him too if needed, and continue with the religion and

18   spirituality.

19        Respectfully, Miguel Fierros and Maria Mancillas

20   Fierros.

21        THE COURT:  Thank you very much, Ms. Mancillas.

22        THE WITNESS:  And I'm sorry.  I'm just --

23        THE COURT:  No, you did just fine.

24        THE WITNESS:  Thank you.

25        THE COURT:  Mr. Dreicer, any other witnesses?

```
1              MR. DREICER:  No, sir.
2              THE COURT:  I need to take just a two-minute
3    restroom break.  So two minutes, and then we'll resume.
4              (Recess)
5              THE COURT:  We're back on the record.  So before I
6    hear argument, let me turn to Ms. Koontz.
7              Ms. Koontz, do you have any victim impact or any
8    other evidence that the government wishes to present?
9              MS. KOONTZ:  I do, Your Honor.  With your
10   permission, I will read the statements from the father or
11   from the family of Victims 1 and 4.
12             And the father of Victims 2 and 3 would like to
13   personally address the Court, if that's okay.
14             THE COURT:  Absolutely.
15             MS. KOONTZ:  From Victim 1:  My wife and I would
16   like to thank the Court for allowing our statement to be read
17   today.
18             Adrian, we had planned to be here and look you in
19   the eyes to tell you all of this ourselves.  The pandemic
20   saved you from that, and once again you get to hide behind a
21   monitor.  I can only hope that our statement holds true for
22   the hundreds of young children you have broken.
23             No one likes to write things that are
24   heart-wrenching and uncomfortable, but we are making this
25   statement for the many families who are affected.  It is not
```

1    easy reliving this nightmare.  Our hope is that you get as

2    much time as possible behind bars.  We will have to live with

3    this the rest of our lives, so you should pay for doing this

4    to our innocent 11-year-old daughter.

5             Thinking back to the night we first learned of

6    this, my daughter was already in bed but came into my home

7    office while my wife was working late and said:  Mommy, I

8    don't feel well.  Oh, no.  Can I get you something?  Was my

9    wife's response.  Then she burst into tears and cuddled up

10   like a fragile, broken child, with her hands on other face,

11   and said:  Mommy, I did something very bad.  Our hearts sunk,

12   as our kind, innocent, straight-A student had been taught

13   right from wrong.  She was shaking and crying.  We were in

14   shock.

15            My wife said:  What did you do?  She said:  I sent

16   pictures to a girl, and now she is threatening to send them

17   to my friends.  Knowing right off the bat this was no girl

18   she was sending pictures to, we automatically started to

19   blame her, as my wife had talked to her in the past about

20   taking pictures of herself.  Again, we were in shock that she

21   didn't listen to us.  Then and there we learned that our life

22   would never be the same.

23            I know that Adrian is a professional pedophile, and

24   whatever we had taught her wouldn't have stopped this from

25   happening.  You see, Adrian is the worst kind of deviant.  He

1   lies, manipulates, threatens, and blackmails young children

2   into providing him what he desires.  Once he gained the

3   leverage on my child, he threatened to send naked pictures of

4   her 11-year-old body to her friends at school if she didn't

5   send more.  He even asked for pictures of my six-year-old

6   special needs son.  I saw the message.  It made me sick.

7          As a family, we talked about what we should do

8   about this, and then I immediately called the police.  I

9   figured nothing would come of it, but I wanted this to be a

10  teaching moment.  This police officer came to our house.  My

11  daughter was scared while talking to the male officer about

12  very uncomfortable things; things that no young child should

13  have to talk about, especially in front of a police officer

14  in our family room.

15         He had to take her phone as evidence, which was

16  unsettling as we had to send her off to school the next day

17  in a horrible mental state, with no phone in case of an

18  emergency or, God forbid, her pictures being spread around

19  school.  Again, I was in shock.

20         We are a law-abiding family, and we have never had

21  the police at our home; let alone on a Tuesday night at 11:00

22  P.M.

23         For days we worked, she went to school scared,

24  confused, and alone as friends did not know.  But would they

25  find out?  And then a few days later she got her phone back,

1   but this time the police were listening.  The soulless

2   deviant sitting in the courtroom today again made threats,

3   and even reached out to a few of her friends and made claims

4   of having my daughter's pictures.  My daughter called me

5   hysterically crying from school because she had a friend ask

6   her about this weird screen name that sent her a creepy

7   message.  I immediately rushed to school, and my daughter and

8   I spoke to the principal and a school resource officer.  My

9   goal was simple:  To make sure any pictures didn't spread

10  around the school.  I don't even want to imagine what could

11  happen as a result.  You are a self-centered, disgusting

12  animal, preying on innocent young children for your own

13  pleasure.

14          Thank you for proving to me that we are a very

15  close and honest family.  Our daughter came to us because she

16  knew we would be there for her.  Other girls and families may

17  not have been so lucky.  Some girls had to live with this

18  fear of you contacting them, threatening to expose them so

19  you would send them more photos.  It's the torture of a

20  young, innocent mind.

21          Our daughter even texted you:  Leave me alone.  I

22  want to kill myself.  And that didn't stop you from

23  threatening her.  I wonder how many other girls threatened to

24  kill themselves.  I wonder:  Did some girls attempt it?  Did

25  some girls end their life because of you, Adrian Fierros?

1         You see, what you don't know is you messed with the

2    wrong family.  My daughter was crushed and hurting inside

3    because she thought she let us down, but she didn't.  She's a

4    hero.  She's a hero for being brave enough to come to us; and

5    as a result, her courage has helped countless other victims,

6    current and future victims of this defendant.  So, no, she

7    didn't let us down; she brought us even closer together,

8    which I didn't think was even possible.

9         I believe this horrible incident in our life will

10   always be a reminder that there are evil and disgusting

11   people in this world.  The animal sitting in court today is a

12   professional pedophile, a professional pervert, a

13   professional con man, a professional manipulator of children,

14   and he needs to serve a professional maximum sentence for

15   each child and family he has destroyed.

16        Our daughter will never be the same because of you,

17   but she's not destroyed because of us.  I ask the Court to

18   give him the maximum sentence.  He never hesitated when my

19   daughter asked him to stop, even after she threatened to kill

20   herself.  Let that sink in.

21        And, Your Honor, that was again from the family of

22   Victim 1.

23        And I also have a statement from the family of

24   Victim 4:

25        I have three daughters.  My wife and I have always

1    tried to protect our girls and raise them in a caring,

2    loving, and safe environment.  We have been supportive of

3    them and have also tried to help them make good decisions.

4    Little did we know that none of these things could stop a

5    very evil, calculating individual from entering our youngest

6    daughter's bedroom via the Internet and trying to threaten

7    and blackmail her into doing things that no child should ever

8    be made to do.

9           Luckily, in our family's case my daughter turned to

10   her older sister, who was 21 at the time, and she was able to

11   fight back against the threats and blackmail attempts.  But

12   unfortunately, this whole terrible ordeal did not end there.

13          Since this time, my daughter is very weary of

14   everyone she meets, and my wife and I are constantly worried

15   about something like this happening again.  We are afraid to

16   let her have the independence on her computer that we know

17   she deserves, and are always looking over her shoulder to

18   make sure no one is trying to hurt her; whether it is in

19   person or over the Internet.

20          Your Honor, please do not give this person that you

21   are about to sentence the ability to do harm to other

22   children.  We thank God everyday that he was not able to do

23   to our daughter what he was able to do to so many other

24   children.  We also pray everyday that the dozens of other

25   children that were affected so profoundly by the keyboard and

1  mind of this sick monster finds the strength to heal.

2          Giving this person the maximum sentence allowed by

3  law will not only help these child victims to heal, it will

4  also send a clear message to those who want to harm our

5  nation's children and keep them from these monstrous acts and

6  let them know that these monstrous acts will not be tolerated

7  by our society or by those who have dedicated themselves to

8  protecting us.

9          Thank you, Your Honor, for allowing me to address

10  the Court.

11          And, Your Honor, the father of Victim 2 and 3 would

12  like to personally address the Court.

13          THE COURT:  Absolutely.  Is it Mr. Pannier?

14          MR. PANNIER:  Yes, Your Honor, it's Kurt Pannier.

15          THE COURT:  Pannier.  My apologies for

16  mispronouncing your name.

17          MR. PANNIER:  No apology necessary.

18          THE COURT:  All right.  Sir, you may proceed.

19          MR. PANNIER:  So, Your Honor, I'll first introduce

20  myself.  My name is Kurt Pannier.  While I humbly serve many

21  roles to many people, the most important and greatest role

22  and responsibility -- God-given responsibility that I have is

23  that of being a daddy and father to three precious children.

24          I have two young daughters and a seven-year-old

25  son.  I'm a father and I'm the father of not one, but two of

1    the underage, innocent victims whom Adrian Fierros

2    intentionally and knowingly targeted, preyed on, and

3    victimized as a pedophile, a sex predator, involving child

4    pornography, threats, and extortion.  To my children, I'm

5    their daddy.  I'm intimately engaged and emotionally

6    available.  I love them more than any words could ever

7    articulate.  I care for them more than any actions could ever

8    demonstrate, and I treasure them and value them more than

9    anything on this entire planet.

10           Far more important than I:  Who are these two

11   victims of these awful criminal acts?  Well, they're

12   children.  Yes, they're still underage.  They are people.  No

13   doubt, yes, they are people.  They are human beings with one

14   life, with one heart, with one soul.

15           At the time of the horrific crimes, my youngest

16   daughter was 12 years old.  At the time of the horrific

17   crimes, my oldest daughter, my first born, had just recently

18   turned 15 years old.  My youngest daughter has always been

19   the sweetest soul and the most positive spirit.  She's done

20   volleyball, great in school, lacrosse, softball, spent a lot

21   of time playing with Barbie dolls, playing at the park.  She

22   was disciplined.  She earned her black belt in MMA.  She

23   loves the Lord.  She's talented, very sweet.  She's so kind,

24   gentle, sensitive, trusting, caring, innocent, loving.  She's

25   pure.  She's compassionate.  She's a great daughter, great

1    person.

2          My first-born daughter, so similar, was a softball

3    player, volleyball, earned her black belt as well, very

4    creative, entrepreneurial, talented, so friendly, so likable,

5    so smart, so social, fun.  She's pretty cool, generous.

6          These two young girls were and are amazing people.

7    They're good children.  They're loved greatly.  Unfortunately

8    and tragically, they are substantively changed after what

9    they've gone through with this heinous and awful, evil,

10   wicked crime.

11         Adrian Fierros, you're a fully grown adult man; an

12   adult male by many, many, many years.  You knew exactly what

13   you were doing in Slymar.  No dirty data or questionnaire

14   testing or psychoanalysis changes the facts.  You stole their

15   innocence.  You robbed them.  You robbed them of a lot.  You

16   robbed a lot of good people.  You robbed them of much.  And

17   as you know exactly and as you intended, sadly, you caused

18   life-altering damage to their young developing hearts, minds,

19   and souls.  You've caused massive damages to the well-being

20   and lives of each of the underage victims and girls, little

21   children, to their families and their extended families.

22         The kind of child sex predator, sex exploitation

23   that has been conducted directly impacts and causes permanent

24   damage that lasts a lifetime; it runs deep and it runs far

25   deeper than whatever could meet the human eye.  You hurt

1   these innocent victims, whom you intentionally, knowingly

2   targeted and hunted down.

3           It was for control.  It was manipulative.  You

4   manipulated and coerced them, masterfully premeditated,

5   preorchestrated, and deceptive, you lied.  You pretended.

6   You tricked them.  You preyed on them; so vulnerable.  You

7   harassed and bullied them.  You intimidated and directly

8   threatened them, knowing exactly how old they were.

9           A fully grown adult man, yet you decided on your

10  own to dishonestly, deceptively pretend to be a young little

11  girl.  You decided to lie to them and to orchestrate this

12  premeditated plot to plan, to manipulate, and abuse underage

13  girls, underage children.  The evil and wickedness of your

14  decided actions are now known, very well known, proven,

15  admitted by you, exposed, and this is a tragedy that will run

16  for lifetimes.

17          It's undisputed.  It's uncontested.  The guilty

18  verdict, the trial, everything has already occurred, so now

19  the proof and evidence is all there; it's already admitted

20  and confessed to.  Deciding on your own to deceptively do

21  this is evil that I can't understand or relate to or imagine;

22  none of us here can.  Pretending to befriend my daughters

23  through the Internet, through social media, hiding behind

24  your screen, you slithered your way to the point of

25  extorsion, blackmail, threats to kill and murder our family

1   if your demands for naked pictures weren't met.  For selfish,

2   self sexual gratification, you threatened a 12-year-old

3   little girl and my 15-year old first-born daughter.

4           As the dad tasked with protecting our children,

5   keeping them safe, I couldn't do that.  I failed with your

6   means.  You threatened to murder our family if your demands

7   weren't met and come to our house where you proudly

8   proclaimed knowledge of our address of where we live.  You

9   threatened to kidnap my youngest daughter's brother, my son,

10  at his school, which you proclaimed you knew of, if your

11  demands to feed your sexual exploiting appetite were not

12  fully met.  You kept going.  You didn't stop.  It was

13  relentless.  You consistently did this in serial victim

14  fashion across many, many good people, and it's important

15  that everybody understands the factual reality of what

16  occurred.

17          So how did these illegal crimes already determined,

18  how did they damage and negatively impact the many underage

19  victims, including both of my underage daughters?  So I've

20  experienced firsthand how your crimes have damaged and hurt

21  and caused pain.

22          Emotionally, mentally, physically, spiritually,

23  financially, yes, these girls have suffered greatly.  The

24  extended family has suffered greatly.  Fear, complete and

25  utter fear; scared waking up in the morning, wondering,

1   questioning, shame.  Mentally how do they trust?  How do they

2   move on?  They're confused; understandably so.  I don't know

3   what it's like to walk directly exactly in their shoes --

4   nobody does here -- but feelings of foolishness,

5   embarrassment, complete and utter.

6           The anxiety and the stress, casting fears and

7   doubts, even wondering way more questions than answers.

8   Countless time, effort, energy spent by good people doing

9   their job over how many, many months to help ensure justice

10  is served.  I respectfully thank you sincerely, with

11  authentic thanks to each of you that participated and helped.

12  Thank you for all that you do.

13          This is ugly.  There's no way to make it pretty.

14  The conversations, the counseling sessions that have already

15  occurred, that will be needing to occur, financially,

16  mentally, emotionally, spiritually.  When you look

17  physically, these innocent little girls have gone through a

18  tortuous hell, which no one here will ever truly understand;

19  of which your crimes, your decisions, your choices, your

20  actions on your own directly and tragically impacted.

21          Everybody has a life journey.  Everybody has

22  childhood struggles, traumas, issues, obstacles, abuse

23  mentally, emotionally, physically.  Everybody has their story

24  in their life journey.  That is no excuse to destroy others'

25  lives.

1        Physically the anxiety and stress, undoubtedly,

2   fueled a series of events.  Approximately nine months after

3   these crimes were committed, my youngest daughter was

4   suddenly diagnosed with Hodgkin's lymphoma cancer.  She's

5   walked through her own battle, and I don't have to speak of

6   the research that's already out there and available for

7   anyone to Google about how the anxiety and stress triggers

8   and fuels a spread of cancer throughout the lymphatic system,

9   especially that of an underage 12-year-old little girl, who

10  has now gone through many, many months of full-on

11  chemotherapy.

12       What happens next?  How do they move on with

13  navigating friendships, relationships, intimacy, trust,

14  feelings?  How do they handle their fear and anxiety,

15  counseling?  We'll never understand the pain and the hurt,

16  and you'll never understand the pain and hurt and the damage

17  of those moments that we have endured, those moments where

18  you just find out and discover what has been done; the

19  coercing, the moments of having to speak to authorities, the

20  moments and the many moments and much time of phone calls,

21  meetings, the case, the time, the waiting, the wondering:

22  Who could do this?  What is happening?  Are we in real danger

23  or not?  No one will understand that for sure.

24       So what now?  Well, I guess the victims, all of the

25  underaged little girls, those that have a voice, those who

1   respectfully decided they just hope and pray that this goes

2   away somehow, but all the victims, they now have a voice.

3   And respectfully I understand you will now face very fair

4   consequences of your illegal and evil decisions to destroy

5   lives and cause pain for your own self-centered

6   gratification, for power, and for control.

7          And I guess our ask in closing, our ask is just to

8   simply grant the request of the fine professional prosecutors

9   on this hands-down guilty case, with confession and all the

10  other evidence that's already been presented, agreed upon and

11  decided upon, our ask is to simply grant that, and to provide

12  the proper sentencing term of 40.  Primarily so some sliver

13  of justice can be served, but also -- and arguably just as

14  important -- so that more good lives are not destroyed and

15  damaged.

16         My wish is not to see you get hurt physically, it's

17  not to call you names, and it's certainly not for revenge.  I

18  want to be clear.  I'm not filled with hate, nor harbor any

19  hate.  I've processed this my own way; and just as any human

20  being does, each of us that have had to experience and endure

21  this, are forced to process it their own way.  I don't have

22  any ill will for you or your family; I have none.  I have

23  forgiveness in my heart.  I, just as all the others, I just

24  simply want justice served.  That's all.

25         As a person and in my heart, my prayer for you is

1    for you to responsibly serve that time that the honorable

2    judge and this court will decide upon today.  And my biggest

3    prayer for you has been and remains, to take this time to get

4    right with God, to make amends with your creator, to know

5    Christ, and to really reflect and understand the impacts.

6    We're each tasked with free will; it's a gift.  But we all

7    make our own decisions in the one life that we get.  Again,

8    my prayer is for you to seek and find and know the Lord.

9              That's all I have, Your Honor.

10             THE COURT:  Thank you very much, Mr. Pannier.  Do

11   you mind me asking:  What is your occupation?

12             MR. PANNIER:  Yes, sir.  I have spent 25 years in

13   technology.  I do -- I lead teams of folks, and I work for a

14   company that serves Fortune 1000 organizations right now at

15   present, and we do quality assurance and testing services for

16   those companies.  So I lead those teams and those sales teams

17   as well.

18             THE COURT:  Well, you express yourself exceedingly

19   well.

20             MR. PANNIER:  Thank you, Your Honor.

21             THE COURT:  That was one of the more powerful

22   victim impact statements I've heard, and I've been in this

23   criminal justice system for 45 years.  And that was well

24   said, and I could tell it was from the heart.  So thank you

25   for your comments, sir.

1          MR. PANNIER:  Thank you, sir, for all that you do.

2     I can only hope that just sharing -- as difficult as it is --

3     could do some adequacy for my daughters and for each of the

4     people that have been impacted by this.

5          THE COURT:  Well, your daughters are lucky to have

6     you.

7          MR. PANNIER:  Thank you.

8          THE COURT:  Ms. Koontz, you had one other victim

9     impact statement?

10         MS. KOONTZ:  That was it, Your Honor.  I read two,

11    and then Mr. Pannier's statement.

12         THE COURT:  And I think I mispronounced it again.

13    My apologies.

14         Any other evidence on behalf of the government?

15         MS. KOONTZ:  No, Your Honor.

16         THE COURT:  All right.  Let me hear argument from

17    the government first, and then I'll hear from Mr. Dreicer

18    last.  Go ahead, Ms. Koontz.

19         MS. KOONTZ:  Thank you, Your Honor.  Your Honor, as

20    you're aware, the government, per the plea agreement, agreed

21    not to ask for more than 40 years.

22         The government submits that a sentence of 40 years

23    is an entirely fair, just, and reasonable sentence, given the

24    nature and circumstances of the offenses of conviction, and

25    in consideration of the other 3553 factors.

1      The severity and extent of the defendant's conduct

2   in this case cannot be overstated.  The defendant was in

3   contact with over 80 females; a majority of which were under

4   the age of 14 years.

5      THE COURT:  Well, that's what I wanted to ask you

6   because in reading your sentencing memorandum, on page 2, you

7   indicate that:  The defendant was in contact with over 80

8   young females.

9      Tell me a little bit more about that.

10     MS. KOONTZ:  Yes, Your Honor.  It was the same when

11  --

12     Actually, this was only over a period of three

13  months.  The subpoena that was sent to Instagram only

14  included three months; and during that three-month period, he

15  was in contact with approximately 80 young girls.  And he

16  used the same tactics that he did in this case; he would

17  convince them to send him -- again posing as a female -- get

18  them to send at least one sexually-explicit image.  And then

19  once they did that, he would continue on, and using the same

20  tactics, get them to send additional inappropriate images.

21     THE COURT:  Has law enforcement made contact with

22  all 80 of these females?

23     MS. KOONTZ:  No.  Unfortunately, we were not able

24  to make contact with all of the females in this case.  They

25  have been involved extensively in trying to identify all of

 1   them; but, fortunately, we were able to get the ones that are

 2   here in Florida and send leads out to the other states as it

 3   relates to the other victims.

 4          THE COURT:  Okay.

 5          MS. KOONTZ:  And, Your Honor, almost all these

 6   tactics involved getting them to send him one inappropriate

 7   image, and then using that one image as leverage to make them

 8   send more revealing videos and images.

 9          The defendant was unrelenting in his sexual abuse

10   of children via the Internet.  He used a mixture of

11   deception, intimidation.  The defendant coerced and extorted

12   these children into sending depraved, sexually explicit, vile

13   and demeaning, sexually-explicit images and videos of

14   themselves to him.

15          When the girls expressed reticence in sending

16   additional sexually-explicit photographs or videos, the

17   defendant further extorted them by threatening to post the

18   previously-provided material on Instagram and other social

19   media sites.  Most damningly, he did in fact distribute the

20   pornographic images of these minor children to their entire

21   contact list; which, again, consisted oftentimes of

22   classmates.

23          Significantly, Your Honor, the victims in this case

24   begged the defendant to stop his demands as he was ruining

25   their lives.  The defendant refused and continued his

1    threats.  Many victims in this case told the defendant that

2    they were going to commit suicide if he did not stop.  The

3    defendant responded that he did not care, and he continued to

4    threaten them with exposure to friends and families.

5         In this case the defendant simply did not ask these

6    children for sexually-explicit images and videos.  He

7    manipulated and tricked them; using threats of public

8    publicity and disclosure to bend these victims to his will.

9    The psychological torment of each child was key to the

10   defendant's offenses.  The defendant's words and deeds are

11   the best argument for a sentence focused on protecting the

12   public.

13        In this case there is significant societal interest

14   in deterring those who abuse the Internet to sexually abuse

15   children.  A substantial sentence strongly signals to

16   prospective offenders that the justice system offers no

17   leniency to those who choose to abuse children, regardless of

18   whether or not that abuse occurs through the vale of the

19   Internet.

20        Under Section 3553, the Court should also consider

21   the need to avoid unwarranted sentence disparities among the

22   defendants with similar records who have been found guilty of

23   similar conduct.  And for this we point to the United States

24   v. Woodson, which again I cited in my sentencing memo.  There

25   Judge Martinez sentenced a subject who was engaged in the

1     same type of behavior to 50 years.

2          And again, and another very important

3     consideration, is the rights and perspectives of the victims.

4     Protecting the victims' dignity and privacy is especially

5     important in a case like this.  The defendant is an

6     extortionist.  He uses victims' private images, their most

7     sensitive digital property as a tool to get what he wanted.

8          And for this reason, Your Honor, we believe that a

9     sentence of 40 years is a just sentence and it's a reasonable

10    sentence, and we would ask that that be the sentence the

11    Court imposes.  Thank you, Your Honor.

12         THE COURT:  All right.  Thank you, Ms. Koontz.

13         Mr. Dreicer, you need to turn off your mute.

14         MR. DREICER:  Good morning, Your Honor.  In all of

15    these cases -- and this one may be unique to the facts

16    presented -- but certainly I have been in the unique position

17    as a human and as a lawyer to stand at normally a podium, and

18    in this case sit in my office, and explain and advocate for

19    my client, who has admitted to crimes which can be considered

20    incomprehensible and egregious.  But that's not what we're

21    here for today.

22         Mr. Fierros did not put the victims through a

23    trial.  He did not, not acknowledge his crimes.  And, in

24    fact, from the moment he came into contact with law

25    enforcement, he wrote an apology letter.  That day -- that

1    was before having any counsel, before being assigned a public

2    defender, or private counsel such as myself -- he felt the

3    need to let law enforcement know that what he did was wrong.

4          And given that there's not going to be one person

5    in the courtroom that's going to disagree that the crimes

6    that he committed are bad and egregious, we have to and we

7    are forced to move to the next level of inquiry, which is:

8    What sentence is sufficient but not greater than necessary

9    for this Court to protect society and punish Mr. Fierros?

10          And my position -- and, again, I contain all of my

11    arguments that I presented in my memorandum of law -- but as

12    I sit before you today, our position is that 15 years in a

13    federal prison system for a person who was 19 years old, who

14    came from an abusive household, was forced to watch

15    pornography at three years old, had trials and tribulations

16    with his brothers, and violence and drugs and parents

17    admittedly were not there for him when he needed, turned this

18    young man into a scared bully, who acted out in the most

19    egregious way.

20          But he is going to get 15 years in prison, followed

21    by a lifetime designation as a sex offender, with the thumb

22    of the government on him in every which way, to make sure

23    that he's complying, treating, and also keeping children safe

24    by his addresses and where he can live; in addition to a

25    lifetime of supervised release, if the Court so finds it to

1    be necessary, but I believe a minimum of five years.

2         This is no slap on the wrist.  This is no sentence

3    that would tell anyone:  If you mess with someone through the

4    Internet or you attack children or you bully children and you

5    ask for these images that you're going to get 15 years in

6    Florida prison.  Your Honor, that is a sentence in that

7    situation that is necessary but not greater than necessary.

8         Your Honor, in this case I want to point some

9    things out about Mr. Fierros that are much different than

10   some of the cases, and I'll go through some cases when we get

11   to the disparity of sentence issue.  But not only did he

12   apologize when he came into contact with law enforcement, Mr.

13   Fierros has had no violations while on pretrial release.  Mr.

14   Fierros has engaged in counseling.  He committed himself to a

15   psychosexual with Dr. Bloomfield, who I understand the Court

16   recognized as a credible expert.  And I can't tell you how

17   well respected Dr. Bloomfield is in the Middle District.  He

18   calls it like he sees it.  And Dr. Bloomfield says through

19   the testing, through his behavior, through his counseling,

20   consistent with what the counselor thought, that this man is

21   salvageable.

22        This young man does not need the key just thrown

23   away and him to be put in prison for 40 years so that he

24   comes out in his 60's -- late 60's or early 60's, followed by

25   supervised release, with possibly not the therapy that he

 1    needs in order to better society.

 2            Your Honor, this is a young man.  He was 19 years

 3    old during the time that this conduct occurred.  And as he

 4    said in his letter, this was his darkest hour.  This is not

 5    the life that Mr. Fierros had built.  This is not a young man

 6    who has had other chances, who got caught, and didn't learn

 7    his lesson.  This is his first time with law enforcement and,

 8    albeit, he swung for the fences.  But he is here and he is

 9    salvageable and his brain is not fully developed.

10            He is referred to as a man.  He is a man in the

11    sense that he's 18 years old.  But, you know, what Dr.

12    Bloomfield has testified to before and the thoughts that he

13    had is the reason we have 18-year-olds in the military, is

14    because 18 year olds don't have a fully developed brain.

15    They run towards the bullets, not away from the bullets.

16            Mr. Fierros has impulsivity issues.  He has frontal

17    lobe lack of development that he will get with age.  And in

18    exchange for that, he is going to be in prison while his

19    brain develops.  There is no question about that.  He is

20    going to be a convicted felon for the rest of his life.  He

21    is going to be on supervised release for a number of years,

22    if not decades.

23            And given that his conduct was that of not a person

24    who didn't take responsibility, who didn't write apology

25    letters, who demanded a trial, who demanded the victims take

1   the stand, he forego and forewent all of that, and for that I

2   believe that he should be given credit and certainly some

3   understanding as to what kind of person Mr. Fierros truly is.

4          So you have to look at the nature and the

5   circumstances of the offense, and it's awful.  But you also,

6   Judge -- and you've been doing this for 45 years -- you have

7   the ability to compare it to other things that you've seen in

8   your courtroom.  And it's not a child rape, thank God, as I'm

9   listening to these fathers and these parents and their

10  expressions.

11         It was an egregious crime but, unfortunately, there

12  are crimes that are worse, that amount to an adult, a grown

13  man, a grandfather, a person in trust, positions of trust,

14  adoptive parents, stepparents, uncles, who actually

15  physically molest these children.  And, thank God, we're not

16  at that level, thank God there is no one who committed

17  suicide, and thank God that there is no one that was

18  physically touched by the hands of Mr. Fierros or anybody

19  else that we know about.  Thank God he didn't actually show

20  up to their homes and their schools and the things that we

21  know other predators do.  And we must consider that lack of

22  conduct in today's sentencing hearing.

23         And we look at the history of Mr. Fierros.  And I

24  point out his remorse, I point out his immaturity, his

25  impulsivity, all the things Dr. Bloomfield spent a great deal

1   of time testifying about that should give the Court comfort

2   that he didn't have a cognitive dissidence, that he didn't

3   come in and say:  So what.  Or:  It's not a big deal.  He

4   recognized it.  His tests were consistent with a young person

5   who recognizes that they had done wrong.

6           He's not a sociopath or a person that if you put

7   away for 40 years or 60 years, you make sure that he'll never

8   be out and ever in a position to harm somebody.  That's not

9   what the testing showed, that's not what his own actions have

10  shown, and we're asking the Court, again, to take all of that

11  into consideration.

12          And again when you're look at the 3553 factors, the

13  need for the sentence imposed, we didn't plead straight up to

14  the Court -- although that wasn't really an option -- we're

15  not asking the Court to make some miraculous finding that the

16  minimum mandatory sentence doesn't apply or this is cruel and

17  unusual punishment or the Eighth Amendment.  We're saying

18  that 15 years, followed by a lifetime of supervision, is a

19  serious sentence, and it's the need for the sentence imposed.

20  But it does promote respect for the law, it does provide just

21  punishment, and it does address the serious nature of the

22  offense committed by Mr. Fierros.

23          And a need to avoid unwanted sentencing

24  disparities, Your Honor, again, Ms. Koontz from the

25  government points a few cases out where people did not take

1    responsibility, where they did go to trial, where they

2    weren't 19 year olds with frontal lobe lack of development.

3    And in our sentencing memorandum, Your Honor, I've pointed to

4    and I would like to just address a few cases.

5              United States v. Polk, which is 546 F.3d, 74.  And

6    in this particular case it was a person who committed the act

7    of attempted production of child pornography.  But in this

8    particular case he was communicating with a 13-year-old --

9    who he believed was a 13-year-old but it was law enforcement,

10   and he actually attempted to meet up with and was caught with

11   a camera and other things in his bag when he was arrested

12   trying to meet up with a young man in order to have a sexual

13   conduct and relation.  This person had prior convictions of

14   aggravated sexual assault on a toddler, a sexual involvement

15   with teenagers, and other chats with teenage girls.  And the

16   court found that Mr. Polk did not accept responsibility.  But

17   in that case Mr. Polk was given 188 months, and that was

18   found to be a reasonable sentence.

19             And in the case of U.S. v. Dorvee, 616 F.3d, 174,

20   in this particular case videos were sent.  They were

21   requested videos and images.  He wanted to meet up and

22   attempted to meet up and photograph the child.  When they

23   actually arrested him, unlike Mr. Fierros, there was

24   thousands of child porn images, hundreds of videos that was

25   traded on the Internet, stored, and categorized.  And the

1  court in that case, he was given 240 months, and that was

2  found to be substantially unreasonable of a sentence.

3         And almost last, Your Honor, U.S. v. McCabe, which

4  is 399 Federal Appendix at 520, which is the child

5  pornography case, they found that in this case five or six

6  men raped and had sex with a 14-year-old victim.  They not

7  only physically had sex with her, they videotaped it.  They

8  took a beer bottle and abused this young girl while she was

9  on the bed, and they filmed her naked.  And in this case the

10  person was given 240 months or 20 years.

11        And I can sit in front of this courtroom, in front

12  of Your Honor, and I can confidently say:  I can make a

13  massive distinction between a grown man who physically has

14  sexual relations, let alone in a gang-rape-type situation

15  with the victim, and a scared, abused, quite frankly, little

16  boy bully, who is sending text messages and disgusting

17  threats across the Internet.

18        One, they're both bad; but there are levels of bad.

19  And I would suggest to the Court that what Mr. Fierros did

20  and will be punished for is not the same, and that person was

21  given 240 months.

22        And lastly in United States v. Osorio, O-s-o-r-i-o,

23  481 Federal 548, in this case this was a person of trust.  It

24  was a stepfather who was setting up cameras inside of the

25  bathroom of a young stepdaughter of his, and she was

1    undressing.  And he got 235 months in a child pornography

2    case.

3         And, again, each case is different.  But when

4    Congress came up with these child pornography laws and these

5    minimum mandatory sentences, Your Honor, it was at a time

6    where child pornography was seen as something where children

7    were being abused and filmed and either uploaded to the

8    Internet or shared or used for personal gratification.  And

9    although I concede in my memo and as I stand here today, Mr.

10   Fierros did commit the elements of that crime.  If he didn't,

11   I would have tried the case.  And I'm not asking for the

12   Court not to understand that we're accepting responsibility,

13   but I am asking the Court to consider how technology has

14   affected what Congress' intent was.

15        And I think the very nature of the guidelines which

16   you started with today that were at 1,296 months and the

17   government's agreeing to a 60 percent downward variance and

18   I'm asking for even more, shows that the guideline

19   calculations are not in proportion to the actual crimes

20   committed in this particular case.  So if the argument is

21   that we, you know, are asking for too much of a variance,

22   it's starting from, frankly, an unreasonable place not

23   contemplated by Congress through texting and extorsion.

24        And respectfully with that, given Mr. Fierros' age,

25   his level of remorse, his allocution, his ability to change,

1    his ability to be amenable to treatment, and for all of the

2    other reasons, we ask that you not look at this young man

3    necessarily in his darkest hours, and look at a lifetime of

4    things that he went through.  Also take into consideration

5    what all the victims had to say today, and I agree they were

6    impactful and important.  But he has taken responsibility.

7    He has saved them any additional trauma that he could by

8    avoiding a trial.

9           And he, in fact, is asking the Court to be

10   sentenced today to 15 years in Florida -- excuse me, the

11   Federal Bureau of Prisons, followed by whatever the Court

12   sees fit in regards to supervised release, as well as

13   whatever the restitution figures turn out to be and fines.

14   That's something I'll leave entirely in the Court's

15   discretion and I will not make argument as to.

16           I would incorporate any arguments that I may have

17   missed in my memorandum of law, Your Honor.  I would ask that

18   the Court consider all of the character letters that I wasn't

19   able to go through and talk about but I know that you read,

20   Dr. Bloomfield's report and his testimony, and everything

21   that we've provided, and sentence him in kind with our

22   request.  Thank you very much, sir, for our opportunity

23   today.

24           THE COURT:  Thank you.

25           The Court has considered the statements of all

1   parties, the presentence report, which contains the advisory

2   guidelines, as well as each of the factors set forth in 18

3   United States Code, Section 3553(a).

4          The Court finds that the defendant is financially

5   unable to pay a fine or assessment under the AVAA Act per 18

6   United States Code, Section 2259(a).

7          However, per the plea agreement, Mr. Fierros has

8   agreed to pay a $5,000 JVTA assessment, per 18 United States

9   Code, Section 3014.  And, of course, restitution is mandatory

10   and shall be ordered.

11          So in looking at the statutory factors contained in

12   18 U.S.C., Section 3553(a), on the aggravating side, we've

13   got the nature of the crime; extreme infliction of mental

14   distress and lasting effects that will be carried by each

15   victim of this crime for life.  We've got over 80 females

16   having been contacted.

17          The Court finds that the crime was particularly

18   cruel.  I don't know whether the crime was committed for the

19   defendant's gratification or whether it was dominance.  All I

20   can say with certainty is that the crime was vile and

21   disgusting.  The acts of the defendant can never be removed

22   from each of these young victims' minds.  I think, as

23   Mr. Pannier -- and I know I'm pronouncing it not correctly --

24   so aptly stated, that these young girls were robbed of their

25   innocence.

1    You know, in many fraud cases we have sophisticated

2    means as an aggravating factor that adds points under the

3    Sentencing Guidelines and increases the advisory range of

4    incarceration.  I think we have sophisticated means in this

5    case; how Mr. Fierros manipulated these young girls.  He made

6    them feel shame and fear.  And, as Mr. Pannier said:  How can

7    they trust anybody?

8    And then on the mitigation side, we've got the age

9    of the defendant; who, I believe, according to the PSI,

10   turned 22 on June the 3rd.  He has no criminal history, he

11   was the victim of some abuse, he pled guilty early on in the

12   case, and these are matters that should aptly be considered

13   by the Court in determining an appropriate sentence.

14   Mr. Dreicer argued that in order to avoid

15   unwarranted sentencing disparities, that a lower sentence

16   should be imposed.  I happened to find a case that I handled

17   back in 2018.  The name of the case is United States of

18   America vs. Aris Gungormez, it's case number 18-60100-CR, and

19   the defendant was charged with similar crimes to those

20   charged.  Count 1 charged production of material involving

21   the sexual exploitation of minors.  And, I believe, Count 3

22   charged use of a computer to knowingly persuade, induce,

23   entice, and coerce an individual who had not attained the age

24   of 18 years old.  He had pled guilty to those counts, and the

25   defendant was also 22 years old.  He had no prior record, and

1    a similar fact pattern.

2              In that case on Count 1, the production of material

3    involving the sexual exploitation of minors, the Court

4    imposed a 30-year sentence.

5              On Count 3, the use of the computer to knowingly

6    persuade, induce, entice, and coerce an individual who had

7    not attained the age of 18 years to engage in sexual

8    activity, the Court imposed a 40-year sentence to be run

9    concurrently.  The defendant was indicted in that case in

10   April of 2018, and ultimately entered a guilty plea in July,

11   July 25th, and was subsequently sentenced in October of 2018.

12   So in looking at the unwarranted disparities in sentencing,

13   that does not help the defendant's cause.

14             But in every sentencing the court is required by

15   law, by statute, to impose a sentence that is sufficient but

16   not greater than necessary to accomplish the sentencing

17   objectives under 3553, which include a sentence that will

18   reflect the seriousness of the offense, a sentence that will

19   show respect for the law, a sentence that will provide just

20   punishment, a sentence that will afford adequate deterrence,

21   a sentence that will protect the public, and a sentence that

22   will provide medical care or correctional treatment if

23   needed.

24             So there is no bright line for a court to use in

25   weighing all of these factors.  The court gives different

1    weight to each of the factors in each sentencing, depending

2    on the nature and circumstances of the offense, the history

3    and characteristics of the defendant, and the need to avoid

4    unwarranted sentencing disparity.

5          In this instance, having considered all of these

6    factors, the Court finds that a sentence of 360 months

7    imprisonment provides sufficient punishment, adequate

8    deterrence, protects the public, shows respect for the law,

9    but that sentence is not greater than necessary to accomplish

10   the aforesaid objectives.

11         Accordingly, it is the judgment of this Court that

12   the defendant, Adrian Fierros, is hereby committed to the

13   custody of the Bureau of Prisons to be imprisoned for

14   360 months.

15         This sentence consists of 360 months as to each of

16   Counts 1 and 2, and --

17         MR. DREICER:  Your Honor?

18         THE COURT:  Yes.

19         MR. DREICER:  Excuse me.

20         THE COURT:  Sir, did you wish to be heard?

21         MR. DREICER:  Your Honor, this entire hearing I've

22   had no difficulty until right when you started ruling.

23         No, sir, I just can't hear you.

24         THE COURT:  Can you hear me now?  Can you hear me

25   now?  Hello?  Can you hear me now?  I don't know why you

```
 1    can't hear me.  I'm not on mute.
 2            Is there anyone else who cannot hear me?  Raise
 3    your hand.
 4            MR. PANNIER:  Your Honor, we can hear you just
 5    fine.
 6            MS. KOONTZ:  I can hear you.
 7            THE COURT:  Mr. Dreicer, you're the only one.  Mr.
 8    Barquinero, can you hear me?
 9            MR. BARQUINERO:  Yes, sir.  We can hear you just
10    fine, Your Honor.
11            THE COURT:  Okay.  We've got the two lawyers can't
12    hear me.  Now I lost video.
13            MR. PANNIER:  They're likely trying to reconnect,
14    Your Honor.
15            THE COURT:  All right.  Mr. Dreicer, can you hear
16    me?
17            MR. DREICER:  I can.  I switched over to my cell
18    phone, hoping that that may help.  Can you hear me?
19            THE COURT:  Yes, I can hear you just fine.
20            MR. DREICER:  I would never interrupt you.  I'm so
21    sorry.  The timing of that was terrible.
22            THE COURT:  Oh, no.  That's quite all right.
23            It is the judgment of this Court that the
24    defendant, Adrian Fierros, is hereby committed to the custody
25    of the Bureau of Prisons to be imprisoned for 360 months.
```

1    This sentence consists of 360 months as to each of Counts 1,

2    2, 3, and 4, and 24 months as to each of Counts 5 through 8.

3    All such terms to be run concurrently.

4                MS. CULBERSON:  Your Honor, I'm sorry to interrupt.

5    But the statutory maximum that can be imposed for Counts 3

6    and 4 can be only 240 months.

7                THE COURT:  Oh, I'm sorry.  Okay.  Thank you for

8    correcting me.

9                The sentence will be corrected as to Counts 3 and 4

10   to be 240 months.

11               So just to repeat, 360 months as to each of

12   Counts 1 and 2, 240 months as to each of Counts 3 and 4,

13   24 months as to each of Counts 5, 6, 7, and 8, all such terms

14   to be served concurrently.

15               It is further ordered that pursuant to 18 United

16   States Code, Section 3664(d)(5), the victims' losses are not

17   yet ascertainable.  Therefore, the Court shall set a date for

18   the final determination of the victims' losses, not to exceed

19   90 days after sentencing.  And we'll send you notice of that

20   date.  I don't have a CRD up here with me, so I can't do that

21   right now.

22               Upon release from imprisonment, the defendant shall

23   be placed on supervised release for a term of life.  This

24   term consists of life as to each of Counts 1 through 4, and

25   one year as to each of Counts 5 through 8, all such terms to

1   be run concurrently.

2          Within 72 hours of release, the defendant shall

3   report in person to the probation office in the district

4   where released.  While on supervised release, the defendant

5   shall comply with the mandatory and standard conditions of

6   supervised release, which include not committing any crimes,

7   being prohibited from possessing a firearm or other dangerous

8   device, not unlawfully possessing a controlled substance, and

9   cooperating in the collection of DNA.

10          The defendant shall also comply with the following

11   special conditions; data encryption restriction, computer

12   possession restriction, employer computer restriction

13   disclosure, mental health treatment, financial disclosure

14   requirement, no new debt restriction, permissible search, no

15   contact with minors, no contact with minors in employment, no

16   involvement in youth groups, sex offender treatment,

17   restricted from possession of sexual materials, Adam Walsh

18   Act search condition, sex offender registration, and unpaid

19   restitution, fines, or special assessments, all as noted in

20   Part F of the presentence report.

21          It is further ordered that the defendant shall pay

22   immediately to the United States a special assessment of $100

23   as to each of Counts 1 through 8, for a total of $800.  The

24   defendant shall also pay a $5,000 JVTA assessment.

25          So the total sentence is 360 months imprisonment,

1    life supervised release, $800 special assessment, $5,000 JVTA

2    assessment.

3            Now that sentence has been imposed, does the

4    defendant or his counsel object to the Court's finding of

5    fact or to the manner in which sentence was pronounced?

6            MR. DREICER:  No, Your Honor.

7            THE COURT:  Let me advise you, Mr. Fierros, you do

8    have the right to appeal the sentence imposed.  Any notice of

9    appeal must be filed within 14 days after entry of judgment.

10   If you're unable to pay for the cost of an appeal, you may

11   apply for leave to appeal in forma pauperis.

12           Now, with respect to execution of the sentence, the

13   Court is going to set a self-surrender date for Thursday,

14   September 10, 2020, at the facility designated by the Bureau

15   of Prisons no later than noon.

16           So, Mr. Fierros, you are to surrender to the

17   facility designated by the Bureau of Prisons no later than

18   noon on September 10, 2020.

19           MR. DREICER:  Your Honor, this is Jessie Dreicer on

20   behalf of Mr. Fierros.

21           THE COURT:  Yes.

22           MR. DREICER:  At this time would the Court consider

23   a recommendation that he be sentenced to Butner, given the

24   recommendation of Dr. Bloomfield's testimony?

25           THE COURT:  I would certainly be inclined to do

1    that, but let me hear from the government.

2              MS. KOONTZ:  Your Honor, that's fine.  I believe

3    the designation to Butner might be appropriate in this

4    situation.

5              THE COURT:  I definitely think it is appropriate;

6    but, as always, I want to give both parties a chance to be

7    heard.

8              The Court will recommend Butner, North Carolina, as

9    his designation.  Folks, anything further?

10             MS. KOONTZ:  Not from the government, Your Honor.

11             THE COURT:  All right.  Well, thank you very much.

12   The conditions of release shall remain in full force and

13   effect up until the time of surrender.  So, Mr. Fierros,

14   you're ordered to continue to comply with all of those

15   conditions of release.

16             All right.  That will conclude this hearing.  Thank

17   you.

18                   C E R T I F I C A T E

19       I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.

21

22   October 13, 2020                /s/ Vernita Allen-Williams

23

24

25